Richard Earl GEORGE
NAME

#H56048
PRISON NUMBER

Centinela State Prison P.O. Box 921
CURRENT ADDRESS OR PLACE OF CONFINEMENT

Imperial, CA. 92251
CITY, STATE, ZIP CODE

| | | |
|---|---|---|
| 2254 ✓ | 1983 | |
| **FILING FEE PAID** | | |
| Yes | No ✓ | |
| **IFP MOTION FILED** | | |
| Yes | No | |
| **COPIES SENT TO** | | |
| Court ✓ | Pro Se | |

**FILED**

NOV 19 2007

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

'07 CV 2215 J   LSP

Richard Earl GEORGE
(FULL NAME OF PETITIONER)
,

PETITIONER

v.

V. M. ALMAGER
,
(NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER [E.G., DIRECTOR OF THE
CALIFORNIA DEPARTMENT OF CORRECTIONS])

RESPONDENT

and

U.S. Southern District Court
,
The Attorney General of the State of
California, Additional Respondent.

Civil No. _____
(TO BE FILLED IN BY CLERK OF U.S. DISTRICT COURT)

PETITION FOR WRIT OF HABEAS CORPUS

UNDER 28 U.S.C. § 2254
BY A PERSON IN STATE CUSTODY

1. Name and location of the court that entered the judgment of conviction under attack: San Diego County Superior Court 220 W. Broadway San Diego, CA. 92101

2. Date of judgment of conviction: Nov. 22, 2005

3. Trial court case number of the judgment of conviction being challenged: SCD179831

4. Length of sentence: Life without/plus SEVEN YEAR'S

CIV 68 (Rev. Dec. 1998)

5. Sentence start date and projected release date: _Jan. 4, 2006 sentence without a release date_

6. Offense(s) for which you were convicted or pleaded guilty (all counts): _Penal Code' section 187, subdivision(a), 211 and 212.5 within the meaning of section 190.2 subdivision(a)(17), sec. 245, subdivision(a)(1), sec. 667.5 subdivision(B)_

7. What was your plea? (CHECK ONE)
   (a) Not guilty ☒
   (b) Guilty ☐
   (c) Nolo contendere ☐

8. If you pleaded not guilty, what kind of trial did you have? (CHECK ONE)
   (a) Jury ☒
   (b) Judge only ☐

9. Did you testify at the trial?
   ☐ Yes  ☒ No

## DIRECT APPEAL

10. Did you appeal from the judgment of conviction in the **California Court of Appeal**?
    ☒ Yes  ☐ No

11. If you appealed in the **California Court of Appeal**, answer the following:
    (a) Result: _Remittitur_
    (b) Date of result, case number and citation, if known: _May 25, 2007 case # SCD179831-D047826_
    (c) Grounds raised on direct appeal: _1). Admitting the Ledesma letter it amounted to prejudicial inadmissible prior acts evidence (sec. 352/1101 subd. (A); 2). admitting suggestive photographic lineup of Mr. George; 3). Admitting the DNA evidence; 4). The insufficient accomplice corroboration to support the verdicts; 5). Cumulative error warrants reversal of the convictions_

12. If you sought further direct review of the decision on appeal by the **California Supreme Court** (e.g., a Petition for Review), please answer the following:
    (a) Result: _The petition for review is denied_
    (b) Date of result, case number and citation, if known: _Aug. 22, 2007, No. D047826-S154087_
    (c) Grounds raised: _1). Admitting the Ledesma letter it amounted to prejudicial inadmissible prior act evidence (sec. 352/1101 subd. (A); 2) admitting suggestive photographic lineup of Mr. George; 3). Admitting the DNA evidence; 4). The insufficient accomplice corroboration to support the verdicts; 5). Cumulative error warrants reversal of the convictions._

13. If you filed a petition for certiorari in the <u>United States Supreme Court</u>, please answer the following with respect to that petition:

    (a) Result: _____

    (b) Date of result, case number and citation, if known: _____

                      _____

    (c) Grounds raised: _____

                 _____

                 _____

                 _____

## COLLATERAL REVIEW IN STATE COURT

14. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the <u>California Superior Court</u>?
    ☐ Yes ☒ No

15. If your answer to #14 was "Yes," give the following information:

    (a) <u>California Superior Court</u> Case Number: _____

    (b) Nature of proceeding: _____

                 _____

    (c) Grounds raised: _____

                 _____

                 _____

                 _____

    (d) Did you receive an evidentiary hearing on your petition, application or motion?
        ☐ Yes ☐ No

    (e) Result: _____

    (f) Date of result: _____

16. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the <u>California Court of Appeal</u>?
    ☐ Yes ☒ No

17. If your answer to #16 was "Yes," give the following information:

    (a) **California Court of Appeal** Case Number:_____

    (b) Nature of proceeding: _____

       _____

    (c) Grounds raised: _____

       _____

       _____

       _____

    (d) Did you receive an evidentiary hearing on your petition, application or motion?
       ☐ Yes  ☐ No

    (e) Result: _____

    (f) Date of result: _____

18. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Supreme Court**?
    ☐ Yes  ☒ No

19. If your answer to #18 was "Yes," give the following information:

    (a) **California Supreme Court** Case Number:_____

    (b) Nature of proceeding: _____

       _____

    (c) Grounds raised: _____

       _____

       _____

       _____

       _____

    (d) Did you receive an evidentiary hearing on your petition, application or motion?
       ☐ Yes  ☐ No

    (e) Result: _____

    (f) Date of result: _____

20. If you did *not* file a petition, application or motion (e.g., a Petition for Review or a Petition for Writ of Habeas Corpus) with the <u>California Supreme Court</u>, containing the grounds raised in this federal Petition, explain briefly why you did not:

I feel, that I'm more likely to relief in petitioning my argument in the District Court, based on Federal constitutional errors. that have been raise already with the court of appeals.

## COLLATERAL REVIEW IN FEDERAL COURT

21. Is this your **first** federal petition for writ of habeas corpus challenging this conviction?
☒ Yes ☐ No   (IF "YES" SKIP TO #22)
   (a) If no, in what federal court was the prior action filed? _____
      (i) What was the prior case number? _____
      (ii) Was the prior action (CHECK ONE):
         ☐ Denied on the merits?
         ☐ Dismissed for procedural reasons?
      (iii) Date of decision: _____
   (b) Were any of the issues in this current petition also raised in the prior federal petition?
      ☐ Yes ☐ No
   (c) If the prior case was denied on the merits, has the Ninth Circuit Court of Appeals given you permission to file this second or successive petition?
      ☐ Yes ☐ No

<u>CAUTION:</u>
- **Exhaustion of State Court Remedies:** In order to proceed in federal court you must ordinarily first exhaust your state court remedies as to each ground on which you request action by the federal court. This means that even if you have exhausted some grounds by raising them before the California Supreme Court, you must first present *all* other grounds to the California Supreme Court before raising them in your federal Petition.

- **Single Petition:** If you fail to set forth all grounds in this Petition challenging a specific judgment, you may be barred from presenting additional grounds challenging the same judgment at a later date.

- **Factual Specificity:** You must state facts, not conclusions, in support of your grounds. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do. A rule of thumb to follow is — state who did exactly what to violate your federal constitutional rights at what time or place.

## GROUNDS FOR RELIEF

22. State *concisely* every ground on which you claim that you are being held in violation of the constitution, law or treaties of the United States. Summarize *briefly* the facts supporting each ground. If necessary, you may attach pages stating additional grounds and/or facts supporting each ground.

(a) **GROUND ONE**: whether the admission of a letter by the accomplice wherein she claimed petitioner tried to kill her in the past amounted to prejudical inadmissible prior acts evidence in violation of Evidence Code sections 352 and 1101, Subd. (A) → (see Attach Sheet)

Supporting FACTS (state *briefly* without citing cases or law) The trial court ERRED in admitting a letter in which Ledesma wrote that Mr. George choked her in the past, for trial counsel offered a compromise of allowing Ledesma to testify Mr. George had tried to kill her in the past in order to support the prosecution's theory Ledesma was afraid of Mr. George and therefore lied to police when she initially claimed Mr. George was not involved. Therefore, there was no need to tell the jury Mr. George specifically choked Ledesma, for the victim died of strangulation, and this similar prior act evidence was cumulative, highly prejudical of limited probative value, and irrelevant to a material disputed fact at issue. Trial counsel for Mr. George argued that the jury would not be utilizing the information in the way the prosecution sought, but they were going to say to themselves, if he choked her, he choked Duray. The prosecution was not offering the evidence to prove some material element of the charged crimes. If an accused has not actually placed that ultimate fact in issue, evidence of uncharged offenses may not be admitted to prove it. Therefore, the "choking" evidence was merely cumulative (see Attached Sheet)

Did you raise <u>GROUND ONE</u> in the California Supreme Court?
☒ Yes ☐ No.

Con't.

(a) Ground One:

The prosecutor knowingly use perjured testimony from Ledesma to obtain a conviction. Napue v. Illinois, 360 U.S. 264 (1959).

Petitioner's conviction followed from the prosecutor's vouching for the credibility of Bertha Ledesma. U.S v. Young 470 U.S. 18 (1985).

The admission of irrelevant "other act's" evidence violates the defendant's due process right to a fair trial. (U.S. Const., 14th Amend., McKinney v. Rees (9th Cir. 1993) 993 F.2d 1378; Colley v. Sumner (9th Cir. 1988) 852 F.2d 424, 428-429.)

cont.

(A) GROUND ONE:   Supporting Facts

1. With respect to other evidence the prosecut-
2. or could offer to prove Ledesma feared
3. Mr. George, the choking evidence was not
4. material to the prosecution's case. The
5. jury was most likely use the choking of
6. Ledesma by Mr. George for improper
7. purposes to think Mr. George has a criminal
8. disposition for strangulation and thus
9. probably committed the present charged
10. offense. Further, no limiting instruction,
11. however thoughtfully phrased or often
12. repeated, could erase from the juror's
13. minds the picture of Mr. George choking
14. Ledesma, and then killing Duray in the
15. same fashion. The net effect to the jury
16. was to paint a sign on Mr. George which
17. said strangler. Ledesma admitted she was
18. upset with Mr. George when she wrote the
19. letter out. "And you can write bull crap down
20. on your notes for that." (RT 370) Trial counsel
21. for Mr. George argued the jury would
22. not be utilizing the information in the
23. way the prosecution sought, but they
24. were going to say to themselves, if he
25. choked her, he choked Duray, and that

page 2

con't.  (A) GROUND ONE:  Supporting Facts

1.  was the REASON the EVIDENCE was being
2.  offered. Although LEDESMA's fear of
3.  MR. GEORGE would be RELEVANT as to
4.  why she lied to police, HER ANSWER
5.  that he hurt her IN the past would be
6.  sufficient to CONVEY that message to
7.  the jury. Trial COUNSEL EVEN OFFERED a
8.  COMPROMISE: "Why she lied could just be
9.  as easily attested to by saying she was
10.  afraid of him, and EVEN that he tried to
11.  Kill her, without getting into what I'll call
12.  the choking issue". (RT 114.) Trial COUNSEL
13.  argued, the prejudicial EFFECT of the prior
14.  choking greatly outweighed the probative
15.  value. (RT 114-115.) The court ruled that
16.  incidents of violence between MR. GEORGE
17.  and LEDESMA were RELEVANT to show
18.  she was afraid of him and why she
19.  did not involve him with the police
20.  until later on in the case. (RT 116.) The
21.  probative value of the uncharged offense
22.  EVIDENCE must be substantial and must
23.  not be largely outweighed by the probability
24.  that its admission would create a serious
25.  danger of undue prejudice of confusing
26.  the issues or misleading the jury.

page 3

Con't. | **(A) GROUND ONE: Supporting Facts**

1. MR. GEORGE was accused of strangling
2. Duray to death. LEDESMA claimed
3. that MR. GEORGE on a past occasion
4. choked her. HERE, when the method of
5. carring out the alleged assault on
6. LEDESMA is the same as the method
7. alleged in the murder of Duray, the was a
8. high probability the jury was likely to believe
9. that if MR. GEORGE choked someone in the
10. past, he choked Duray, and therefore
11. convicted him not for what he allegedly
12. did but what he allegedly did in the past.
13. As such, the convictions should be REVERSED.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.

(b) **GROUND TWO**: Whether the trial court erred in admitting the suggestive photographic lineup of Petitioner. Mr. George was convicted on the basis of an identification (SEE Attached) sheet

Supporting FACTS (state *briefly* without citing cases or law): HERE, Mr. Killpack was shown a six-pack of pictures and the background color of Mr. George's picture was substantially different than the background color of the other five suspects. As observed by the trial court in viewing the line-up, Mr. George was surrounded by a "green" background whereas the other suspects had a blue/gray background. (Exhibit 38; CT-562) The court even admitted its "preference" would have been not to have the "green" background. This obvious distinction made Mr. George's photo standout, making the photographic line-up unduly suggestive identification, and as such, tainted the subsequent in-court identification. FURTHER, EXPERT DR. FRASER opined that if the background color of the suspect's photograph is different than the background of the other five photographs, it could influence the witness's choice. (RT 1125) If a defendant's identification as the perpetrator of a crime is derived from a pretrial identification that, under all of the circumstances of the case, was so unnecessarily suggestive as to be conducive to irreparable mistaken identification, admission of that identification or a derived in-court identification may constitute a denial of due process of law. Dr. FRASER testified factors which - (SEE Attached) - sheet

Did you raise <u>GROUND TWO</u> in the California Supreme Court?
☒ Yes ☐ No.

Con't.

(b) Ground Two:

that was unconstitutionally suggestive. Neil v. Biggers, 409 U.S. 188 (1972; Manson v. Brathwaite, 432 U.S. 53 (1957). If a defendant's identification as the accomplice of a crime is derived from pretrial identification, all of the circumstances of the case was so un- necessarily suggestive as to be conducive to mis- taken identification. A admission of that identificat- ion or a derived in-court identification may be a denial of due process of law. (Stovall v. Denno (1967) 388 U.S. 293 [87 S. Ct. 1967, 18 L. Ed. 2d 1199]; People v. Blair (1979) 25 Cal. 3d 640, 659; People v. Carlos (2006) 138 Cal. App. 4th 907, 912.)

Accordingly, Mr. George was denied his due pro- cess right to a fair trial. (U.S. Const. 14th Amend.; Manson v. Brathwaite (1977) 432 U.S. 98 [97 S. Ct. 2243; 53 L. Ed. 2d 140]; Simmons v. U.S. (1968) 390 U.S. 377, 384 [88 S. Ct. 967, 19 L. Ed. 2d 1247]; Thigpen v. Cory (6th Cir. 1986) 804 F. 2d 893, 895; People v. Gordon (1990) 50 Cal. 3d 1223, 1242.) The defendant bears the burden of showing unfairness as a demonstrable reality not just speculation. (People v. Perkins (1986) 184 Cal. App. 3d 583, 589.) "The question is whether anything caused Mr. George to "stand out" from the others in a way that would suggest the witness should select him." (People v. Cunningham (2001) 25 Cal. 4th 926, 990.)

Con't.    (b) GROUND TWO:    Supporting Facts

1. INFLUENCE the accuracy of EYE WITNESS MEMORY
2. WERE STRESS, the ingestion of alcohol, divided
3. attention, and CROSS-Racial identification. (RT 1117-
4. 1121.) All the factors WERE PRESENT HERE: Killpack's
5. was UNDER great STRESS and FEAR at the time
6. of the incident, FOR HE was struggling with
7. two assailants: LEDESMA inside the car fighting,
8. scratching and biting him, and the man out-
9. side the car Reaching in and choking him.
10. (RT 432-434.) With respect to divided attention,
11. Killpack was trying to KEEP the door closed with
12. ONE hand while at the same time struggling
13. with LEDESMA with the other hand. (RT 433-436,
14. 463.) Killpack's identification was impaired
15. by the fact HE had BEEN drinking for four
16. hours and hadn't EATEN anything FOR NINE
17. to ten hours. (RT 414-415, 468, 471, 615, 793-794.)
18. Killpack did not call the police right away
19. because HE had BEEN drinking. (RT 468, 615)
20. FURTHER, LEDESMA testified SHE KNEW Killpack
21. had BEEN drinking because she could smell
22. liquor on him (RT 793-794.) With respect to
23. CROSS-Racial identification, Killpack was
24. Caucasian and the Suspect was African-
25. AMERICAN (RT 460, 465.) ON January 5, 2005,
26. Killpack told police the man who attacked him

Con't.   (b) Ground Two:   Supporting Facts

1. wore a dark blue Members Only jacket
2. without the epplets, blue jeans and white
3. tennis shoes. (RT 605) Killpack described
4. the man as over six feet tall, 250 to 280 pounds
5. and stocky build. (RT 606.) He stated the male
6. attacker had really short hair, no facial
7. hair and very dark complected. (RT 613.)
8. However, Ledesma testified Mr. George was
9. wearing jeans, a "black" sweater with a hood on
10. it and zipper in front, and some "black" and
11. "white" tennis shoes. (RT 718.) The lineup photo-
12. graphic 6-pack shows Mr. George is not
13. very darkly complected, and actually has
14. a much "lighter" complexion than the other
15. five men in the line-up. (Exibit 38.) Further,
16. according to Mr. George's manager at
17. Amvets, Mr. George always had a "shaved
18. bald" head. (RT 629-635.) Therefore, Killpack's
19. description of Mr. George was not accurate.
20. Moreover, the time between the crime and
21. the confrontation was not short, with
22. nine to ten days having elapsed between
23. the crime and the photographic line-up.
24. (RT 597.) Mr. George sought an order supp-
25. ressing the admission of killpack's prior

con't.    (b) Ground Two:    Supporting Facts

1. photographic line-up identification and
2. any in-court identification of Mr. George,
3. and arguing that Mr. George's photo was
4. set out from the others and made more
5. prominent by virtue of its green background,
6. wherein the other suspect's pictures
7. had blue backgrounds, and therefore, the
8. photographic line-up was impermissibly
9. suggestive. (CT 111-119.) In denying the
10. request, the court stated: "I took a close
11. look at the photographic line-up when it
12. was first submitted to me, after review-
13. ing the moving papers and the response.
14. When I look at it, I do remember being
15. directed to it. I have to say, I read the
16. motion first, which probably was not the
17. smart thing to do." But I did notice the
18. green background." It is a "light" green. It's
19. sort of a haloing around the face, going
20. into a gray. Then there's that same effect
21. in the other pictures, but it's blue going into
22. that darker blue/gray type color on the
23. other pictures. The bottom line is when I
24. look at it, "my preference would have been
25. not to have the green background, greenish."
26. (RT 3-4.)

page 4

Con't.    (b) Ground Two:   Supporting Facts
1.   Further, Dr. Fraser testified that there are
2.   personal irrelevant cues, studies showed that
3.   those can influence the decision and choices
4.   of the individual. If the suspect's photograph
5.   was different in any significant way from
6.   the other five, the witness tended to look
7.   at it first because it was odd. Our visual
8.   system is structured to detect what is
9.   different. (RT 1124.) If the choices are similar,
10.  the witness tends to spend more cumulative
11.  time on that alternative. (RT 1124-1125.) If the
12.  background color of the suspect's photograph
13.  is different than the background of the other
14.  five photograph's, it could influence the
15.  witness's choice. (RT 1125.) Because the obvious
16.  difference in the background color of Mr.
17.  George's photograph, Killpack was sub-
18.  consciously influenced to identify that
19.  photograph as the suspect. As such, this
20.  identification procedure was unduly
21.  suggestive.
22.  Further, Killpack pointed out to the police
23.  areas on the driver's door he believed
24.  the attacker touched. (RT 465.) Approximately
25.  ten fingerprints were lifted off Killpack's car.

con't. (b) GROUND TWO: Supporting Facts

1. (RT 550.) The fingerprints were of sufficient
2. quality to make a comparison, but NONE
3. matched MR. GEORGE. (RT 552.)
4.
5.
6.
7.
8.
9.
10.
11.
12.
13.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.

(c) **GROUND THREE:** Whether the trial court erred in admitting the DNA evidence because the statistical calculation did not consider the scenario excluding petitioner (SEE Attached Sheet)

Supporting FACTS (state *briefly* without citing cases or law): HERE, the statistical calculation did not take into consideration the results showing MR. GEORGE could be excluded as a contributor to the DNA found in Duray's car. As such, to attach a statistical probability to the data HERE did not comport with the Kelly analysis. Criminalist Patrick O'Donnell testified the DNA samples contained such low levels of DNA that the allele at only one marker qualified for the San Diego's Police Department's DNA analysis. (AUG RT 8-10, 51-52.) MR. GEORGE possessed a 14 allele at that marker, and therefore considered a homozygote at 14 because he inherited a 14 from his mother and a 14 from his father. (AUG RT 52, 62-63.) However, in item 30 at marker D8 there were 13, 14, and 15 alleles, (AUG RT 56). It was clear that more than one person's DNA was detected, and depending on the combination, excluded MR. GEORGE. (AUG RT 31, 63-64.) Therefore, for the purpose of the statistical analysis, if it is assumed the donor was either a 13, 14 or 14, 15, there should not be given any statistic probability as to MR. GEORGE. If that were the case, it was impossible for MR. GEORGE to be a contributor. (AUG RT 88.) It was clear MR. GEORGE was a homozygote 14 allele at the D8 marker, in item 30 and 31 there — (SEE Attached Sheet)

Did you raise GROUND THREE in the California Supreme Court?

☒ Yes ☐ No.

con't.    (C) GROUND THREE

and therefore, the calculation did not follow correct
scientific procedures and was unreliable. The
statistical calculation phase of DNA analysis is
complicated and therefore requires Kelly/Frye
screening of evidence on statistical probabilites of
random matches at loci to assure that (1) the method-
ology used is generally accepted in the scientific
community, and (2) the calculations in the particular
case followed correct scientific procedures.
(People v. Venegas, supra, 18 Cal. 4th at pp. 83-84.)
Petitioner's conviction was obtained as the result
of evidence that is insufficient to persuade a
properly instructed, reasonable jury of his guilt
beyond a reasonable doubt. Jackson v. Virginia,
433 U.S. 307 (1979). In Kelly, the Calif. Supreme Court
adopted the test for the admissibility of scientific
evidence that was first articulated in Frye v. United
States (D.C. Cir. 1923) 293 Fed. 1013. The test had long
been known as the Kelly-Frye rule. In Daubert v.
Merrell Dow Pharmaceuticals, Inc. (1993) 509 U.S. 579
[113 S. Ct. 2786, 125 L. Ed. 2d 469], the United States
Supreme Court held that Frye was abrogated by
rule 702 of the Federal Rules of Evidence. However,
Kelly remains the law in California. (People v. Venegas
(1998) 18 Cal. 4th 47, 76.)

con't.    (C) GROUND THREE:    Supporting Facts

1. was a 14 allele at the D8 marker, and there also was a 13

2. and 15 allele. What was not clear was whether the

3. contributor of the sample was a homozygote 14. In fact

4. the testing results showed that it was more likely the

5. contributor was a "heterozygote" 13, 14, or 14, 15. (AUG

6. RT 63.) Under that scenario, MR. GEORGE was excluded

7. as a contributor. The prosecution's own expert admitted

8. this assumption was not conclusive, and the data suggest-

9. ed that the person was not a homozygote 14. Further, the

10. samples were from at least three different persons, and

11. possible four. Moreover, as O'Donnell explained, different

12. labs look at complex mixtures differently, statistically

13. analyze complex samples differently, you would get

14. differing statistical results, and some labs would not EVEN

15. EVEN want to put a statistical number on it because they

16. feel uncomfortable. (AUG RT 33-36.) In the article O'Donnell

17. was referred to, "Interpretation of Complex Forensic DNA

18. Mixtures," it states: "The process can be complicated by a

19. number of factors, including possible allele overlap

20. among an unknown number of contributors, 3-allele

21. patterns. Some laboratories in the U.S. have not proffered

22. a mixture statistic in sworn courtroom testimony. In

23. some cases the analyst might simply testify that the

24. evidentiary sample represents a DNA mixture and that

25. the suspect/victim can be either included or excluded

26. as a possible contributor." (AUG RT 32, Court's Exhibit 2,

27. Croat. Med. J. 2001; 42: 244-246.) Criminalist JANINE MILLER

page 2

con't,    (c) GROUND THREE:  Supporting Facts
1.  conducted DNA testing on the two samples
2.  retrieved from Duray's car. (RT 847, 866.) When
3.  Miller was attempting to extract DNA from the
4.  samples, the samples had DNA below the
5.  level that her laboratory's qualification
6.  level could pick up. (RT 893.) In other words,
7.  she knew she was dealing with a sample
8.  that had no DNA or a low level of DNA. (RT 894.)
9.  Moreover, there were no control swabs, i.e.,
10.  samples taken from a surrounding
11.  surface. (RT 899-901.) In one of the samples,
12.  designated item 31, Miller recieved low-
13.  level DNA types on four out of the nine
14.  markers. (RT 873.) Miller concluded that
15.  a low mixture of DNA from more than
16.  one person was present in item 31 and
17.  that Mr. George was included as a
18.  possible contributor to the mixture.
19.  (RT 873.) To determine who else in the
20.  human population might be included,
21.  Miller did a calculation on marker D8.
22.  (RT 874.) At that marker there was a 14 allele.
23.  (RT 877.) Miller conducted a statistical
24.  calculation on the frequency of finding
25.  that DNA type in the human population and

page 3

**Con't.**      **(C) GROUND THREE: Supporting Facts**

1. concluded one in nine African-American's
2. have the same DNA found in item 31.(RT 875.)
3. In other words, one in nine African-Amer-
4. ican's, or 11% of the African-American
5. population would be expected to have
6. the same allele found as the predomin-
7. ant allele at marker D8. (RT 875, 885.)
8. However, the 14 allele was relatively
9. common in the human population, and she
10. would expect more than a couple of people
11. in the courtroom to be consistent with the
12. DNA in item 31.(RT 929.) With respect to
13. the African-American population, the 14
14. allele was the most prevalent and present
15. in one-third of the African-American
16. population. (RT 934-935.) Miller could not
17. give any firm conclusionary statements
18. as to whether or not a female could be
19. included or excluded. (RT 906.) In the
20. article used to get the frequencies, the
21. table only showed the frequency of a 14 in
22. the population, which was not correlated
23. to the person being a "homozygote" 14. (RT 932-
24. 933.) In other words, it did not differentiate
25. whether the person was a "heterozygote" 14.
26. (RT 933.)

page 4

(C) GROUND THREE: Supporting Facts

con4.

1. Miller only did a calculation on marker D8
2. because the amount of DNA found at the other
3. locus was so low that it did not meet the
4. qualifications of the San Diego Police Crime
5. Lab for her to include them in the statist-
6. ical calculation. (RT 875-876.) She also testified
7. that at the D5 marker, there were four alleles.
8. (RT 906-907.) Again, that told her that there
9. was more than one individual. (RT 907.) The 9
10. allele was the most robust. However, if the
11. 9 allele came from a person with two 9 alleles,
12. it could not be Mr. George, for he had a 9 and
13. 13 allele at the D5 locus. She could not say
14. whether or not the 9 from a homozygote.
15. (RT 927.) There were other ways to interpret
16. the data. She did not know whether it came
17. from a male or female. (RT 928.) This was
18. true of all the markers on the sample.
19. (RT 928-929.) With respect to item 30, she
20. knew there were at least three people
21. contributing to item 30. There was no
22. way to say what the combination at
23. locus D8 was, whether it was a 13 and 14, a
24. 14 and 15 together, or a person with a 13, or 14,
25. or a 15. In sum, there were several ways to

page 5

con't. | (c) GROUND THREE:  Supporting Facts

1. INTERPRET that data WHEN you saw THREE diffER-
2. ENT MARKERS above the threshold. (RT 902.) She
3. just did NOT KNOW how they paired up. (RT 920.)
4. It could be two people, ONE with a 13, 14 allele
5. and ONE with a 14, 15 alleles. (RT 920.) If that
6. WERE the case, MR. GEORGE would be EXCLUD-
7. ED. (RT 902-922.) She had no way of KNOWing
8. whether the PERSON IN that mixture was a
9. SINGLE 14. She could NOT tell that MR. GEORGE
10. was absolutely a contributor of item 30.
11. She also KNEW that THERE WERE SEVERAL IN
12. the mixture that could NOT beyond all
13. doubt be MR. GEORGE. (RT 922.) FURTHER, at
14. the D5 MARKER THERE WERE FIVE alleles,
15. which meant THERE WERE at least three
16. people contributing to that sample.
17. (RT 907-908.) Miller also testified she did
18. NOT KNOW WHEN the samples WERE left IN
19. the car, and that it could have been left
20. beFORE the homicide. (RT 923.) She did
21. NOT KNOW WHETHER OR NOT the sample
22. was left 20 minutes OR FIVE days beFORE
23. the homicide. (RT 939-940.) With RESPECT
24. to item 30, at the D8 MARKER THERE WERE
25. alleles 13, 14, and 15. THEREFORE, the
26. FREQUENCY was a staggering ONE out of

page 6.

Con't | (c) GROUND THREE: Supporting Facts

1. EVERY two African-American's, Caucasian's,
2. and Hispanic's had the same DNA as
3. found in item 30. (RT 917.) In other words,
4. half of the population could have con-
5. tributed to the DNA found in DuRay's car.
6. If it were two people, one with a 13, 14
7. allele and one with a 14, 15 alleles, Mr.
8. GEORGE would be excluded. Miller had no
9. way of knowing whether the person in
10. that mixture was a homozygote 14, and
11. therefore, Miller could not conclude that
12. Mr. GEORGE was absolutely a contributor
13. of item 30, but did know beyond all doubt
14. that there were several people in the
15. mixture that could not be Mr. GEORGE. Comp-
16. aring these statistics with data from
17. the 2004 U.S. Census for San Diego County,
18. Mr. GEORGE and 18,392 other African-
19. American's in San Diego County have the
20. same DNA as found in item 31, and Mr.
21. GEORGE and 1,466,731 other people in
22. San Diego County have the same DNA found
23. in item 30. The statistical probability of Mr.
24. GEORGE being a contributor was so small
25. that it could not support a finding of
26. guilt beyond a reasonable doubt.

page # 7

Cont. (c) GROUND THREE: Supporting Facts

1. THEREFORE, the DNA EVIDENCE was VERY
2. WEAK, and did Not CORROBORATE LEdESMAS
3. testimony. BECAUSE THERE was Nothing
4. ELSE linking MR. GEORGE to the MURDER
5. of DURAY, LEdesma's testimony was Not
6. sufficiently CORRoborated by the DNA
7. EVIdENCE to support a CONVICTION FOR
8. MURdER and Robbery beyond a REASONABLE
9. doubt.
10. Accordingly, the CONVICTIONS should bE
11. REVERSEd.
12.
13.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.

(d) **GROUND FOUR**: There was Insufficient Accomplice Corroboration to support the Verdicts. The Corroborating Evidence must tend to implicate - (see Attached Sheet).

Supporting FACTS (state *briefly* without citing cases or law): The only Evidence incriminating Mr. George was the testimony of accomplice Ledesma, and there was insufficient corroboration of Evidence. Because it was clear Ledesma was directly involved in the crimes charged against Mr. George, the jury was instructed that Ledesma was an accomplice as a matter of law, and her testimony was required to be corroborated by other Evidence tending to connect Mr. George with the commission of the crimes. (CT525-528.) Accomplice testimony is suspect because, like hearsay, it too may be unreliable. The Evidence of an accomplice should be viewed with care, caution and suspicion because it comes from a tainted source and is often given in the hope of leniency or immunity. In addition to being derived from a suspect source accomplice testimony is frequently cloaked with a plausibility which may interfere with the jury's ability to evaluate its credibility. It must without aid from the accomplice testimony tend to connect the defendant with these crimes, and must do more than raise a conjecture or suspicion of guilt. The rationale for    - (see Attached) - Sheet

**Did you raise GROUND FOUR in the California Supreme Court?**

☒ Yes ☐ No.

Con't.

(d) Ground Four

the deffendant by relating to an act that is an element of the crime with aid from the accomplice testimony to connect the deffendant with the crime. (People v. McDermott (2002) 28 Cal. 4th 946, 985; People v. Rodrigues (1994) 8 Cal. 4th 1060, 1128.) Petitioner's conviction was based on less than proof beyond a reasonable doubt of each and every element of the charged crime. (In re Winship, 397 U.S. 358 (1970). Further, this conviction resulted from state court errors which, taken together, denied Petitioner a fair trial. Estelle v. McGuire, 502 U.S. 62 (1991).

page 1

con't.  (d) GROUND FOUR: Supporting Facts

1. REQUIRING CORROBORATION of an accomplice
2. is that the hope of immunity or CLEMENCY in
3. RETURN for testimony which would help to
4. convict MR. GEORGE makes the accomplice's
5. testimony suspect. Removing Ledesma's testimony
6. against MR. GEORGE, the prosecution's evidence to
7. corroborate the robbery and assault of Killpack
8. was Killpack's identification of MR. GEORGE,
9. and the RECEIPTS found in MR. GEORGE'S Mustang
10. showing Killpack's father's credit card had
11. been used. As set forth above, the identification
12. should have been excluded. It was unreliable,
13. and Ledesma admitted she used the credit
14. cards. She stated, "it came out of Killpack's car. It
15. was in a womens name." "He had a credit card with
16. a lady's name on it in his wallet. I used it (gas card)
17. once or twice and passed it on. (RT 390.) As such,
18. excluding Ledesma's testimony, the evidence
19. amounted to nothing more than a mere suspicion
20. MR. GEORGE might have been involved, and therefore,
21. did not corroborate Ledesma's claims. Located
22. in MR. GEORGE'S Mustang were two receipts for
23. gas stations. One receipt was in the name of
24. Killpack's father and was for the gas station
25. on 515 North Magnolia. (RT 610-611.) The other

page 2

con't:    (d) GROUND FOUR: Supporting Facts

1. Receipt matched one of the entries on a
2. listing of credit card activity for killpack's
3. fathers account it terms of the total amount of
4. gas pumped and the date. (RT 612.) However,
5. the evidence also showed Ledesma routinely
6. drove Mr. George's Mustang, dropping him off
7. at work and using his car for the day. Mr.
8. George's co-worker Juan Quiroz saw Mr.
9. George drive to work in a Mustang with a
10. female passenger in the car, and that
11. occured very often. (RT 1072-1074.) More import-
12. ant, one week after the murder, he saw
13. Mr. George being dropped of at work by a
14. female. (RT 1076.) Further, Ledesma testified
15. she would take Mr. George to work, drop
16. him off and use his car. (RT 767, 778.) She
17. admitted she used Mr. George's Mustang from
18. time to time. Before the incident she would
19. use his car. (RT 776.) While Mr. George was
20. at work at Amvets, Ledesma would be
21. out having dates during the day, and
22. would give people rides in the car.
23. (RT 769, 778.) Mr. George asked her to return
24. the car with as much gas as he had left
25. with her. (RT 778-779.) Ledesma admitted

page #3

Con't.  (d) Ground Four: Supporting Facts

1. to police that she used Killpack's gas credit
2. card a couple of times then passed it on.
3. (RT 779.) As such the credit card receipts
4. found in the Mustang could have been the ones
5. Ledesma used and left in the Mustang
6. when she drove it while Mr. George was
7. at work. Therefore, this evidence did not
8. corroborate Ledesma's claims. Moreover, it
9. must be pointed out that Ledesma's credibil-
10. ity was seriously called into question, for
11. she testified that everything she origina-
12. lly told the police were all lies. (RT 764, 774,
13. 782, 783, 788, 798.) According to Devlin Chambers
14. Ledesma was known as a habitual liar. (RT 991-992.)
15. She would lie in the context of regular conver-
16. sation. (RT 993.) For as long as he had known
17. her, Ledesma was a crack addict who smoked
18. the drug every day. (RT 999.) He also knew Mr.
19. George and knew that Ledesma and Mr. George
20. were boyfriend and girlfriend. (RT 991-992.)
21. Ledesma never indicated that Mr. George
22. was her pimp. (RT 992.) Christine Marshall
23. was a friend of Ledesma's for several years,
24. Ledesma introduced Mr. George as her boy-
25. friend, and never told Marshall that Mr. George

page 4

Con't.    (d) GROUND FOUR: Supporting Facts

1. was her pimp. (RT 1078-1079.) Ledesma's drug dealer
2. Samantha George, testified Ledesma was not
3. a truthful person. (RT 1084.) Ledesma admitted
4. she had gotten high on crack cocaine several
5. times the day and night of the crimes. (RT 700-
6. 701.) Duray, one of her regular customers,
7. came driving by. (RT 720-721.) Duray picked her
8. up, they parked, he gave her money and Ledesma
9. put a condom on him. (RT 721-722.) When she
10. bent over to put on the condom, she took
11. Duray's cell phone and put it in her pocket.
12. She had no reason to do it, she just had a
13. thing for cell phones. (RT 724.)
14. At 6:12 a.m., Duray's cell phone rang his
15. daughter Christie, when she answered it
16. she heard a rustling sound. She then heard
17. a man's voice state, were is your wallet,
18. were is your keys. (RT 490.) Ledesma had Duray's
19. cell in her pocket, and could hear someone
20. talking on it. She heard a women's voice
21. hollering for her Dad, asking what was
22. wrong. Ledesma took the phone out of her
23. pocket and turned it off. (RT 732.) Duray's
24. cell phone records showed that at 6:12 a.m.
25. a cell phone call was made to Christie's
26. phone. (RT 594.) Christie Duray hung up and

page 5

con't.

(d) Ground Four: Supporting Fact

1. had a really bad feeling, so she called her father's
2. cell phone, and his voice mail came on. (RT 491.)
3. Ledesma used Duray's cell phone to call Mr. George
4. several times, and also called her drug dealer.
5. (RT 739.) Mr. George's mother, Maudester George,
6. testified that between August 2003 and January
7. 2004, Mr. George lived with her off and on.
8. (RT 1004.) Mr. George's fourteen-year-old son
9. also lived with her. (RT 1004.) Maudester usually
10. awoke at 5:30 to 6:00 in the morning to pray.
11. When he did not spend the night there, Mr. George
12. would come to the house between 6:30 and 7:00
13. a.m. to pick up his son and take him to school.
14. (RT 1006-1007.) He would also come to the house
15. every Saturday morning between 6:00 and
16. 7:00 a.m. to check her car before she went
17. to church, and come to the house every
18. Sunday between 6:30 and 7:00 a.m. and do
19. yard work and other chores for her. (RT 1008-
20. 1010.) Ledesma was interviewed by police on
21. January 14, 2004, and told police she was per-
22. forming oral sex on Duray when a man named
23. Eddie Pree jumped in the car and robbed her,
24. and she ran away. (RT 785.) She had also smoked
25. crack and marijuana that day and was
26. high. (RT 751.) In addition, a brown soft leather

con4.  (d) Ground Four: Supporting Facts

1. Bill Blast wallet was recovered from Mr. George.
2. (RT 537-538.) Duray's son had meet with Duray
3. in early 2003, and Duray showed him a new
4. wallet he got. (RT 557.) It was a high quality
5. leather wallet. (RT 559.) Duray's son believed
6. the wallet recovered from Mr. George looked
7. similar to Duray's wallet but could "not"
8. be certain. He wasn't certain as to the color.
9. (RT 558.) Further, Ledesma claimed Jodi called
10. Mr. George on the morning of January 4, 2004
11. between 6:00 and 7:00 a.m. nothing on Mr. George
12. records indicate anyone using Jodi's phone
13. called Mr. George's number between 6:00
14. and 7:00 a.m. on January 4, 2004, and noth-
15. ing in Jodi's cell phone records showed Mr.
16. George's cell phone called Jodi during
17. the early morning of January 4, 2004. (RT 1044.)
18. Jodi Daly was a girlfriend of Mr. George.
19. (RT 1054.) Phone records showed that on
20. January 4, 2004, the first time Mr. George's
21. cell phone called Jodi was at 2:31 p.m.
22. (RT 1043-1044.)
23. In sum, Ledesm was a known liar and drug addict,
24. excluding her testimony, the evidence linking Mr.
25. George to the crimes was weak. As such, there
26. was insufficient corroboration, and therefore,

page 7

cont.

(d) Ground Four: Supporting Facts

1. Insufficient evidence to support the convictions.
2. Mr. George was convicted of first degree felony
3. murder, robbery, and assault, were in two separ-
4. ate incidents prostitute Bertha Ledesma attacked
5. and robbed two separate victims, one incident
6. resulting in one of the victims death. At trial,
7. Ledesma testified and implicated Mr. George
8. as the man who assisted her in the crimes.
9. Moreover, even including the evidence, it did not
10. support a verdict of guilt beyond a reasonable
11. doubt. Removing Ledesma's testimony, the jury
12. was left with the surviving victim's identificat-
13. ion of Mr. George, which was unreliable
14. because it occurred while Killpack was in a
15. state of high stress, fear, alcohol use, and
16. divided attention and cross-racial profiling.
17. Further, the DNA evidence was very weak,
18. with only a one out of two and a one out
19. of nine probability it was Mr. George's DNA,
20. and under the scenario actually excluded
21. Mr. George. Therefore, there was insufficient
22. evidence connecting Mr. George to these crimes
23. to corroborate Ledesma's testimony that he
24. assisted her in committing the crimes. This case
25. presents interesting and important issues for
26. review by this district court. This case should be

page 8

con't.   (d) Ground Four: Supporting Facts

1. REVIEW because it provides an opportunity for
2. District Court to decide important questions of
3. law with respect to the ERRONEOUS admission of
4. EVIDENCE, and whether there was sufficient
5. corroboration of the EVIDENCE that petitioner
6. assisted the accomplice in committing these
7. CRIMES.
8.
9.
10.
11.
12.
13.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.

(E) Ground Five

Cumulative Error Warrants Reversal of the Convictions.

All errors here added up to a trial in which Mr. George was deprived of the due process required by the Fifth and Fourteenth Amendments of the U.S. Constitution and Article I, section 15, of the California Constitution. (See, e.g., People v. Cuccia (2002) 97 Cal. App. 4th 785, 795; People v. Kronemyer (1987) 189 Cal. App. 3d 314, 349.) That is combined, even without individual prejudice, the errors "" created a negative synergistic effect, rendering the degree of overall unfairness to defendant more than that flowing from the sum of the individual errors,'" and deprived Mr. George of a fair trial. (People v. Hill (1998) 17 Cal. 4th 800, 844.) Accordingly, Mr. George was denied due process. (Donnelly v. De Christoforo (1974) 416 U.S. 637, 642-643 [94 S. Ct. 1868; 40 L. Ed. 2d 431] In People v. Zerillo (1950) 36 Cal. 2d 222, the California Supreme Court determined that the combined effect of a number of alleged errors, resulted in reversible error. (Id. at pp. 226-233.)

23. Do you have any petition or appeal **now pending** in any court, either state or federal, pertaining to the judgment under attack?
☐ Yes  ☒ No

24. If your answer to #23 is "Yes," give the following information:

   (a)  Name of Court: _____

   (b)  Case Number: _____

   (c)  Date action filed: _____

   (d)  Nature of proceeding: _____

   _____

   (e)  Grounds raised: _____

   _____

   _____

   _____

   _____

   (f)  Did you receive an evidentiary hearing on your petition, application or motion?
    ☐ Yes  ☐ No

25. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

   (a)  At preliminary hearing: _Public Defender (Conflict Counsel) Olivia Gilliam_

   (b)  At arraignment and plea: _Public Deffender (Conflict Counsel) Jacquline C. Crowle_

   (c)  At trial: _Sandra Resnick  270 E. Douglas ST. El Cajon Ca. 92020_

   (d)  At sentencing: _Sandra Resnick 270 E. Douglas ST. El Cajon, Ca. 92020_

   (e)  On appeal: _Joseph T. Tavano 4364 Bonita Rd. #121 Bonita, Ca. 91902_

   (f)  In any post-conviction proceeding: _____

   (g)  On appeal from any adverse ruling in a post-conviction proceeding: _____

26. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
☒ Yes  ☐ No

27. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
☐ Yes  ☒ No

   (a)  If so, give name and location of court that imposed sentence to be served in the future:

_____

   (b)  Give date and length of the future sentence: _____

_____

   (c)  Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
   ☐ Yes  ☐ No

28. Date you are mailing (or handing to a correctional officer) this Petition to this court: _____

_____

Wherefore, Petitioner prays that the Court grant Petitioner relief to which he may be entitled in this proceeding.

_____

SIGNATURE OF ATTORNEY (IF ANY)

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

_11/11/07_____        _Richard E. George_____

     (DATE)                               SIGNATURE OF PETITIONER

COURT OF APPEAL - STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE

San Diego County Superior Court - Main
P.O. Box 120128
San Diego, CA 92112

RE:     THE PEOPLE,
        Plaintiff and Respondent,
        v.
        RICHARD GEORGE, H56048
        Defendant and Appellant.
        **D047826**
        **San Diego County No. SCD179831**

# * * * REMITTITUR * * *

I, Stephen M. Kelly, Clerk of the Court of Appeal of the State of California, for the Fourth Appellate District, certify the attached is a true and correct copy of the original opinion or decision entered in the above-entitled case on May 25, 2007, and that this opinion or decision has now become final.

_____ Appellant _____ Respondent to recover costs.
_____ Each party to bear own costs.
_____ Costs are not awarded in this proceeding.

Witness my hand and the seal of the Court affixed this **AUG 2 7 2007**

STEPHEN M. KELLY, Clerk

By: _____
Deputy

cc: All Parties (Copy of remittitur only, Cal. Rules of Court,

Court of Appeal, Fourth Appellate District, Div. 1 - No. D047826
**S154087**

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

THE PEOPLE, Plaintiff and Respondent,

v.

RICHARD E. GEORGE, Defendant and Appellant.

The petition for review is denied.

SUPREME COURT
# FILED

AUG 2 2 2007

~~Frederick K. Ohlrich, Clerk~~

~~DEPUTY~~

**GEORGE**

Chief Justice

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**FILED**

NOV 19 2007

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                    DEPUTY

**I (a) PLAINTIFFS**

**DEFENDANTS**

Richard Earl George

FILING FEE PAID    Yes    No
IFP MOTION FILED    Yes    No
COPIES SENT TO
Court    ProSe

VM Almager

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Imperial
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Richard Earl George
PO Box 921
Imperial, CA 92251
H-56048

ATTORNEYS (IF KNOWN)

'07 CV 2215 J    LSP

**II. BASIS OF JURISDICTION** (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question
   (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN X IN ONE BOX
(For Diversity Cases Only)                FOR PLAINTIFF AND ONE BOX FOR DEFENDANT

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION** (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).

## 28 U.S.C. 2254

**V. NATURE OF SUIT** (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury- Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | **SOCIAL SECURITY** | |
| | | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities Exchange |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC |
| ☐ 160 Stockholders Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 790 Other Labor Litigation | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☒ 530 General | ☐ 791 Empl. Ret. Inc. | | |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ Security Act | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

**VI. ORIGIN** (PLACE AN X IN ONE BOX ONLY)

☒ 1 Original Proceeding    ☐ 2 Removal from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify)    ☐ 6 Multidistrict Litigation    ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23    DEMAND $    Check YES only if demanded in complaint:    JURY DEMAND: ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See Instructions):    JUDGE    Docket Number

DATE    11/19/2007    SIGNATURE OF ATTORNEY OF RECORD