1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | GARY W. SCHONS
Senior Assistant Attorney General
4 | LISE JACOBSON
Deputy Attorney General
5 | ROBIN DERMAN, State Bar No. 228485
Deputy Attorney General
6 |  110 West A Street, Suite 1100
San Diego, CA 92101
7 | P.O. Box 85266
San Diego, CA 92186-5266
8 | Telephone:  (619) 645-2230
Fax:  (619) 645-2271
9 | Email:  Robin.Derman@doj.ca.gov

10 | Attorneys for Respondent

11 |                    IN THE UNITED STATES DISTRICT COURT

12 |                 FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14 | **RICHARD EARL GEORGE,**                     07CV2215-J (LSP)

15 |                                 Petitioner,    **ANSWER TO PETITION FOR
WRIT OF HABEAS CORPUS**
16 |         v.                                      **AND MEMORANDUM OF
POINTS AND AUTHORITIES**
17 | **V. M. ALMAGER, WARDEN,**                      **IN SUPPORT THEREOF**

18 |                                 Respondent.   Judge:  The Honorable
                                               Leo S. Papas
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

                                                                        **Page**

PROCEDURAL BACKGROUND                                                      1

FACTUAL BACKGROUND                                                         1

    Assault And Robbery Of Killpack                    1

    Robbery And Murder Of Thomas Duray                 3

    Defense                                            5

    Rebuttal                                           6

STANDARD OF REVIEW                                                         6

ARGUMENT                                                                   8

I.    PETITIONER'S CLAIM THAT THE TRIAL COURT IMPROPERLY ADMITTED EVIDENCE OF A PRIOR BAD ACT FAILS TO PRESENT A FEDERAL QUESTION; BECAUSE THE CALIFORNIA COURT OF APPEAL REASONABLY REJECTS THIS CLAIM, AEDPA PRECLUDES RELIEF                 8

    A.   Background                     8

    B.   Petitioner's Claim Fails To Present A Federal Question          9

    C.   Petitioner's Claim Does Not Provide A Basis For Relief Under Aedpa Because There Is No Controlling United State's Supreme Court Authority          10

    D.   The California Court Of Appeal's Rejection Of Petitioner's Claim Was Reasonable; AEDPA Precludes Relief          11

    E.   Any Error Was Harmless          12

II.   PETITIONER'S DUE PROCESS RIGHTS WERE NOT VIOLATED BY THE TRIAL COURT'S ADMISSION OF A PHOTO-LINEUP THAT WAS NOT UNDULY SUGGESTIVE          12

    A.   Background          13

    B.   The California Court Of Appeal's Rejection Of Petitioner's Claim Was Reasonable; AEDPA Precludes Relief          13

    C.   Any Error Was Harmless          15

III.  PETITIONER'S CLAIM THAT THE TRIAL COURT IMPROPERLY ADMITTED DNA EVIDENCE AT HIS TRIAL FAILS TO PRESENT A FEDERAL QUESTION; BECAUSE THE CALIFORNIA COURT OF APPEAL REASONABLY REJECTS THIS CLAIM, AEDPA PRECLUDES RELIEF          16

i

## TABLE OF CONTENTS  (continued)

| | | Page |
|---|---|---|
| A. | Background | 16 |
| B. | Petitioner's Claim Fails To Present A Federal Question | 18 |
| C. | The California Court Of Appeal's Decision Was Reasonable; AEDPA Precludes Relief | 19 |
| D. | Any Error Was Harmless | 19 |
| IV. | PETITIONER'S CLAIM THAT INSUFFICIENT EVIDENCE CORROBORATED HIS ACCOMPLICE'S TESTIMONY FAILS TO PRESENT A FEDERAL QUESTION; BECAUSE THE CALIFORNIA COURT OF APPEAL REASONABLY REJECTS THIS CLAIM, AEDPA PRECLUDES RELIEF | 20 |
| A. | Petitioner's Claim Fails To Present A Federal Question | 20 |
| B. | The California Court Of Appeal's Rejection Of Petitioner's Claim Was Reasonable; AEDPA Precludes Relief | 21 |
| C. | Any Error Was Harmless | 23 |
| V. | BECAUSE PETITIONER FAILS TO RAISE ISSUES PRESENTING CONSTITUTIONAL ERRORS OR PREJUDICE, HIS CUMULATIVE ERROR CLAIM MUST BE REJECTED | 23 |
| CONCLUSION | | 25 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

07CV2215-J (LSP)

1

## TABLE OF AUTHORITIES

2                                                                      **Page**

3   **Cases**

4

5   *Brecht v. Abrahamson*
    507 U.S. 619
    113 S. Ct. 1710
6   123 L. Ed. 2d 353, 363                              12, 15, 19, 23

7   *Chapman v. California*
    386 U.S. 18
8   87 S. Ct. 824
    17 L. Ed. 2d 705 (1967)                                        12

9
    *Chrisafi v. Oliver*
10  396 F.2d 293 (9th Cir. 1968)                                    9

11  *Estelle v. McGuire*
    502 U.S. 62
12  112 S. Ct. 475
    116 L. Ed. 2d 380 (1991)                          9, 10, 18, 20, 24

13  *Fry v. Pliler*
14  127 S. Ct. 2321
    168 L. Ed. 2d 16, 17 (2007)                                    12

15
    *Garceau v. Woodford*
16  275 F.3d 769 (9th Cir. 2001)                                   10

17  *Houston v. Roe*
    177 F.3d 901 (9th Cir. 1999)                                   10
18
    *Jammal v. Van de Kamp*
19  926 F.2d 918  (9th Cir. 1991)                               10, 11

20  *Jeffries v. Blodgett*
    5 F.3d 1180 (9th Cir. 1993)                                     9
21
    *Killian v. Poolee*
22  282 F.3d 856 (9th Cir. 2002)                                   23

23  *Laboa v. Calderon*
    224 F.3d 972 (9th Cir. 2000)                                   20
24
    *Lambert v. Blodgett*
25  393 F.3d 943 (9th Cir. 2004)                                    7

26  *Lara v. Ryan*
    455 F.3d 1080 (9th Cir. 2006)                                   1

27

28

TABLE OF AUTHORITIES  (continued)

**Page**

*Lewis v. Jeffers*
497 U.S. 764
110 S. Ct. 3092
111 L. Ed. 2d 606 (1990) ........... 18, 24

*Lindh v. Murphy*
521 U.S. 320
117 S. Ct. 2059
138 L. Ed. 2d 481 (1997) ........... 6

*Lockyer v. Andrade*
538 U.S. 63
123 S. Ct. 1166 (2003) ........... 7

*Manson v. Brathwaite*
432 U.S. 113
97 S. Ct. 2243
53 L. Ed. 2d 140 (1977) ........... 14

*Neil v. Biggers*
409 U.S. 188
93 S.Ct. 375
34 L. Ed. 2d 401 (1972) ........... 13, 14

*People v. Holt*
28 Cal. App. 3d 343
104 Cal. Rptr. 572 (1972) ........... 14

*People v. Johnson*
3 Cal. 4th 1183
842 P.2d 1
14 Cal. Rptr. 2d 702 (1992) ........... 14

*People v. Kelly*
17 Cal. 3d 24
130 Cal. Rptr. 144
549 P.2d 1240 (1976) ........... 18

*Pulley v. Harris*
465 U.S. 37
104 S. Ct. 871
79 L. Ed. 2d 29 (1984) ........... 24

*Simmons v. United States*
390 U.S. 377
88 S. Ct. 967
19 L. Ed. 2d 401 (1972) ........... 13, 14

*Smith v. Roe*
232 F. Supp. 2d 1073 (C.D. Cal. 2002) ........... 10

07CV2215-J (LSP)

iv

TABLE OF AUTHORITIES  (continued)

| | Page |
|---|---|

*Taylor v. Maddox*
366 F.3d 992 (9th Cir.2004) — 7

*United States v. Augenblick*
393 U.S. 348
89 S.Ct. 528
21 L. Ed. 2d 537 (1969) — 20

United States v. Bagley
 772 F.2d 482 (9th Cir. 1985) — 13, 14

*United States v. Barrett*
703 F.2d 1076 (9th Cir. 1983) — 13

*United States v. Burdeau*
168 F.3d 352 (9th Cir. 1998) — 13

*United States v. Carbajal*
956 F.2d 924 (9th Cir. 1992) — 13

*United States v. Johnson*
820 F.2d 1065 (9th Cir. 1987) — 13, 14

*United States v. LeMay*
260 F.3d 1018 (9th Cir. 2001) — 10, 11

*United States v. Lopez,*
803 F.2d 969 (9th  Cir. 1986) — 20

*United States v. Montgomery*
150 F.3d 983  (9th Cir. 1998) — 13

*United States v. Necoechea*
986 F.2d 1273 (9th Cir. 1993) — 20

*United States v. Sambrano*
505 F.2d 284 (9th Cir. 1974) — 13

*Weaver v. Thompson*
197 F.3d 359 (9th Cir. 1999) — 6

*Williams v. Taylor*
529 U.S. 362
120 S. Ct. 1495
146 L. Ed. 2d 389 (2000) — 6, 7

*Windham v. Merkle*
163 F.3d 1092 (9th Cir. 1998) — 9, 18

07CV2215-J (LSP)

v

TABLE OF AUTHORITIES  (continued)

**Page**

*Woodford v. Garceau*
538 U.S. 202
123 S. Ct. 1398
155 L.Ed.2d 363 (2003)                                              10

*Ylst v. Nunnemaker*
501 U.S. 797
111 S. Ct. 2590
115 L. Ed. 2d 706 (1991)                                             7

**Statutes**

28 U.S.C.
    § 2254(d)                                              6, 12, 19, 23
    § 2254(d)(1)                                                       7
    § 2254(d)(2)                                                       7
    § 2254(e)(1)                                                    1, 7

Cal. Penal Code
        § 187(a)                                                       1
        § 211                                                          1
        § 190.2(a)                                                     1
        § 245 (a)(1)                                                   1
        § 667.5(b)                                                     1

California Evidence Code
        § 352                                                       8, 9
        § 1101(a)                                                   8, 9

**Other Authorities**

Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA)    6, 7, 12, 19

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GARY W. SCHONS
   Senior Assistant Attorney General
4  STEVE OETTING
   Supervising Deputy Attorney General
5  ROBIN DERMAN, State Bar No. 228485
   Deputy Attorney General
6   110 West A Street, Suite 1100
    San Diego, CA 92101
7   P.O. Box 85266
    San Diego, CA 92186-5266
8   Telephone: (619) 645-2230
    Fax: (619) 645-2271
9   Email: Robin.Derman@doj.ca.gov

10  Attorneys for Respondent

11             IN THE UNITED STATES DISTRICT COURT

12           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14  RICHARD EARL GEORGE,                    07CV2215-J (LSP)

15                            Petitioner,   ANSWER TO PETITION FOR
                                            WRIT OF HABEAS CORPUS
16     v.                                   AND MEMORANDUM OF
                                            POINTS AND AUTHORITIES
17  V. M. ALMAGER, WARDEN,                  IN SUPPORT THEREOF

18                            Respondent.   Judge:     The Honorable
                                                       Leo S. Papas
19

20          COMES NOW Respondent, by and through his counsel, Edmund G. Brown Jr., Attorney

21  General of the State of California, and Robin Derman, Deputy Attorney General, and files this

22  Answer to the Petition for Writ of Habeas Corpus ("Petition"):

23                                         I.

24          Petitioner Richard Earl George ("Petitioner") is in the lawful custody of the Warden of

25  the Centinela State Prison, Imperial, California.

26                                         II.

27          The Petition is timely under 28 U.S.C. § 2254(d).

28  ///

                                                         07CV2215-J (LSP)

                                            1

III.

The Petition is not a successive petition.

IV.

The highly deferential standard of federal habeas corpus review established by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d), applies to Petitioner's claims.

V.

Petitioner's first ground for relief — that the trial court's admission of evidence that he had choked his accomplice on a prior occasion was improper as the evidence was highly prejudicial and improperly allowed the jury to infer that he had the propensity to commit the charged crimes — fails to present a federal claim. Moreover, even assuming a proper federal issue, the California Court of Appeal properly rejected the claim in a decision that involved neither an unreasonable application of clearly established federal law as set forth by the United States Supreme Court nor an unreasonable determination of the facts in light of the evidence presented.

VI.

Petitioner's second ground for relief — that the trial court improperly admitted evidence of an unduly suggestive photo-lineup — was properly rejected by the California Court of Appeal in a decision that involved neither an unreasonable application of clearly established federal law as set forth by the United States Supreme Court nor an unreasonable determination of the facts in light of the evidence presented.

VII.

Petitioner's third ground for relief — that the trial court improperly admitted unreliable DNA evidence — fails to present a federal claim. Moreover, even assuming a proper federal issue, the California Court of Appeal properly rejected the claim in a decision that involved neither an unreasonable application of clearly established federal law as set forth by the United States Supreme Court nor an unreasonable determination of the facts in light of the evidence presented.

07CV2215-J (LSP)

VIII.

Petitioner's fourth ground for relief — that insufficient evidence corroborated his accomplice's testimony — fails to present a federal claim. Moreover, even assuming a proper federal issue, the California Court of Appeal properly rejected the claim in a decision that involved neither an unreasonable application of clearly established federal law as set forth by the United States Supreme Court nor an unreasonable determination of the facts in light of the evidence presented.

IX.

Petitioner's fifth ground for relief — that the cumulative effect of the errors at his trial deprived him of due process — was properly rejected by the California Court of Appeal in a decision that involved neither an unreasonable application of clearly established federal law as set forth by the United States Supreme Court nor an unreasonable determination of the facts in light of the evidence presented.

X.

The relevant facts and procedural history set forth in the accompanying Memorandum of Points and Authorities are incorporated by reference herein. Except as expressly admitted, Respondent denies each and every allegation of the Petition and specifically denies that Petitioner's confinement is in any way improper, that any condition of Petitioner's confinement is illegal, or that any of his rights has been or is being violated in any way.

WHEREFORE, for the reasons set forth more fully in the accompanying Memorandum of Points and Authorities, the Petition must be denied and the proceedings dismissed.

///
///
///

07CV2215-J (LSP)

3

1    Dated:  March 25, 2008

2                                    Respectfully submitted,

3                                    EDMUND G. BROWN JR.
                                     Attorney General of the State of California

4                                    DANE R. GILLETTE
                                     Chief Assistant Attorney General

5                                    GARY W. SCHONS
                                     Senior Assistant Attorney General

6
                                     STEVE OETTING
7                                    Supervising Deputy Attorney General

8

9                                    s/ROBIN DERMAN

10
                                     ROBIN DERMAN
11                                   Deputy Attorney General

                                     Attorneys for Respondent
12

13   70118528.wpd
     SD2007701188

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                                07CV2215-J (LSP)

# MEMORANDUM OF POINTS AND AUTHORITIES

## PROCEDURAL BACKGROUND

On November 22, 2005, a jury found Petitioner guilty of first degree murder committed during the course of a robbery (Cal. Penal Code §§ 187(a), 190.2(a)(17)), two counts of robbery (Cal. Penal Code § 211), and one count of assault by means of force likely to produce great bodily injury (Cal. Penal Code § 245 (a)(1)). (3 CT 722; 7 RT 1301-1302[1].) In a bifurcated court trial, the trial court found four prior prison term allegations to be true. (3 CT 723; 7 RT 1313; Cal. Penal Code § 667.5(b).) On January 4, 2006, the trial court sentenced Petitioner to serve life without parole plus seven years. (3 CT 731-732; 7 RT 1317-1318.)

Petitioner appealed the judgment on the same grounds he raises in the instant Petition. (Lodgment 5.) On May 25, 2007, the California Court of Appeal, Fourth Appellate District, Division One issued an unpublished opinion in which the court affirmed the judgment. (Lodgment 8.)

On July 2, 2007, in case number S154087, Petitioner filed a petition for review in the California Supreme Court. (Lodgment 9.) The California Supreme Court denied the petition on August 22, 2007. (Lodgment 10.)

## FACTUAL BACKGROUND[2]

### Assault And Robbery Of Killpack

George was Bertha Ledesma's boyfriend and pimp. She had been a prostitute since she was 15-years-old and was a crack addict. George drove Ledesma to locations where she worked as a prostitute and he parked nearby. After each "date," Ledesma would go to his car and give him the money she had earned. Ledesma was afraid of George, and at one point, she wrote a letter stating that

---

1. Respondent has referred to the Clerk's Transcript as CT and the Reporter's Transcript as RT throughout this Answer. These documents have been lodged with this Court respectively as Lodgments 1 and 2.

2. The facts of the crimes have been taken verbatim from the Court of Appeal's unpublished opinion. Under the AEDPA, a state court's factual determinations are presumed to be correct unless the petitioner has rebutted the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Lara v. Ryan*, 455 F.3d 1080, 1082 (9th Cir. 2006) (adopting California Court of Appeal's unchallenged summary of facts).

1    if she were found dead, to investigate George because he had tried to kill her by strangling her. From

2    August 2003 to January 2004, George and Ledesma stayed at motels, with George paying in cash.

3    George sold drugs and he was also a driver for Amvets in El Cajon.

4          On Saturday night, January 3, 2004, George drove Ledesma to one of her usual prostitution

5    locations by the Adult Emporium on Main Street in Chula Vista. At about 2:15 a.m., her third "date"

6    that night was Fred Killpack. Killpack had spent the evening at a cowboy western bar in Mission

7    Valley where he had two or three light beers. He was on his way home and he pulled off the freeway

8    in Chula Vista, intending to get something to eat. He changed his mind when he saw Ledesma

9    standing in front of the Adult Emporium, and he decided to "pick her up." She agreed to give him

10   oral sex for $20 and directed him to a street behind the Adult Emporium. Because Ledesma

11   complained about being warm, Killpack rolled down his window about four inches.

12         Once they were parked, Killpack paid Ledesma and reclined his seat as she undid his pants.

13   She put a condom on him and started to give him oral sex. Killpack became nervous when a vehicle

14   with its lights on pulled up behind them. Ledesma told him to relax, that there were a lot of cars that

15   came into the area, but he was uncomfortable and asked her to leave. Ledesma continued to try to

16   reassure him while he continued to ask her to leave. The vehicle left in less than a minute.

17         Shortly thereafter, Killpack saw George walking towards his car from the corner. Ledesma

18   refused to leave and Killpack thought he was being "set up." He started the car's engine and Ledesma

19   began punching, scratching and biting his face. The next thing Killpack noticed was George standing

20   at the driver's side window. George told Ledesma to throw the car keys out of the car, which she did.

21   George reached into the car and choked Killpack into unconsciousness. George took Killpack's

22   wallet, which Killpack had taken out during the struggle and offered to George. They left Killpack

23   unconscious in his car.

24         While George and Ledesma were driving away, George told Ledesma to take everything

25   of value out of the wallet. She removed a gas credit card and threw the wallet out the window. She

26   later gave the credit card to George.

27         Killpack regained consciousness about an hour or so later and noticed his wallet was

28   missing. He looked for his car keys, but did not find them. He used his cell phone to get a ride home

07CV2215-J (LSP)

2

from his ex-wife. He did not immediately report what had happened because he was embarrassed. But, on Monday, January 5, after learning about a murder occurring in the same general area, Killpack went to the police and provided a description of his assailants. He was shown a photographic line-up that did not include Ledesma's photograph but did include the photograph of another prostitute the police believed might be involved. He did not make a positive identification. Killpack took the police to the crime scene where he found his car keys in the dirt near a fence.

On January 13, the police showed him two photographic line-ups, one containing Ledesma's photograph, the other George's photograph. Killpack spent two to three minutes looking at Ledesma's line-up and tentatively identified her based on her acne and hair. In contrast, Killpack "instantaneously" identified George as the assailant, stating "that's the guy." He was 100 percent positive in his identification. Killpack also identified George at trial.

When George and Ledesma were arrested on January 14, George had receipts in his car for gas station purchases made with Killpack's credit card. One of the receipts was from a gas station near the Amvets store in El Cajon where George worked. Records for Killpack's credit card indicated the credit card had been used on the morning of January 4 at a gas station near the motel where Ledesma and George were staying. In addition, Ledesma testified she was with George on January 6 when she used Killpack's card to buy gas.

**Robbery And Murder Of Thomas Duray**

After robbing Killpack, George and Ledesma returned to the motel room. George told Ledesma to get ready to go back out and refused to let her go alone. Ledesma changed her clothes and they drove to an area on 32nd Street, in San Diego, arriving about 5:00 a.m. Ledesma went to the corner where she was picked up by one of her "regulars," Tom Duray; she had met with him twice before. They drove around the corner and he paid her $30. He reclined his seat and while she was putting a condom on him, she stole his cell phone and put it in her pocket. She began orally copulating him. Less than 10 minutes later, George reached into the car, tried to grab Duray's throat and told Ledesma to throw the car keys out the window. She threw the keys out the window. She bit Duray on the thigh. Duray pleaded with George not to kill him, telling him he had three children and offered to take him to his bank and give him money, but his pleas had no impact on George. At one

1  point Ledesma heard a female voice coming from Duray's cell phone, yelling for her father and

2  asking what was wrong. Ledesma turned off the phone.

3        Eventually, George got into the back seat of Duray's car and strangled Duray until he

4  stopped fighting. George took Duray's wallet from the glove compartment. He and Ledesma left the

5  scene and as they were driving away, George told Ledesma to take everything of value out of the

6  wallet. He asked her about the condition of the wallet, and she told him it looked brand new. He told

7  her he needed a new wallet, transferred the contents of his wallet to Duray's wallet and threw away

8  his old wallet.

9        Not long after they returned to the motel room, George received a phone call, spoke briefly

10  and hung up. Ledesma, suspecting the call was from one of George's girlfriends, grabbed the phone

11  and accidentally hit George in the head with the phone. He was upset and hit her in the jaw, breaking

12  it. Phone records showed a three minute call was made to George's cell phone at 6:43 a.m. on

13  January 4th.

14        When the police investigated the crime scene, they found the driver's seat fully reclined.

15  A gallon bucket of water in the back seat had been knocked over and Duray's body had been dragged

16  between the front seat and the console and halfway into the right rear passenger seat. There were

17  signs of a struggle, including pieces of the ignition on the floorboard, damage to the underside of

18  the steering wheel, the presence of Duray's shoe outside the vehicle, and bruises on his left shin and

19  foot.

20        Duray died due to manual strangulation. His hyoid bone was broken, an injury that usually

21  does not occur except in traffic accidents or manual strangulation. There was evidence that he had

22  struggled; typically a person takes about 15 minutes to die from strangulation. Even if Duray had

23  only been strangled into unconsciousness and then the strangulation had stopped, he still could have

24  died due to a fractured bone and deep neck hemorrhaging, "injuries that you can't fix quickly." The

25  medical examiner testified Duray's injuries were consistent with Ledesma's testimony of what had

26  occurred.

27        From Duray's car, the police recovered a used condom and collected samples from

28  smudges on the right rear window for DNA analysis. An expert testified the outside of the condom

07CV2215-J (LSP)

4

1   contained a mixture of DNA and the statistical analysis indicated an extremely high statistical

2   probability the DNA belonged to Duray and Ledesma.

3          The samples from the rear window of Duray's car contained lower levels of DNA, with

4   only some DNA markers having sufficient quantity for typing. The expert testified that in one of the

5   samples, a DNA marker with sufficient quantity for typing indicated it was a mixture of DNA from

6   at least two people. Duray and Ledesma were excluded as contributors of the DNA. Killpack and

7   George were included as contributors. The expert testified the statistical analysis indicated one out

8   of two African-Americans, Caucasians and Hispanics had the same DNA marker as found in the

9   sample. As to the other sample from the rear window of Duray's car, there was also a mixture of

10  DNA from at least two persons. Duray and Ledesma were excluded as contributors of the DNA.

11  Killpack could not be excluded or included as a contributor. George could have been a contributor.

12  The statistical analysis indicated that one out of nine African-Americans could have been a

13  contributor. George is African-American. In other words, 11 percent of African-Americans could

14  have contributed to the DNA sample.

15         Duray's son testified Duray had recently purchased a new wallet, which looked similar to

16  the wallet recovered from George.

17         Duray's daughter testified that on January 4, 2004, at about 6:12 a.m., her phone rang.

18  When she answered the phone, she heard only a rustling sound. She said, "Hello, hello?" She then

19  clearly heard a "very deep, very strong" man's voice say, "Where's your wallet? Where's your keys?"

20  She thought "something was going down." She heard more rustling sounds and then hung up the

21  phone. Because "something didn't seem right," she wrote down the time of the phone call and then

22  called her father because she was worried. His cell phone was turned off and she left a message.

23  **Defense**

24         George presented evidence that Ledesma was a habitual drug user and liar and was high

25  on the day of the crimes. She had not told her friends that George was her pimp, rather, she told them

26  he was her boyfriend.

27         George's mother testified that between August 2003 and January 14, 2004, George lived

28  off and on in her house. She remembered he came by her house on Saturday, January 3 to check her

1    car, as he did every Saturday morning. She also specifically remembered him coming to her house

2    about 6:00 a.m. on January 4 because she had to make a phone call at 6:00 a.m. to La Jolla about a

3    bread pick-up, and while she was on the phone, George entered the house.

4         An expert on eyewitness identification testified factors that reduce the rates of correct

5    identification include high levels of stress when a person is frightened, alcohol use, divided attention,

6    and cross-racial identification. The expert testified that when a photo line-up contains "personal

7    irrelevant cues" such as jewelry or clothing or is in some way significantly different from the other

8    photographs, a witness may focus more on that photograph and be influenced in their selection. A

9    victim's or witness's certainty of their identification is not necessarily a reliable predictor of whether

10   an identification is correct. During cross-examination, the expert stated one of the best predictors of

11   whether an identification is accurate is "scan duration." When an individual "pops out immediately"

12   with an identification, "[t]hat tends to have the highest rate of accuracy."

13   **Rebuttal**

14        A police detective testified that he interviewed George's mother on January 20, 2004. She

15   told him she had no idea where George was on the weekend of the robbery and murder and that he

16   had been gone the entire weekend.

17   **STANDARD OF REVIEW**

18        Petitioner filed the Petition after the effective date of, and thus is subject to, the

19   Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). *See Lindh v. Murphy*, 521 U.S.

20   320, 326, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997); *Weaver v. Thompson*, 197 F.3d 359, 362 (9th

21   Cir. 1999). In cases subject to the AEDPA, a petitioner may not receive relief with respect to any

22   claim that was adjudicated on the merits in state court proceedings unless the adjudication of the

23   claim was either "contrary to, or involved an unreasonable application of, clearly established Federal

24   law, as determined by the Supreme Court of the United States" or was based on "an unreasonable

25   determination" of the state court evidence. 28 U.S.C. § 2254(d).

26        The "contrary to" and "unreasonable application" clauses contained in 28 U.S.C. § 2254(d)

27   have distinct meanings. *Williams v. Taylor*, 529 U.S. 362, 404, 120 S. Ct. 1495, 146 L. Ed. 2d 389

28   (2000). A decision is "contrary to" United States Supreme Court authority if it fails to apply the

1    correct controlling authority, or if it applies the controlling authority to a case involving facts

2    materially indistinguishable from those in a controlling case, but reaches a different result. *Williams*

3    *v. Taylor*, 529 U.S. at 413-14. A decision is an "unreasonable application" of clearly established

4    federal law if the state court identifies the correct governing legal principle but unreasonably applies

5    that principle to the facts of that case. *Id.* at 413. The "unreasonable application" clause requires

6    the state court decision to be more than incorrect or erroneous; in order for a federal court to grant

7    a habeas writ, the state court decision must be objectively unreasonable. *Lockyer v. Andrade*, 538

8    U.S. 63, 75, 123 S. Ct. 1166 (2003) (citing *Williams v. Taylor*, 529 U.S. at 409-410, 412).

9           When a state court does not find a constitutional violation, a federal court may still grant

10    relief if the state court's decision "was based on an unreasonable determination of the facts in light

11    of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Under the

12    AEDPA, a state court's factual findings are entitled to a presumption of correctness. Therefore, a

13    petitioner must prove the state court's factual findings erroneous by clear and convincing evidence.

14    28 U.S.C. § 2254(e)(1); *see also Taylor v. Maddox,* 366 F.3d 992, 999 (9th Cir. 2004). Mixed

15    questions of fact and law are reviewed under the "contrary to" and "unreasonable application"

16    clauses in 28 U.S.C. § 2254(d)(1). *Lambert v. Blodgett*, 393 F.3d 943, 976 (9th Cir. 2004). A state

17    court's factual findings underlying its conclusion on mixed issues are accorded a presumption of

18    correctness. *Id.*

19           Ordinarily, when a state's highest court fails to issue a reasoned decision addressing a

20    petitioner's claim, the federal habeas court may look to the last reasoned state-court decision to

21    determine whether the state court's determination of the merits of a claim was contrary to, or

22    involved an objectively unreasonable application of, clearly-established federal law as set forth by

23    the United States Supreme Court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 115

24    L. Ed. 2d 706 (1991).

25    ///

26    ///

27    ///

28

07CV2215-J (LSP)

7

**ARGUMENT**

**I.**

**PETITIONER'S CLAIM THAT THE TRIAL COURT IMPROPERLY ADMITTED EVIDENCE OF A PRIOR BAD ACT FAILS TO PRESENT A FEDERAL QUESTION; BECAUSE THE CALIFORNIA COURT OF APPEAL REASONABLY REJECTS THIS CLAIM, AEDPA PRECLUDES RELIEF**

Petitioner contends the trial court erred by admitting a letter in which Petitioner's accomplice wrote that he choked her and attempted to kill her.    While the crux of Petitioner's argument is that the admission of this evidence was highly prejudicial as it amounted to inadmissible propensity evidence under the California Evidence Code, he cursorily states that the admission of the letter violated his rights to due process and a fair trial (Petition at 7).  (Petition at 6-10.)  As Petitioner's challenge is a challenge to a state evidentiary ruling and as he has failed to demonstrate that the alleged error was so prejudicial that it violated his right to a fair trial, his claim does not present a federal question.  Even if construed as a federal question, Petitioner cannot demonstrate that the California Court of Appeal's determination of the matter was unreasonable.  Finally, any error in admitting the evidence was harmless.

**A.    Background**

In investigating Petitioner's crimes, police officers contacted Ledesma at her house on January 8, 2004, conducted a probation search, and found a letter in her belongings.  The letter was dated December 16, 2003, and stated:

I, Bertha Ledesma, I am writing this letter for if something was to happen to me, like if I was to come up dead, it was done by Mr. Richard Earl George.  He tried to kill me once already on the 12th of December of '03, putting his hands around my neck, stop me from getting air.

So, if I die, go to him Richard Earl George.

(4 RT 746.)

Before trial, Petitioner moved to exclude Ledesma's letter and any mention that Petitioner had choked her in the past on the grounds that it was inadmissible under California Evidence Code § 1101(a), and substantially more prejudicial than probative under California Evidence Code § 352.

1   (1 RT 107, 113-116; 1 CT 185-196.) If the court was going to allow the evidence, then Petitioner

2   suggested the court only allow Ledesma to testify that Petitioner had tried to kill her and prohibit any

3   reference to choking. (1 RT 114.)

4          The court denied Petitioner's motion and in doing so explained that the letter and

5   Ledesma's testimony regarding the prior choking incident were relevant to show Petitioner's

6   knowledge of the consequences of choking. Also, the court ruled the evidence was "very probative"

7   as to why Ledesma initially lied to the police.

8   **B.    Petitioner's Claim Fails To Present A Federal Question**

9          Federal habeas corpus does not ordinarily lie to review questions about the admissibility

10  of evidence. *Estelle v. McGuire*, 502 U.S. 62, 112 S. Ct. 475, 116 L. Ed. 2d 380 (1991). Federal

11  courts may not interfere with a state evidentiary ruling, but only consider whether the evidence was

12  so prejudicial that its admission violated fundamental due process and the right to a fair trial.

13  *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998); *Jeffries v. Blodgett*, 5 F.3d 1180, 1192

14  (9th Cir. 1993); *Chrisafi v. Oliver*, 396 F.2d 293 (9th Cir. 1968).

15         Petitioner's claim — that the admission of the letter constituted impermissible propensity

16  evidence and was substantially more prejudicial than probative — fails to present a federal question.

17  Petitioner relies on California Evidence Code sections 352 and 1101(a) in making his claim (Petition

18  at 6), arguing that the evidence had little probative value to the prosecution's case, but its admission

19  was highly prejudicial as there was a substantial likelihood that the jury would infer from the

20  evidence that if he choked Ledesma in the past, then he choked Duray in the present case. (Petition

21  6, 8-10.) Notably, in rendering its decision, the Court of Appeal applied an Evidence Code section

22  352 analysis and found that the letter was probative as to Ledesma's fear of Petitioner and explained

23  why she initially lied to the police. The court further found that the evidence was not unduly

24  prejudicial, especially when compared to evidence of the charged crimes. (Lodgment 8 at 9-12.)

25  As such, this claim is based entirely on an interpretation of state law, and thus is not cognizable in

26  a habeas proceeding.

27  ///

28  ///

1    **C.    Petitioner's Claim Does Not Provide A Basis For Relief Under Aedpa Because There Is No Controlling United State's Supreme Court Authority**

2

3         The United States Supreme Court has never held that it violates due process to admit other

4    crimes evidence.  In fact, in *Estelle v. McGuire, supra*, 502 U.S. 62, the Supreme Court expressly

5    reserved the issue, stating "we express no opinion on whether a state law would violate the Due

6    Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a

7    charged crime." *Id.* at 75 n. 5; *see Garceau v. Woodford*, 275 F.3d 769, 774 (9th Cir. 2001), reversed

8    on other grounds in *Woodford v. Garceau*, 538 U.S. 202, 123 S. Ct. 1398, 155 L.Ed.2d 363 (2003)

9    ("the Supreme Court has never expressly held that it violates due process to admit other crimes

10   evidence for the purpose of showing conduct in conformity therewith, or that it violates due process

11   to admit other crimes evidence for other purposes without an instruction limiting the jury's

12   consideration of the evidence to such purposes"). In *Smith v. Roe*, 232 F. Supp. 2d 1073, 1085-1088

13   (C.D. Cal. 2002), the District Court for the Central District of California recognized that claims

14   regarding other crimes evidence are not cognizable under the AEDPA. *Id.* at 1087-1088 ("Since

15   [petitioner] cannot point to any Supreme Court holding governing this claim, Petitioner cannot

16   satisfy AEDPA's requirement that the state supreme court's denial of this claim be either contrary

17   to, or an unreasonable application of, a Supreme Court holding"). Similarly, in *Houston v. Roe,* 177

18   F.3d 901, 910 n. 5 (9th Cir. 1999), the Ninth Circuit noted it does not address allegations in a federal

19   habeas petition that the admission of prior bad acts violated state law.

20        Additionally, Petitioner makes a cursory reference that the admission of the letter violated

21   his right to due process. (Petition at 7.) To demonstrate a violation of due process, Petitioner must

22   show that the trial court committed an error in admitting the evidence that rendered the trial

23   fundamentally unfair. *Estelle v. McGuire*, 502 U.S. at 67.  Only where no permissible inferences can

24   be drawn from admitted evidence will due process be violated. *Jammal v. Van de Kamp,* 926 F.2d

25   918, 920 (9th Cir. 1991).  Evidence of prior similar acts "will only sometimes violate the

26   constitutional right to a fair trial, if it is of no relevance, or if its potential for prejudice far outweighs

27   what little relevance it might have." *United States v. LeMay*, 260 F.3d 1018, 1027 (9th Cir. 2001).

28   ///

07CV2215-J (LSP)

Here, the admission of the letter did not render Petitioner's trial fundamentally unfair as its probative value, explaining Ledesma's motive to lie to the police out of fear of what Petitioner would do to her, outweighed any prejudicial effect. Petitioner devoted a significant portion of his defense to attacking Ledesma's credibility. The defense pointed out that Ledesma had three interviews with the police, and during two of them she stated Petitioner was not involved. (5 RT 764, 774, 797-798.) The prosecution had to explain to the jury why Ledesma initially lied to the police, and convince the jury that she was telling the truth at trial. Ledesma's fear of Petitioner provided that explanation, and the fact that he had previously choked her corroborated that fear. Ledesma's letter was very probative of the fact that she feared Petitioner. The fact that it was written before the crimes occurred and was seized by law enforcement before any arrests had been made caused the letter to be especially probative. (4 RT 745-746.) Thus, the letter was relevant to Ledesma's motive to lie initially, but tell the truth at trial. Because this was a permissible inference the jury could draw from this evidence, *Jammal*, 926 F.2d at 920, the admission of this evidence did not render petitioner's trial fundamentally unfair.

**D. The California Court Of Appeal's Rejection Of Petitioner's Claim Was Reasonable; AEDPA Precludes Relief**

Even if construed as a federal claim, it does not provide a basis for federal habeas relief. As noted, only where there are no permissible inferences that may be drawn from the evidence, *Jammal v. Van de Kamp,* 926 F.2d at 920, the evidence has no relevance, or the prejudicial effect of the evidence far outweighs its probative value, *United States v. LeMay*, 260 F.3d at 1027, can there be a due process violation. Here, as the Court of Appeal observed:

> Since [Petitioner] did not testify, attacking Ledesma's credibility was key to his defense and, among other things, he pointed out that initially Ledesma had not told the police about [Petitioner's] involvement. The fact Ledesma's letter was written before the crimes occurred, and was recovered during a search of her belongings before she was arrested, made it especially probative of her fear of [Petitioner] and to explain why she lied to the police prior to [Petitioner's] incarceration. Evidence of Ledesma's mental state, that is,

///

1    her fear of [Petitioner], was a distinct purpose from showing [Petitioner] had propensity

2        to commit the charged crimes.

3  (Lodgment 8 at 11.) The Court of Appeal's reasoning is sound, and Petitioner has failed to show that

4  this decision was based on an unreasonable determination in light of the evidence presented at trial.

5  As such, AEDPA precludes relief. 22 U.S.C. § 2254 (d).

6      **E.    Any Error Was Harmless**

7          Even if the trial court's admission of the evidence was erroneous, any error was harmless

8  under *Brecht v. Abrahamson*, 507 U.S. 619,  623, 113 S. Ct. 1710, 1714, 123 L. Ed. 2d 353, 363.

9  *See Fry v. Pliler*  127 S. Ct. 2321, 2328, 168 L. Ed. 2d 16, 17 (2007) (in all federal habeas

10  proceedings, a court must apply the "substantial and injurious effect" analysis set forth in *Brecht*

11  regardless of whether the state appellate court applied the harmless error standard set forth in

12  *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).  There was nothing

13  more inflammatory about the letter or Ledesma's testimony than the violent and graphic evidence

14  presented regarding Killpack's robbery and Duray's murder.  There is no likelihood that the jury

15  disbelieved the evidence concerning the charged offenses but convicted Petitioner based on the

16  strength of the evidence of the prior choking incident with Ledesma.  Because of the overwhelming

17  evidence of Petitioner's guilt, the admission of this evidence did not have a substantial and injurious

18  influence on the jury's verdict.

19                                  **II.**

20  **PETITIONER'S DUE PROCESS RIGHTS WERE NOT VIOLATED BY
    THE TRIAL COURT'S ADMISSION OF A PHOTO-LINEUP THAT**
21  **WAS NOT UNDULY SUGGESTIVE**

22          Petitioner contends that his due process rights were violated by the trial court's admission

23  of an unduly suggestive photo-lineup.   (Petition at 11-17.)  Contrary to Petitioner's assertion, the

24  photo-lineup was not so suggestive that it in anyway increased the likelihood that the victim

25  misidentified him. Because Petitioner has failed to show that the Court of Appeal's rejection of this

26  claim was an unreasonable application of United States Supreme Court precedent or an unreasonable

27  determination of the facts, his claim must be rejected.

28  ///

07CV2215-J (LSP)

A.   **Background**

Before trial, Petitioner moved to exclude the photo lineup from which Killpack identified Petitioner. (1 RT 1-2.) The basis of Petitioner's contention was that the background of his photo was green whereas the other pictures were blue. (1 RT 3; 1 CT 113-121.) The trial court viewed the photo lineup and stated that while it would have preferred not to have the green background, there was nothing about the lineup that rose to a "constitutional infirmity." The trial court denied Petitioner's motion. (1 RT 3-4.)

B.   **The California Court Of Appeal's Rejection Of Petitioner's Claim Was Reasonable; AEDPA Precludes Relief**

"[C]onvictions based on eyewitness identification at trial following a pretrial identification . . . will be set aside . . . only if the [pretrial] identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *United States v. Montgomery*, 150 F.3d 983, 992 (9th Cir. 1998), quoting, *Simmons v. United States,* 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 401 (1972). The likelihood of misidentification implicates a defendant's due process rights. *Neil v. Biggers*, 409 U.S. 188, 198, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). An identification procedure is suggestive when it "emphasize[s] the focus upon a single individual" thereby increasing the likelihood of misidentification. *Montgomery*, 150 F.3d at 992, quoting *United States v. Bagley*, 772 F.2d 482, 493 (9th Cir. 1985).

Photo lineups have been found not to be unduly suggestive in the following situations: where there were insubstantial differences between the placement, hue, and facial expression of the defendant's photograph as compared to the other photographs, *United States v. Burdeau*, 168 F.3d 352, 357-58 (9th Cir. 1998); where the defendant's photograph was the only one in which the individual was wearing a wig and had bruises on his face, *United States v. Carbajal*, 956 F.2d 924, 929 (9th Cir. 1992); where the defendant's photograph was hazier than the others, *United States v. Johnson*, 820 F.2d 1065, 1073 (9th Cir. 1987); where the defendant was the only person wearing tinted glasses and the witness described the suspect as wearing dark glasses, *United States v. Barrett*, 703 F.2d 1076, 1085 (9th Cir. 1983); where the defendant's photograph was darker and clearer than the others. *United States v. Sambrano*, 505 F.2d 284, 286 (9th Cir. 1974).

1    Even where a pretrial identification procedure is impermissibly suggestive, an in-court

2  identification is not automatically excluded. *Manson v. Brathwaite*, 432 U.S. 113-14, 97 S. Ct.

3  2243, 53 L. Ed. 2d 140 (1977); *Neil*, 409 U.S. at 198-99. An in-court identification after an unduly

4  suggestive pretrial identification is proper where it is reliable under the totality of the circumstances.

5  *Id.*; *Bagley*, 772 F.2d at 492. In considering whether the in-court identification is reliable, a court

6  considers: (1) the witness's opportunity to view the perpetrator at the scene, (2) the witness's degree

7  of attention, (3) the witness's certainty at the time of the pretrial identification, (4) the accuracy of

8  the witness's prior description of the perpetrator, and (5) the amount of time between the crime and

9  the pretrial identification. *Neil*, 409 U.S. at 199-200; *Bagley*, 772 F.2d at 492. Where a witness's

10  identification is sufficiently reliable, there is "no substantial likelihood of misidentification." *Neil*,

11  409 U.S. at 201.

12    In rejecting Petitioner's claim, the Court of Appeal followed California Supreme Court

13  authority holding that differences in background colors of photographs in a lineup do not, alone,

14  render the lineup unduly suggestive. (Lodgment 8 at 12, citing *People v. Johnson* 3 Cal. 4th 1183,

15  1217, 842 P.2d 1, 14 Cal. Rptr. 2d 702 (1992), *People v. Holt* 28 Cal. App. 3d 343, 349-350, 104

16  Cal. Rptr. 572 (1972)[3/]. The court further found that Killpack's instantaneous identification of

17  Petitioner in the lineup and his inability to identify anyone in a lineup that did not contain Petitioner

18  were further indications that his identification was accurate and not based on an unduly suggestive

19  photograph. (Lodgment 8 at 12-13.)

20    The Court of Appeal's conclusion that the photographic lineup was not unduly suggestive

21  is not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

22  The difference in the background color of Petitioner's photograph was not so impermissibly

23  suggestive to raise concerns of misidentification, particularly where Killpack's identification was

24  reliable. First, Killpack had a good opportunity to view Petitioner. The area in which his car was

---

26    3. *People v. Johnson* 3 Cal.4th 1183 at 1216, cites *Manson v. Brathwaite*, 432 U.S. at 104-107, for the proposition that constitutional reliability depends on whether the identification procedure

27  is unduly suggestive and unnecessary. *People v. Holt,* 28 Cal.App.3d at 349, applies the standard announced in *Simmons v. United States*, 390 U.S. at 384, that a lineup will only be unduly suggestive

28  where it gives rise to a substantial likelihood of misidentification.

1   parked was well lit. There was a street light on the corner as well as a security light on a building

2   across the street. He first saw Petitioner coming from about 100 to 150 yards away. (3 RT 429.)

3   Killpack was face to face with Petitioner when Petitioner reached in the car and began to choke him.

4   Killpack got a full view of Petitioner's face from about three feet away. (3 RT 433.) Second,

5   Killpack was attentive. During the minute while Petitioner was strangling him until he lost

6   consciousness, Killpack focused solely on Petitioner's face. (3 RT 434.) Third, Killpack's

7   description of Petitioner was accurate. He recalled Petitioner wearing white tennis shoes, jeans, and

8   a dark blue "Member's Only" type of jack. (3 RT 434-435.) Ledesma recalled Petitioner wearing

9   blue jeans, a black zip-up sweater with a hood, and black and white tennis shoes. (4 RT 718.) When

10  Petitioner was arrested ten days later he was wearing clothing generally matching Killpack's

11  description. (3 RT 526.) Finally, Killpack was positive about his identification of Petitioner in the

12  photo lineup. He identified Petitioner immediately and said "he was 100 percent positive that was

13  the individual who had robbed him." (3 RT 452, 4 RT 603-604.) By the defense identification

14  expert's own opinion, an identification as immediate as Killpack's is one "that tends to have the

15  highest rate of accuracy." (6 RT 1137.) All of these factors render Killpack's pretrial identification,

16  and subsequent in-court identification, reliable such that there was no risk he had misidentified

17  Petitioner.

18      Accordingly, it cannot be said that the Court of Appeal's rejection of this claim involved

19  an unreasonable application of controlling authority or that it was based on an unreasonable

20  determination of the facts. Therefore, this claim should be denied.

21  **C.  Any Error Was Harmless**

22      Even if the trial court's admission of the identification evidence was erroneous, any error

23  was harmless under *Brecht v. Abrahamson*, 507 U.S. at 623. Aside from Killpack's identification,

24  Petitioner's identity was established by other means. Most significantly, Ledesma testified that

25  Petitioner robbed Killpack. (4 RT 711-713.) Her testimony was corroborated by the gas receipts

26  from Killpack's Shell station card found in Petitioner's car. (4 RT 610, 612.) Those receipts were

27  from stations near the motels where Petitioner was staying as well as near his work. (4 RT 606-610,

28  655-656, 673, 678.) Killpack's description of Petitioner including his clothing was consistent with

07CV2215-J (LSP)

15

1  Ledesma's description of his clothing and generally matched the clothing he was wearing when

2  arrested. (3 RT 434-435, 526, 4 RT 718.) Accordingly, given Ledesma's testimony, Killpack's

3  description even absent the identification, and the other corroborating evidence, any error in

4  admitting the photo lineup evidence did not have a substantial and injurious effect on the jury's

5  verdict.

### III.

**PETITIONER'S CLAIM THAT THE TRIAL COURT IMPROPERLY ADMITTED DNA EVIDENCE AT HIS TRIAL FAILS TO PRESENT A FEDERAL QUESTION; BECAUSE THE CALIFORNIA COURT OF APPEAL REASONABLY REJECTS THIS CLAIM, AEDPA PRECLUDES RELIEF**

10  Petitioner contends that the trial court erred in admitting DNA evidence that he claims was

11  unreliable because the statistical calculations used by the criminalist did not take into account a

12  genetic combination excluding him. (Petition at 18-26.) As Petitioner's claim is a challenge to a

13  state court evidentiary ruling and Petitioner has not demonstrated that his constitutional rights were

14  affected, he fails to present a federal claim. Moreover, Petitioner cannot demonstrate that the state

15  Court of Appeal's rejection of this claim was unreasonable. Finally, any error in admitting the DNA

16  evidence was harmless.

17  **A.  Background**

18  Before trial, Petitioner moved to exclude the DNA evidence and statistical analysis

19  claiming they were scientifically unreliable. (1 CT 65-71.) The trial court conducted an Evidence

20  Code section 402 hearing at which Dr. Patrick O'Donnell, a supervising criminalist for the San Diego

21  Police Department, testified about the standard procedure of the police department and the specific

22  testing employed in this case. (AUG RT 1-100[4].) After hearing the testimony at the hearing, the

23  trial court denied Petitioner's motion to exclude the evidence. (AUG CT 3.)

24  At trial, San Diego Police Department Criminalist Janine Miller testified. (5 RT 847.) She

25  performed the actual DNA testing in this case. Miller received two samples, labeled 30 and 31,

26  ───────────────────────────────

27      4.  The record on direct appeal was augmented with a reporter's transcript and clerk's

transcript of this hearing. They are referred to as "AUG RT" and "AUG CT" and have been lodged

28  with the Court as lodgments 3 and 4 respectively.

consisting of two swabs each, taken from the interior of the right rear window of the Duray vehicle. (5 RT 871, 896.)  With regard to sample 30, testing using only one genetic marker detected 13, 14 and 15 alleles in "robust" amounts indicating that more than two people contributed to the sample. (5 RT 907-908, 914, 918-919.)  Miller explained that she could not tell in what combination the alleles occurred.  For example, the contributors could have two 13 alleles, 13 and 14 alleles, 13 and 15 alleles, and so on.  There could be just two contributors, one with 13, 14 alleles and one with 14, 15 alleles, and under this hypothetical Petitioner would be excluded.  (5 RT 918-919, 921-922.) There could be three contributors each with single alleles at that marker, meaning a 13,13 contributor, a 14,14 contributor, and a 15,15 contributor. (5 RT 920.) Petitioner, having a single 14 allele at that marker could not be excluded.  (5 RT 922.)  Miller also acknowledged that 14 is the most common allele for many races and ethnicities at the marker used in this case. (5 RT 935.) She performed a population frequency calculation using the one genetic marker and determined that one out of every two African Americans could have contributed to the sample. (5 RT 914, 917, 927, 938.)  Miller specifically told the jury that because there is no scientific test to determine the exact combination of alleles or how many people contributed to the sample, she could neither exclude Petitioner nor say for certain he was a contributor.  (5 RT 922.)

Miller testified that a low-level mixture of  DNA from more than one person was recovered from item 31, and that Petitioner was included as a possible contributor.  She also testified that Killpack could neither be included nor excluded from that sample.  (5 RT 873.)  Based on the "robustness" of the 14 allele present at the one genetic marker, Miller opined that the contributor would have a 14 allele from his mother and a 14 allele from his father.  (5 RT 926, 942.)  Petitioner has a single 14 allele at that marker.  (5 RT 915-916.)  She explained that trace levels of 13 and 15 alleles were detected at that genetic marker as well, but due to the low level did not factor into any calculations.  (5 RT 915.)  Miller performed a population frequency calculation using that genetic marker which revealed that one in nine, or 11 percent, of African Americans would have the 14 allele at that marker.  (5 RT 874-875, 885, 941.)

Miller also stated she tested two condoms collected in this case.  One condom was obtained from Duray's body.  (3 RT 511, 5 RT 815, 861.)  The testing revealed that the statistical

probability of Duray being the source of the genetic material inside the condom was one in 280 billion for the Caucasian population, one in 670 billion for the African American population, and one in 70 billion for the Hispanic population. (5 RT 862-863.) Testing of DNA located on the outside of the condom indicated a mixture with more than one contributor with a high probability that Ledesma and Duray were the contributors. (5 RT 863-864.) The statistical probability of Ledesma being a contributor to the DNA outside of the condom was one in 320 billion in the African American population. (5 RT 864-865.) Miller also tested the outside of a condom located at the Killpack robbery scene and determined Ledesma was very likely the source of DNA recovered from the outside of the condom by a one in 6.3 trillion probability for the African American population. (5 RT 865-866.)

**B.    Petitioner's Claim Fails To Present A Federal Question**

Federal habeas relief does not lie for errors of state law. *Estelle v. McGuire,* 502 U.S. at 62. A federal court must respect a state court's findings of fact and application of its own law, rather than engage in de novo review. *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990). Petitioner challenges the admission of the DNA evidence in this case on the grounds that the statistical probability portion of the evidence did not meet the requirements of *People v. Kelly*, 17 Cal. 3d 24, 30, 549 P.2d 1240, 130 Cal. Rptr. 144 (1976). (Petition at 19.) As the claim relates to an application of state law to an evidentiary ruling, Petitioner's claim does not implicate constitutional concerns unless he can demonstrate that the DNA evidence was so prejudicial that its admission violated fundamental due process and his right to a fair trial. *See Windham v. Merkle*, 163 F.3d at 1092. Here it did not.

As the Court of Appeal explained, the jury heard that "this was a limited DNA analysis, complicated by the low levels of DNA and the multiple contributors." (Lodgment 8 at 19.) The jury heard that there some genetic combinations that would exclude Petitioner as a contributor. (5 RT 918-919, 921-922.) Additionally, the DNA evidence was the least damaging evidence presented at Petitioner's trial; as demonstrated in the previous arguments, the remaining evidence against him was overwhelming. Accordingly, Petitioner has failed to show that the DNA evidence was so prejudicial that its admission rendered his trial fundamentally unfair.

07CV2215-J (LSP)

**C.    The California Court Of Appeal's Decision Was Reasonable; AEDPA Precludes Relief**

Even assuming Petitioner has presented a federal claim, it is without merit. The Court of Appeal correctly concluded that Petitioner's challenge to the statistical analysis as being unreliable because it was based on a mixture from multiple persons such that an expert could not state to a certainty that he was or was not a contributor, went to the weight that the jury would assign to that evidence, not to its admissibility. (Lodgment 8 at 18-19.) The court concluded that this was relevant evidence that was proper for the jury to consider and was not unduly prejudicial or misleading. The court went on to explain that the fact that an expert from another laboratory might have reached a different decision does not render the testimony inadmissible, and Petitioner was free to bring in his own expert to challenge the results. (Lodgment 8 at 19.) Finally, the court noted that another expert might have interpreted the DNA evidence in a manner much more damaging to Petitioner as the San Diego laboratory employed more conservative thresholds, and laboratories using lower thresholds would have concluded that Petitioner carried a higher statistical probability of being a contributor to the sample on Duray's car. The appellate court ultimately concluded that the trial court properly admitted the DNA evidence. (Lodgment 8 at 20.)

Petitioner has failed to show that this decision was based on an unreasonable determination in light of the evidence presented at the state court proceeding. As such, AEDPA precludes relief. 22 U.S.C. § 2254 (d).

**D.    Any Error Was Harmless**

Even if the trial court's instructions were erroneous, any error was harmless under *Brecht v. Abrahamson*, 507 U.S. at 623. Independent of the DNA results, the evidence against Petitioner was more than compelling. Ledesma told the jury that Petitioner was the robber and killer. (4 RT 711-713, 720-727.) Killpack identified Petitioner as his robber. (3 RT 438, 451, 4 RT 603-604.) The crimes took place close in time and location. (3 RT 420, 542-543, 4 RT 721-722, 734-735.) The way in which the crimes were committed was significantly similar. Receipts from Killpack's gas card were found in Petitioner's car. (4 RT 610, 612.) The gas card had been used near where Petitioner lived and worked. (4 RT 606-610, 655-656, 673, 678.) The evidence also supported the

07CV2215-J (LSP)

19

1  reasonable inference that when arrested, Petitioner had Duray's wallet. (3 RT 537-538, 556-559, 4

2  RT 729-730.) In light of the substantial evidence against him, any error in admitting the DNA

3  evidence was harmless as there was no probability it had a substantial and injurious effect on the

4  jury's decision.

5  **IV.**

6  **PETITIONER'S CLAIM THAT INSUFFICIENT EVIDENCE
   CORROBORATED HIS ACCOMPLICE'S TESTIMONY FAILS TO
7  PRESENT A FEDERAL QUESTION; BECAUSE THE CALIFORNIA
   COURT OF APPEAL REASONABLY REJECTS THIS CLAIM, AEDPA
8  PRECLUDES RELIEF**

9  Petitioner contends that insufficient evidence corroborated the testimony of his

10  accomplice, Ledesma, and therefore that testimony could not be used to support the guilty verdicts.

11  (Petition at 27-28.) Petitioner's claim fails to state a federal question. Even if construed as a federal

12  issue, the Court of Appeal's determination was reasonable. Lastly, even assuming error, Petitioner

13  has not demonstrated that this testimony had a substantial and injurious effect on the jury's verdict.

14  **A.    Petitioner's Claim Fails To Present A Federal Question**

15  Corroboration of accomplice testimony is not constitutionally mandated. *See United States*

16  *v. Augenblick*, 393 U.S. 348, 352, 89 S. Ct. 528, 21 L. Ed. 2d 537 (1969) ("When we look at the

17  requirements of procedural due process, the use of accomplice testimony is not catalogues with

18  constitutional restrictions."). Accordingly, any failure to satisfy California's requirement of

19  corroboration for accomplice testimony does not present a federal question unless the accomplice

20  testimony is facially incredible or insubstantial, *United States v. Necoechea*, 986 F.2d 1273, 1282

21  (9th Cir. 1993); *United States v. Lopez*, 803 F.2d 969, 973 (9th Cir. 1986), or unless the alleged

22  violation rendered petitioner's trial fundamentally unfair, *Laboa v. Calderon*, 224 F.3d 972, 979 (9th

23  Cir. 2000) (citing *Estelle v. McGuire*, 502 U.S. at 72-73.) Because, as discussed below, the

24  accomplice's testimony in this case was credible and substantial, and because Petitioner fails to

25  demonstrate that the testimony rendered his trial unfair in anyway, this claim fails to present a federal

26  question.

27  ///

28  ///

07CV2215-J (LSP)

**B.    The California Court Of Appeal's Rejection Of Petitioner's Claim Was Reasonable; AEDPA Precludes Relief**

Here, Ledesma's accomplice testimony was credible, substantial, and in no way rendered Petitioner's trial fundamentally unfair.    There was ample evidence corroborating Ledesma's testimony.    With regard to the Killpack robbery, Killpack's testimony was markedly consistent with Ledesma's account of the events. The fact that there very few differing details between their versions of the events tends to show that Ledesma testified truthfully.

Further with regard to the Killpack robbery, the evidence gathered by law enforcement corroborated Ledesma's testimony. Ledesma's account that she threw the car keys out of the window was corroborated by the fact that the police located Killpack's keys in the dirt near where his car was parked during the robbery. (4 RT 585-586.) Ledesma's testimony that she took everything of value out Killpack's wallet including the Shell gas card was corroborated by the fact that Shell gas receipts were located in Petitioner's car. (4 RT 610-612.) The transactions from after the robbery and before the card was canceled occurred at gas stations near the Bay Cities Motel, the Motel 6, and Petitioner's work. (4 RT 646-651, 655-656, 673.) Although the gas card itself was not located, the receipts in Petitioner's car are analogous to possessing recently stolen property from a robbery. The evidence located during the police investigation of the crime scene corroborated Ledesma's testimony and connected Petitioner to the Killpack robbery.

Moreover, Killpack not only identified Petitioner in court as the person who robbed and strangled him, he also picked Petitioner out of a photo lineup on January 13, 2004. (3 RT 438, 4 RT 449, 451-452, 601, 603-604.)  Even without the assistance of Ledesma's testimony, Killpack's account of the events and positive identification of Petitioner was sufficient in and of itself to connect Petitioner with the crime.

With regard to the Duray murder and robbery, Ledesma was the only eyewitness. However, the similar circumstances of the crime as compared to the Killpack robbery corroborate Ledesma's testimony and tend to connect Petitioner to the Duray murder as well. First, the Killpack robbery occurred at about 2:15 a.m. at 3500 Dalbergia. (3 RT 420, 4 RT 581.) Based on the cell phone call placed to Duray's daughter at 6:12 am, a fair assumption is that the Duray murder

occurred shortly thereafter. (3 RT 490-491.) The murder scene was at 3100 Martin. (3 RT 494.) The two offenses occurred close in time, close in location to each other, and close in location to the motel where Petitioner was staying at the time. (3 RT 542-543.) A reasonable inference to be drawn from the short time frame in which both crimes were committed and their geographical proximity is that Petitioner participated in both offenses. Therefore, evidence of the time frame and location of the crime scenes corroborates Ledesma's testimony.

Additionally, the offenses were committed in very similar ways. Killpack solicited a prostitute before the robbery and had reclined his seat while Ledesma was in his car. (3 RT 419-422, 426.) Even without Ledesma's testimony that Duray had done the same, Duray's body was found in the reclined driver's seat of his vehicle and DNA evidence connected Ledesma to the condom found on Duray's body. (3 RT 504, 511, 5 RT 864-866.) Both victims were strangled. Both victims were strangled to the point of unconsciousness and with such force as to cause internal bleeding. (3 RT 433-434, 437, 6 RT 986-987.) Both victims' wallets had been stolen. (3 RT 441, 512-513.) Petitioner was Ledesma's pimp or at the very least, her boyfriend. (4 RT 686-688.) Even though their relationship on its own is insufficient to corroborate Ledesma's testimony, in combination with all of the other independent evidence implicating Petitioner, it is certainly a relevant fact that the jury considered. The evidence showing the similarity of the crimes, even without Ledesma's testimonial assistance, tended to implicate Petitioner in the commission of the Duray murder as well.

Ledesma's testimony as to how the Duray murder occurred was also corroborated by evidence located by law enforcement. Ledesma again said that she threw Duray's keys out the window. (4 RT 722.) The police located keys to the car a short distance from where it was parked. She testified that she heard someone on Duray's cell phone during the attack. (4 RT 731-732.) That testimony was confirmed not only by Duray's daughter, the recipient of the call, but also by phone records. (3 RT 490-492, 4 RT 594.) Ledesma testified that after she took Duray's belongings from his wallet, Petitioner kept the wallet because it was new and began to use it as his own. (4 RT 729-730.) When arrested, Petitioner had a new wallet on him. (3 RT 537-538.) Duray's son, although not entirely certain whether it was the same wallet, confirmed that Duray had very recently purchased a new wallet. (3 RT 556-557.) Therefore, independent evidence corroborated Ledesma's

1  testimony as to the Duray murder, demonstrated that her testimony was truthful, and connected

2  Petitioner to the crime.

3       Relying on the facts recited above, the Court of Appeal held:

4       Under these circumstances, given Killpack's identification of [Petitioner] as his attacker,

5       Ledesma's presence at both incidents, her relationship to [Petitioner], the timing and

6       location of the incidents, and the strong similarities of how the robberies and assaults

7       occurred, a jury could reasonably infer that Ledesma's accomplice in both incidents was

8       the same man and that man was [Petitioner]. In other words, even without Ledesma's

9       testimony or the DNA evidence, there was sufficient evidence to establish [Petitioner's]

10       identity as the robber and assailant.

11  (Lodgment 8 at 23-24.) Petitioner has cited no authority suggesting the Court of Appeal's decision

12  was contrary to, or involved an unreasonable application of federal law as determined by the

13  Supreme Court of the United States, and has in no way demonstrated that the court's decision was

14  an unreasonable determination of the facts. 28 U.S.C. § 2254 (d).

15     **C.   Any Error Was Harmless**

16       Because there was more than ample evidence independent of Ledesma's testimony as

17  explained above, even if the trial court erred in admitting it, the testimony did not have a substantial

18  and injurious effect on the jury's verdicts. *Brecht v. Abrahamson*, 507 U.S. at 623. Accordingly,

19  even had there been error, it would have been harmless.

20                            **V.**

21     **BECAUSE PETITIONER FAILS TO RAISE ISSUES PRESENTING
      CONSTITUTIONAL ERRORS OR PREJUDICE, HIS CUMULATIVE**

22     **ERROR CLAIM MUST BE REJECTED**

23       Petitioner contends that the cumulative effect of the alleged instructional and evidentiary

24  errors at his trial rendered the trial fundamentally unfair. (Petition at 37.) Petitioner's cumulative

25  error claim fails because his individual claims do not establish constitutional errors or prejudice.

26       For purposes of federal habeas corpus, the "cumulative error" doctrine recognizes that

27  "even if no single error were prejudicial, where there are several substantial errors, 'their cumulative

28  effect may nevertheless be so prejudicial as to require reversal' [citation]." *Killian v. Poole*, 282 F.3d

07CV2215-J (LSP)

1  856, 858 (9th Cir. 2002).  However unless there is a specific constitutional violation, habeas review

2  of trial error is limited to whether the error "so infected the trial with unfairness as to make the

3  resulting conviction a denial of due process."  *Estelle v. McGuire*, 508 U.S. at 71-72.   A federal

4  court may not grant the writ on the basis of errors of state law whose combined effect does not

5  violate the federal constitution. *Lewis v. Jeffers*, 497 U.S. at 764; *Pulley v. Harris*, 465 U.S. 37, 42,

6  104 S. Ct. 871, 79 L. Ed. 2d 29 (1984).

7        The Court of Appeal rejected Petitioner's cumulative error claim finding his trial to have

8  been free from error.  (Lodgment 8 at 24.)   As argued above,  Petitioner cannot show that the

9  California Court of Appeal's denial of this claims involved an unreasonable application of clearly

10  established federal law, and accordingly his cumulative-error contention must be rejected.

11  ///

12  ///

13  ///

07CV2215-J (LSP)

1

**CONCLUSION**

2   For the reasons stated above, Petitioner's Petition must be dismissed with prejudice.

3   Dated:  March 25, 2008

4                       Respectfully submitted,

5   EDMUND G. BROWN, JR.
    Attorney General of the State of California

6   DANE R. GILLETTE
    Chief Assistant Attorney General
7
    GARY W. SCHONS
8   Senior Assistant Attorney General

9   LISE JACOBSON
    Deputy Attorney General

10

11                   s/ ROBIN DERMAN

12                   ROBIN DERMAN
                     Deputy Attorney General
13
                     Attorneys for Respondent
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07CV2215-J (LSP)

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    *George v. Almager*

No.:    **07CV2215-J (LSP)**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On <u>March 26, 2008</u>, I served the attached **ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 110 West A Street, Suite 1100, P.O. Box 85266, San Diego, CA  92186-5266, addressed as follows:

Richard Earl George
H-56048
Centinela State Prison
P.O. Box 921
Imperial, CA  92251

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on March 26, 2008, at San Diego, California.

| | |
|---|---|
| Terri Garza | *Marie Hanyo* |
| Declarant | Signature |

70118678.wpd