UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| RICHARD EARL GEORGE,<br><br>Plaintiff,<br><br>v.<br><br>V.M. ALMAGER, WARDEN,<br><br>Defendant. | Civil No.   07cv2215-J (POR)<br><br>**PROPOSED FINDINGS OF FACT AND RECOMMENDATION THAT PETITION FOR WRIT OF HABEAS CORPUS BE DENIED**<br><br>**[Document No. 1]** |
|---|---|

**I.   INTRODUCTION**

On November 19, 2007, Petitioner Richard Earl George ("Petitioner"), a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  This Court has reviewed the Petition, Respondent's Answer, Petitioner's Traverse, and all supporting documents.  After a thorough review, this Court finds Petitioner is not entitled to the relief requested and recommends the Petition be **DENIED**.

**II.   PROCEDURAL BACKGROUND**

On November 22, 2005, a jury found Petitioner guilty of first degree murder committed during the course of a robbery, two counts of robbery, and one count of assault by means of force likely to produce great bodily injury.  In a bifurcated trial, the trial court found four prior prison term allegations to be true.  On January 4, 2006, the trial court sentenced Petitioner to serve life without parole plus seven years.

Petitioner filed an appeal to the California Court of Appeal, Fourth Appellate District, Division One.  (Lodgement No. 8).  On May 25, 2007, the California Court of Appeal affirmed the

judgment. (Lodgement No. 8).

On July 2, 2007, Petitioner filed a petition for review in the California Supreme Court. (Lodgement No. 9). The California Supreme Court denied the petition on August 22, 2007. (Lodgement No. 10).

On November 19, 2007, Petitioner filed a federal petition for writ of habeas corpus. (Doc. No. 1). On March 26, 2008, Respondent filed an Answer. (Doc. No. 8). Petitioner filed his Traverse on May 14, 2008. (Doc. No. 14).

## III. STATEMENT OF FACTS

The following facts are taken from the California Court of Appeal opinion in People v. George, No. SCD179831 (Cal. Ct. App. May 25, 2007). (Lodgement No. 8). The Court presumes these factual determinations are correct pursuant to 28 U.S.C. § 2254(e)(1).

> *Assault and Robbery of Killpack*
> George was Bertha Ledesma's boyfriend and pimp. She had been a prostitute since she was 15-years-old and was a crack addict. George drove Ledesma to locations where she worked as a prostitute and he parked nearby. After each "date," Ledesma would go to his car and give him the money she had earned. Ledesma was afraid of George, and at one point, she wrote a letter stating that if she were found dead, to investigate George because he had tried to kill her by strangling her. From August 2003 to January 2004, George and Ledesma stayed at motels, with George paying in cash. George sold drugs and he was also a driver for Amvets in El Cajon.
> On Saturday night, January 3, 2004, George drove Ledesma to one of her usual prostitution locations by the Adult Emporium on Main Street in Chula Vista. At about 2:15 a.m., her third "date" that night was Fred Killpack. Killpack had spent the evening at a cowboy western bar in Mission Valley where he had two or three light beers. He was on his way home and he pulled off the freeway in Chula Vista, intending to get something to eat. He changed his mind when he saw Ledesma standing in front of the Adult Emporium, and he decided to "pick her up." She agreed to give him oral sex for $20 and directed him to a street behind the Adult Emporium. Because Ledesma complained about being warm, Killpack rolled down his window about four inches.
> Once they were parked, Killpack paid Ledesma and reclined his seat as she undid his pants. She put a condom on him and started to give him oral sex. Killpack became nervous when a vehicle with its lights on pulled up behind them. Ledesma told him to relax, that there were a lot of cars that came into the area, but he was uncomfortable and asked her to leave. Ledesma continued to try to reassure him while he continued to ask her to leave. The vehicle left in less than a minute.
> Shortly thereafter, Killpack saw George walking towards his car from the corner. Ledesma refused to leave and Killpack thought he was being "set up." He started the car's engine and Ledesma began punching, scratching, and biting his face. The next thing Killpack noticed was George standing at the driver's side window. George told Ledesma to

throw the car keys out of the car, which she did. George reached into the car and choked Killpack into unconsciousness. George took Killpack's wallet, which Killpack had taken out during the struggle and offered to George. They left Killpack unconscious in his car.

While George and Ledesma were driving away, George told Ledesma to take everything of value out of the wallet. She removed a gas credit card and threw the wallet out the window. She later gave the credit card to George.

Killpack regained consciousness about an hour or so later and noticed his wallet was missing. He looked for his car keys, but did not find them. He used his cell phone to get a ride home from his ex-wife. He did not immediately report what had happened because he was embarrassed. But, on Monday, January 5, after learning about a murder occurring in the same general area, Killpack went to the police and provided a description of his assailants. He was shown a photographic line-up that did not include Ledesma's photograph but did include the photograph of another prostitute the police believed might be involved. He did not make a positive identification. Killpack took police to the crime scene where he found his car keys in the dirt near a fence.

On January 13, the police showed him two photographic line-ups, one containing Ledesma's photograph, the other George's photograph. Killpack spent two to three minutes looking at Ledesma's line-up and tentatively identified her based on her acne and hair. In contrast, Killpack "instantaneously" identified George as the assailant, stating "that's the guy." He was 100 percent positive in his identification. Killpack also identified George at trial.

When George and Ledesma were arrested on January 14, George had receipts in his car for gas station purchases made with Killpack's credit card. One of the receipts was from a gas station near the Amvets store in El Cajon where George worked. Records for Killpack's credit cards indicated the credit card had been used on the morning of January 4 at a gas station near the motel where Ledesma and George were staying. In addition, Ledesma testified she was with George on January 6 when she used Killpack's card to buy gas.

*Robbery and Murder of Thomas Duray*

After robbing Killpack, George and Ledesma returned to the motel room. George told Ledesma to get ready to go back out and refused to let her go alone. Ledesma changed her clothes and they drove to an area on 32nd Street, in San Diego, arriving about 5:00 a.m. Ledesma went to the corner where she was picked up by one of her "regulars," Tom Duray; she had met with him twice before. They drove around the corner and he paid her $30. He reclined his seat and while she was putting a condom on him, she stole his cell phone and put it in her pocket. She began orally copulating him. Less than 10 minutes later, George reached into the car, tried to grab Duray's throat and told Ledesma to throw the car keys out the window. She threw the keys out the window. She bit Duray on the thigh. Duray pleaded with George not to kill him, telling him he had three children and offered to take him to his bank and give him money, but his pleas had no impact on George. At one point, Ledesma heard a female voice coming from Duray's cell phone, yelling for her father and asking what was wrong. Ledesma turned off the phone.

Eventually, George got into the back seat of Duray's car and strangled Duray until he stopped fighting. George took Duray's wallet from the glove compartment. He and Ledesma left the scene and as they were driving away, George told Ledesma to take everything of value out

of the wallet. He asked her about the condition of the wallet, and she told him it looked brand new. He told her he needed a new wallet, transferred the contents of his wallet to Duray's wallet, and threw away his old wallet.

Not long after they returned to the motel room, George received a phone call, spoke briefly and hung up. Ledesma, suspecting the call was from one of George's girlfriends, grabbed the phone and accidentally hit George in the head with the phone. He was upset and hit her in the jaw, breaking it. Phone records showed a three minute call was made to George's cell phone at 6:43 a.m. on January 4th.

When the police investigated the crime scene, they found the driver's seat fully reclined. A gallon bucket of water in the back seat had been knocked over and Duray's body had been dragged between the front seat and the console and halfway into the right rear passenger seat. There were signs of a struggle, including pieces of the ignition on the floorboard, damage to the underside of the steering wheel, the presence of Duray's shoe outside the vehicle, and bruises on his left shin and foot.

Duray died due to manual strangulation. His hyoid bone was broken, an injury that usually does not occur except in traffic accidents or manual strangulation. There was evidence that he had struggled; typically a person takes about 15 minutes to die from strangulation. Even if Duray had been only strangled into unconsciousness and then the strangulation had stopped, he still could have died due to a fractured bone and deep neck hemorrhaging, "injuries that you can't fix quickly." The medical examiner testified Duray's injuries were consistent with Ledesma's testimony of what had occurred.

From Duray's car, the police recovered a used condom and collected samples from smudges on the right rear window for DNA analysis. An expert testified the outside of the condom contained a mixture of DNA and the statistical analysis indicated an extremely high statistical probability the DNA belonged to Duray and Ledesma.

The samples from the rear window of Duray's car contained lower levels of DNA, with only some DNA markers having sufficient quantity for typing. The expert testified that in one of the samples, a DNA marker with sufficient quantity for typing indicated it was a mixture of DNA from at least two people. Duray and Ledesma were excluded as contributors of the DNA. The expert testified the statistical analysis indicated one out of two African-Americans, Caucasians, and Hispanics had the same DNA marker as found in the sample. As to the other sample from the rear window of Duray's car, there was also a mixture of DNA from at least two persons. Duray and Ledesma were excluded as contributors. Killpack could not be excluded or included as a contributor. George could have been a contributor. The statistical analysis indicated that one out of nine African-Americans could have been a contributor. George is African-American. In other words, 11 percent of African-Americans could have contributed to the DNA sample.

Duray's son testified Duray had recently purchased a new wallet, which looked similar to the wallet recovered from George.

Duray's daughter testified that on January 4, 2004, at about 6:12 a.m., her phone rang. When she answered the phone, she heard only a rustling sound. She said, "Hello, hello?" She then clearly heard a "very deep, very strong" man's voice say, "Where's your wallet? Where's your keys?" She thought "something was going down." She heard more rustling sounds and then hung up the phone. Because "something didn't seem right," she wrote down the time of the phone call and then called her father because she was worried. His cell phone was turned off and she left a message.

*Defense*

George presented evidence that Ledesma was a habitual drug user and liar and was high on the day of the crimes. She had not told her friends that George was her pimp, rather, she told them he was her boyfriend.

George's mother testified that between August 2003 and January 14, 2004, George lived off and on in her house. She remembered he came by her house on Saturday, January 3 to check her car, as he did every Saturday morning. She also specifically remembered him coming to her house about 6:00 a.m. on January 4 because she had to make a phone call at 6:00 a.m. to La Jolla about a bread pick-up, and while she was on the phone, George entered the house.

An expert on eyewitness identification testified factors that reduce the rates of correct identification include high levels of stress when a person is frightened, alcohol use, divided attention, and cross-racial identification. The expert testified that when a photo line-up contains "personal irrelevant cues" such as jewelry or clothing or is in some way significantly different from the other photographs, a witness may focus more on that photograph and be influenced in their selection. A victim's or witness's certainty of their identification is not necessarily a reliable predictor of whether an identification is correct. During cross-examination, the expert stated one of the best predictors of whether an identification is accurate is "scan duration." When an individual "pops out immediately" with an identification, "[t]hat tends to have the highest rate of accuracy."

*Rebuttal*

A police detective testified that he interviewed George's mother on January 20, 2004. She told him she had no idea where George was on the weekend of the robbery and murder and that he had been gone the entire weekend.

## IV. STANDARD OF REVIEW

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a). As amended, the AEDPA now reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was <u>contrary to</u>, or involved an <u>unreasonable application</u> of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in State court proceeding.

28 U.S.C.A. § 2254(d) (emphasis added).

To obtain federal habeas relief, Petitioner must satisfy either § 2254(d)(1) or § 2254(d)(2). See Williams v. Taylor, 529 U.S. 362, 403 (2000). The threshold question is whether the rule of law was clearly established at the time petitioner's state court conviction became final. Williams v. Taylor, 520 U.S. 362, 406 (2000). Clearly established federal law, as determined by the Supreme Court of the United States "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision. Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 71 (2003). However, Ninth Circuit case law may be "persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established.'" Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000). Only after the clearly established Federal law is identified can the court determine whether the state court's application of that law "resulted in a decision that was contrary to, or involved an unreasonable application of" that clearly established Federal law. See Lockyer, 538 U.S. at 71-72.

A state court decision is "contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Williams, 529 U.S. at 405-06. "A state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407. Under Williams, an application of federal law is unreasonable only if it is "objectively unreasonable." Id. at 409.

Further, a state court's decision results in a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in State court proceeding" if it "is so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997) (citations omitted).

A federal habeas corpus petition must allege a deprivation of one or more federal rights to present a cognizable claim pursuant to § 2254. A state's interpretation of its laws or rules provides no basis for federal habeas corpus relief when no federal constitutional question arises. Estelle v. McGuire, 502 U.S. 62, 68 (1991) (stating that federal habeas corpus relief does not lie for errors of state law, and federal courts may not reexamine state court determinations on state law issues). Habeas corpus proceedings under § 2254 measure state convictions against federal constitutional requirements applicable to the states. A federal district court does "not sit as a 'super' state supreme court" with general supervisory authority over the proper application of state law. Smith v. McCotter, 786 F.2d 697, 700 (5th Cir. 1986); see Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (federal habeas courts must respect state court's application of state law); Jackson v. Ylst, 921 F.2d 882, 885 (9th Cir. 1990) (federal courts have no authority to review state's application of state law). Instead, federal courts may only intervene in state judicial proceedings to correct errors of federal constitutional magnitude. Oxborrow v. Eikenberry, 877 F.2d 1395, 1400 (9th Cir. 1989) (stating that federal courts are not concerned with errors of state law unless they rise to level of constitutional violation).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991). A state court need not cite Supreme Court precedent when resolving a habeas corpus claim. Early v. Packer, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" id., the state court decision will not be "contrary to" clearly established federal law. If a state court fails to provide a reasoning for its decision, habeas review is not *de novo*, but requires an independent review of the record to assess whether the state court erred in its application of controlling federal law. Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

## V. DISCUSSION

The instant petition raises five grounds for relief: 1) the trial court improperly admitted evidence of a prior choking incident; 2) the trial court improperly admitted evidence of an unduly suggestive photo line-up; 3) the trial court improperly admitted unreliable DNA evidence; 4)

insufficient evidence corroborated Petitioner's accomplice's testimony; and 5) the cumulative effect of the errors at Petitioner's trial deprived him of due process. (Doc. No. 1).

**A.     Ground One: Trial Court's Improper Admission of Evidence of Prior Choking Incident**

Petitioner's first ground of relief is a claim the trial court improperly admitted evidence of a prior choking incident, thereby violating his right to due process. (Doc. No. 1 at 6-7). The trial court admitted a letter in which Petitioner's accomplice wrote Petitioner tried killing her in the past by choking her. In light of the allegation Petitioner choked Duray to death, Petitioner contends this similar prior act evidence is highly prejudicial, of limited probative value, and admitted as propensity evidence in violation of Evidence Code § 352 and §1101(a).

Respondent contends Petitioner's claim does not state a federal claim because Petitioner challenges a state evidentiary ruling and Petitioner fails to demonstrate the alleged error was so prejudicial as to violate his right to a fair trial. (Doc. No. 8 at 19). Even if Petitioner states a federal claim, Respondent further asserts Petitioner cannot demonstrate the Court of Appeal's determination of the matter was unreasonable.

A state's interpretation of its laws or rules provides no basis for federal habeas corpus relief when no federal constitutional question arises. Estelle v. McGuire, 502 U.S. 62, 68 (1991). Nevertheless, the Ninth Circuit has indicated state laws can give rise to liberty interests cognizable on federal habeas, and that a federal due process violation can arise from arbitrary rulings. See Fetterly v. Paskett, 997 F.2d 1295, 1300 (9th Cir. 1993) ("[T]he failure of a state to abide by its own statutory commands may implicate a liberty interest protected by the Fourteenth Amendment against arbitrary deprivation by a state, [and] Ninth Circuit precedent generally supports this proposition."), citing Ballard v. Estelle, 937 F.2d 453 (9th Cir. 1991).

Specifically with regard to evidentiary rulings, "a state court's procedural or evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process." Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995). Therefore, a federal court may not disturb on due process grounds a state court's decision to admit uncharged bad acts evidence unless admission of that evidence "was arbitrary or

so prejudicial that it rendered the trial fundamentally unfair." Walters, 45 F.3d at 1357; Jammal v. Van DeKamp, 926 F.2d 918, 919 (9th Cir. 1991).

California Evidence Code § 352 grants courts discretion to exclude evidence if its probative value is substantially outweighed by the probability its admission will necessitate undue consumption of time, create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

California Evidence Code § 1101(a) generally prohibits introducing evidence a defendant committed acts, other than those charged, to prove he or she is a person of bad character or has a criminal disposition. Evidence Code § 1101(b), however, allows introduction of such evidence to prove issues such as identity, intent, motive, and lack of mistake or accident. People v. Kipp, 18 Cal. 4th 349, 369 (1998). Nevertheless, "evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent." Id. Also, uncharged misconduct is subject to exclusion if its probative value is substantially outweighed by a danger of undue prejudice, confusion of the issues, or of misleading the jury. Id. at 371.

In the last reasoned state court decision, the Court of Appeal held the trial court did not abuse it discretion in admitting evidence of a prior choking incident. (Lodgement No. 8 at 9-12). The Court of Appeal held the trial court properly admitted the choking evidence because it was relevant to show Ledesma may have initially lied to the police out of fear of Petitioner and the probative value of the choking evidence outweighed any prejudicial effect. (Lodgment No. 8 at 11). Specifically, the Court of Appeal held:

> Below, [Petitioner's] counsel conceded Ledesma's fear of [Petitioner] was relevant to explain why she initially lied to the police but argued instead of admitting Ledesma's letter stating that if she were found dead, the police should investigate [Petitioner] because he had tried to kill her by choking her in the past, the court should allow Ledesma to testify she was afraid of [Petitioner] and even that he tried to kill her "without getting into...the choking issue." On appeal, [Petitioner] stresses Ledesma's fear of [Petitioner] "was not an ultimate fact in the case and was not in dispute." (Italics omitted). This argument, however, overlooks the fact that Ledesma was a key witness and her credibility was sharply disputed. Since [Petitioner] did not testify, attacking Ledesma's credibility was key to his defense and, among other things, he pointed out that initially Ledesma had not told the police about [Petitioner's] involvement. The fact that Ledesma's letter was written before the crimes occurred, and was

> recovered during a search of her belongings before she was arrested, made it especially probative of her fear of [Petitioner] and to explain why she lied to the police prior to George's incarceration. Evidence of Ledesma's mental state, that is, her fear of [Petitioner], was a distinct purpose from showing [Petitioner] had a propensity to commit the charged crimes.
>
> Nor do we find the evidence unduly prejudicial. The act of choking Ledesma was not likely to inflame the jury against [Petitioner], especially in light of the facts relating to the charged crimes, which involved the application of a vicious degree of violence, causing serious injury to one victim and death to the other. There is no reasonable probability the jury's verdict was the result of being inflamed against George by Ledesma's letter or based on reliance on propensity evidence rather than based on evidence presented to support the charges.

(Lodgment No. 8 at 11-12).

In ruling the trial court did not commit error in admitting evidence of a prior choking incident, the Court of Appeal relied on its conclusion the evidence was properly admitted pursuant to California law. (Lodgement No. 8 at 11-12 ). That finding is supported by the record. Specifically, the Court of Appeal applied an Evidence Code § 352 analysis and found the letter was probative of Ledesma's fear of Petitioner and explained why she initially lied to the police. The Court also found the evidence was not unduly prejudicial in light of other evidence presented to support the charges against Petitioner. In light of these considerations, Petitioner is unable to demonstrate either the trial judge arbitrarily admitted the choking evidence or the appellate court arbitrarily rejected his claim. Based thereon, Petitioner has failed to demonstrate a due process violation. Fetterly, 997 F.2d at 1300.

Moreover, the Court of Appeal's decision the trial court did not abuse its discretion in admitting evidence of a prior choking incident was not contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts. Therefore, Petitioner has failed to show admission of a prior choking incident rendered his trial fundamentally unfair. Estelle v. McGuire, 502 U.S. at 62. Accordingly, the Court RECOMMENDS the Petition be denied as to this ground for relief.

**B.     Ground Two: The Trial Court Improperly Admitted Evidence of Unduly Suggestive Photo Line-Up**

Petitioner's second ground of relief is a claim the trial court improperly admitted evidence of an unduly suggestive photo line-up, thereby violating his right to due process. (Doc. No. 1 at 11-

1  17). Petitioner contends his photograph had a green background while the other photographs had a
2  blue background, thereby rendering the photo line-up unduly suggestive. (Doc. No. 1 at 11).
3  Respondent contends the photo line-up was not unduly suggestive and the Court of Appeal's
4  rejection of this claim was neither an unreasonable application of United States Supreme Court
5  precedent nor an unreasonable determination of the facts. (Doc. No. 8 at 23).

6  "[C]onvictions based on eyewitness identification at trial following a pretrial identification
7  by photograph will be set aside on that ground only if the photographic identification procedure was
8  so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable
9  misidentification." Simmons v. U.S., 390 U.S. 377, 384 (1968). An identification procedure is
10 suggestive when it "emphasize[s] the focus upon a single individual" thereby increasing the
11 likelihood of misidentification. United States v. Bagley, 772 F.2d 482, 493 (9th Cir. 1985). "It is
12 the likelihood of misidentification which violates a defendant's right to due process." Neil v.
13 Biggers, 409 U.S. 188, 198 (1972).

14 Even when a pretrial identification procedure is found to be unduly suggestive, an in-court
15 identification is not automatically excluded. Manson v. Brathwaite, 432 U.S. 98, 113-114 (1977).
16 An in-court identification after an unduly suggestive pretrial identification is proper where it is
17 reliable under the totality of the circumstances. Id. at 113. To determine reliability, a court
18 considers: (1) the witness's opportunity to view the perpetrator at the scene; (2) the witness's degree
19 of attention; (3) the witness's certainty at the time of pretrial identification; (4) the accuracy of the
20 witness's prior description of the perpetrator; and (5) the amount of time between the crime and the
21 pretrial identification. Id. at 114; Bagley, 772 F.2d at 492. A witness's identification is sufficiently
22 reliable when there is no "substantial likelihood of misidentification." Neil, 409 U.S. at 201.

23 Here, the Court of Appeal held the photo array was not unduly suggestive. (Lodgement No.
24 8 at 12). The Court of Appeal relied on California Supreme Court case law, which indicates
25 differences in the background colors of photographs in a lineup do not, in and of themselves, render
26 a lineup suggestive. Further, the Court of Appeal noted:

27 > Killpack's identification of [Petitioner] in the photo line-up was
> "instantaneous"; as soon as the detective placed the line-up before Killpack,
28 > he immediately identified [Petitioner] as his assailant. [Petitioner's]
> eyewitness expert testified such immediate identifications, that is,

> identifications with extremely short scan durations, tend to be the most accurate identifications. The expert also testified that identifications tend to be more reliable if the witness has been earlier shown a photo array not containing the defendant and had selected no one as the suspect. In this case, Killpack had been shown a photographic array containing a prostitute who the police suspected might have been involved in the robbery and he did not identify any of the photographs as showing a person involved in the offense.

(Lodgement No. 8 at 12-13). Based thereon, the Court of Appeal held the photographic line-up was not unduly suggestive.

The Court of Appeal's decision the photographic line-up was not unduly suggestive is not contrary to established federal law. In concluding the difference in background color of Petitioner's photograph was not impermissibly suggestive, the Court of Appeal properly determined the photo line-up was not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons, 390 U.S. at 384. Further, the Court of Appeal's consideration Killpack instantaneously made a positive identification of Petitioner indicates the photo line-up identification was reliable. Because the Court of Appeal reasonably concluded there was no likelihood of misidentification and the pretrial identification was reliable, Petitioner's due process rights were not violated. Neil, 409 U.S. at 198. Accordingly, the Court RECOMMENDS the Petition be denied as to this ground for relief.

**C.    Ground Three: The Trial Court Improperly Admitted Unreliable DNA Evidence**

Petitioner contends the trial court erred in admitting unreliable DNA evidence because the statistical calculations used by the criminalist did not take into account a genetic combination excluding him. (Doc. No. 1 at 18-26). Respondent contends Petitioner has failed to present a federal claim. (Doc. No. 8 at 27). In the alternative, Respondent asserts Petitioner cannot demonstrate the Court of Appeal's rejection of this claim was unreasonable. Id.

A federal habeas corpus petition must allege a deprivation of one or more federal rights to present a cognizable claim pursuant to § 2254. A state's interpretation of its law or rules provides no basis for federal habeas corpus relief when no federal constitutional question arises. Estelle v. McGuire, 502 U.S. 62, 68 (1991) (stating federal habeas relief does not lie for errors of state law). Nevertheless, the Ninth Circuit has indicated state laws can give rise to liberty interests cognizable on federal habeas, and that a federal due process violation can arise from arbitrary rulings. See

1 Fetterly v. Paskett, 997 F.2d 1295, 1300 (9th Cir. 1993) ("[T]he failure of a state to abide by its own statutory commands may implicate a liberty interest protected by the Fourteenth Amendment against arbitrary deprivation by a state, [and] Ninth Circuit precedent generally supports this proposition."), citing Ballard v. Estelle, 937 F.2d 453 (9th Cir. 1991).

Specifically with regard to evidentiary rulings, "a state court's procedural or evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process." Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995).

The Court of Appeal held the trial court did not abuse its discretion in determining the jury could hear the DNA evidence and determine what weight to give the evidence. (Lodgement No. 8 at 20). Relying on People v. Kelly, 17 Cal.3d 24, 30 (1976), the Court of Appeal noted scientific evidence is only admissible if it meets certain requirements of acceptance within the scientific community, the correct scientific procedures are utilized, and the proffered expert is qualified to give an opinion. Id. at 16. Further, the Court of Appeal noted the fact different experts may disagree about the conclusions to be drawn from certain evidence does not render the scientific methodology unreliable or inadmissible. Id. The Court also concluded it is the province of the jury to decide whether an expert's opinion is reasonable and determine the weight to be given to expert testimony. Id. At 16-17. Ultimately, the court indicated DNA evidence, like other evidence, is subject to exclusion under Evidence Code section 352 if the probative value of the evidence is outweighed by a danger of undue prejudice or by a danger of misleading the jury. Id. at 17.

In reaching its conclusion, the Court of Appeal specifically held:

> Here, DNA analysis used in this case–the STR method–has been held to be generally accepted within the scientific community. [Citations omitted]. It has also been held that the statistical analysis used in this case, that is, the comparison of a DNA profile to the relevant ethnic population has received general acceptance within the scientific community. [Citation omitted]. The comparison has been held necessary to give meaning to the value of the DNA evidence to the jury.
>
> . . .
>
> [Petitioner's] contention that the statistical analysis was "unreliable" does not attack the basic methodology or the scientific

> underpinnings of the DNA analysis or the calculation of the statistical probability. Rather, [Petitioner] argues the statistical analysis was unreliable since the samples contained a mixture of DNA from multiple persons and it could not be definitively stated whether [Petitioner] had contributed or not contributed to the DNA mixture. As he points out, in the samples, the 13, 14, and 15 alleles were detected and he would have been excluded as a contributor if the DNA had been contributed by two heterozygote persons, for example, by one person with the 13 and 14 alleles and another person with the 14 and 15 alleles. He contends this scenario–where [Petitioner] would be excluded as a contributor because he was a homozygote with only 14 alleles–"was not taken into consideration in the statistical calculation...[that] instead assumed one of the contributors was a homozygote 14, thereby resulting in statistical frequency...for [Petitioner] being a contributor."
>
> This argument goes to the weight of the evidence, not its admissibility. As [an expert] explained at the Evidence Code section 402 hearing, the statistical analysis "simply [addresses]...the percent of the population that doesn't have a 14 allele, and, therefore, can absolutely be excluded as a contributor to the sample." The statistical analysis showing the percentage of the population of African Americans who could have contributed to the samples was proper evidence for the jury to consider; it was relevant information. It was not unduly prejudicial, that is, it was not unduly inflammatory nor was it likely to mislead the jury. It was clearly presented to the jury that this was a limited DNA analysis, complicated by the low levels of DNA and the multiple contributors. The jury was fully apprised that it was not possible to determine whether the 14 allele has been contributed by a homozygote and that it was possible the DNA had been contributed by heterozygotes with 13, 14, and 14, 15 alleles, a situation that would exclude [Petitioner] as a donor.
>
> [Petitioner] also contends that the evidence was unreliable because O'Donnell admitted that experts from different laboratories could reach different opinions about the statistical probability that an individual had contributed DNA to a sample. This argument does not further [Petitioner's] argument that the evidence should have been excluded. The experts disagreed only because they used differing thresholds for determining when an allele should be factored into a statistical analysis. The fact that experts may differ does not render testimony inadmissible. If that were so, then we would never have trials with competing experts. Juries are allowed to hear and to weigh competing expert testimony. [Petitioner] was free to bring in his own expert to dispute the analysis for the prosecution's witness or, as he did both at the evidentiary hearing and at trial, use cross-examination to expose differing expert views. Further, the evidence indicated that the San Diego laboratory was conservative in setting thresholds and other laboratories, using lower thresholds, would have computed a higher statistical probability that [Petitioner] contributed to the DNA found on Duray's car. In other words, other expert opinions might have been more damaging to the defense than the expert opinion offered here.

(Lodgement No. 8 at 17-20).

In ruling the trial court did not abuse its discretion in admitting the DNA evidence, the Court of Appeal based its decision on the conclusion the evidence was properly admitted pursuant to

1    California law. (Lodgement No. 8 at 16). Relying on People v. Kelly, the Court of Appeal noted the
2    DNA analysis used at trial is generally accepted in the scientific community. (Lodgement No. 8 at
3    17). The Court of Appeal also concluded Petitioner did not attack the methodology used to analyze
4    the DNA evidence, so that his claim went to the weight of the evidence rather than its admissibility.
5    (Lodgement No. 8 at 19). The Court of Appeal found the DNA evidence was relevant, not unduly
6    prejudicial or inflammatory, and not likely to mislead the jury, especially because the DNA evidence
7    was clearly presented to the jury as limited DNA analysis. (Lodgement No. 8 at 19). Ultimately,
8    the Court of Appeal noted it is the province of juries to hear and weigh competing evidence. In light
9    of these considerations, it is evident the Court of Appeal applied state law carefully and thoroughly.
10   Therefore, Petitioner is unable to demonstrate that either the trial court arbitrarily admitted the DNA
11   evidence or the appellate court arbitrarily rejected his claim. Based thereon, Petitioner has failed to
12   demonstrate a due process violation. Fetterly, 997 F.2d at 1300.
13           Petitioner has also failed to demonstrate fundamental unfairness arising from the admission
14   of the DNA evidence. The Court of Appeal correctly points out the conservative threshold used by
15   the laboratory in Petitioner's case potentially benefitted him. Another laboratory, using lower
16   thresholds, would have computed a higher statistical probability that [Petitioner] contributed to the
17   DNA found on Duray's car. Therefore, other expert opinions might have been more damaging to
18   the defense than the expert opinion offered in this case. Based thereon, the Court of Appeal's
19   decision the trial court did not abuse its discretion in admitting the DNA evidence was not contrary
20   to or an unreasonable application of clearly established federal law or an unreasonable determination
21   of the facts. Accordingly, the Court RECOMMENDS the Petition be denied as to this ground for
22   relief.
23   **D.    Ground Four: Insufficient Evidence Corroborated Accomplice's Testimony**
24           Petitioner's fourth ground of relief is a claim insufficient evidence corroborated the
25   testimony of his accomplice, Ledesma. (Doc. No. 1 at 27-37). Petitioner contends without her
26   testimony, the evidence was not sufficient to support the verdicts of guilty beyond a reasonable
27   doubt. Respondent contends Petitioner fails to state a federal question. (Doc. No. 8 at 31). Even
28   assuming error, Respondent asserts Petitioner has not demonstrated the testimony had a substantial

and injurious effect on the jury's verdict.

The federal constitutional right to due process "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). When a habeas petitioner claims there was insufficient evidence produced at trial to support a conviction, a federal court determines whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 301, 319 (1979). Deference is provided to the trier of facts' weighing of the evidence by reviewing "*all of the evidence*...in the light most favorable to the prosecution." Id. (emphasis in the original). With the additional layer of deference established by the AEDPA, Petitioner must demonstrate the California Court of Appeal contradicted clearly established Supreme Court precedent by rejecting Petitioner's claim because no rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. Cf. Juan H. v. Allen, 408 F.3d 1262, 1274-75 (9th Cir. 2005).

In considering the requirements of procedural due process, use of accomplice testimony is not catalogued with constitutional restrictions. United States v. Augenblick, 393 U.S. 348, 352 (1969). Accordingly, any failure to satisfy California's requirement of corroboration for accomplice testimony[1] does not present a federal question unless the accomplice testimony is facially incredible or insubstantial, United States v. Necoechea, 986 F.2d 1273, 1282 (9th Cir. 1993), or unless the alleged violation rendered the petitioner's trial fundamentally unfair. Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000) (citing Estelle v. McGuire, 502 U.S. at 72-73). A state violates a criminal defendant's due process right to fundamental fairness if it arbitrarily deprives the defendant of a state law entitlement. Hicks v. Oklahoma, 447 U.S. 343, 346 (1980).

---

[1] Cal. Penal Code § 1111 states:

A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.

The Court of Appeal held there was sufficient evidence to corroborate Petitioner's accomplice, Ledesma's testimony, with regard to both the Killpack robbery and assault as well as the Duray robbery and murder. Specifically with regard to the Killpack incident, the Court of Appeal held:

> The photographic line-up was not unduly suggestive and, moreover, Killpack's instantaneous identification of George and experience of having viewed a photo array where neither of the assailants was present tended to show his identification was likely to be accurate. Killpack's eyewitness testimony [Petitioner] was the robber and assailant amply corroborated Ledesma's testimony. Furthermore, Ledesma's testimony was corroborated by the presence of gas station receipts from the use of Killpack's credit card in [Petitioner's] car and evidence indicating gasoline purchases on the credit card were made at locations close to where [Petitioner] lived and worked. The fact that Ledesma sometimes used [Petitioner's] car did not render this evidence wholly uncorroborative; it was instead a factor for the jury's consideration in determining her credibility.

(Lodgement No. 1 at 21-22).

With respect to the Duray robbery and murder, the Court of Appeal relied on evidence independent of Ledesma's testimony to find there was sufficient evidence to find Petitioner guilty. The Court of Appeal held:

> The DNA evidence, admittedly, was not strongly compelling evidence. However, the DNA evidence was not the only physical evidence corroborating Ledesma's testimony. Duray's car keys were located outside where the car had been parked, thus corroborating Ledesma's testimony she had thrown the keys out the window. Duray's daughter testified she received a call from Duray's phone where she heard rustling noises and a man demanding money. Her testimony not only corroborated Ledesma's story that Duray's cell phone received a call from a woman who was calling for her father during the incident but also was independent evidence there was a man involved in the robbery. Additionally, when arrested, [Petitioner] had a new wallet on him that was similar to the wallet stolen from Duray.
>
> Furthermore, [Petitioner] could be connected to the Duray robbery and murder based on the striking similarities to the Killpack robbery and assault. Both incidents occurred on the same night, within a few hours of each other, and within a short distance of each other. Indeed, Killpack testified he was prompted to report the crime because of the location of the murder. Killpack's eyewitness identification established that Ledesma was present during his robbery and assault, that she was a prostitute, had directed him to recline his seat and she used a condom. Duray was found with his seat reclined. A condom was found containing DNA both from Duray and Ledesma, thus corroborating that Ledesma was involved in the Duray robbery and murder. In both incidents the car keys were a short distance away from where the cars were parked, the windows of the car were partially rolled down, the victim was manually strangled, and the

> victim's wallet was taken. There was also evidence, from Ledesma as well as other witnesses, that [Petitioner] was her boyfriend.
> Under these circumstances, given Killpack's identification of [Petitioner] as his attacker, Ledesma's presence at both incidents, her relationship to [Petitioner], the timing and location of the incidents, and the strong similarities of how the robberies and assaults occurred, a jury could reasonably infer that Ledesma's accomplice in both incidents was the same man and that man was [Petitioner]. In other words, even without Ledesma's testimony or the DNA evidence, there was sufficient evidence to establish [Petitioner's] identity as the robbery and assailant.

(Lodgement No. 8 at 22-24).

Here, the Court of Appeal found there was sufficient evidence to corroborate Ledesma's testimony. That finding is supported by the record. Killpack's identification of Petitioner and eyewitness testimony corroborate Ledesma's testimony with respect to the Killpack robbery and assault. Additionally, the presence of gas receipts from the use of Killpack's credit card in Petitioner's car corroborate her testimony. Ledesma's testimony regarding the location of Duray's car keys and the phone call from Duray's daughter were corroborated by evidence independent of her testimony. Ultimately, the similarities between the Killpack and Duray robberies serve to corroborate Ledesma's testimony. In light of this evidence, Petitioner cannot demonstrate the trial court acted in an arbitrary fashion with respect to allowing the testimony of his accomplice, or that the decision of the appellate court rejecting his claim was arbitrary. Therefore, because Ledesma's testimony was neither incredible nor insubstantial on its face, and because Petitioner was not denied his right to a fair trial, Petitioner has failed to demonstrate a violation of his right to due process.

Further, by reaching the conclusion a jury could reasonably infer Ledesma's accomplice was Petitioner, the adjudication of this claim by the appellate court was neither contrary to, nor involved an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts. Jackson v. Virginia, 443 U.S. at 319. Although the Court of Appeal found no error, in light of the ample evidence independent of the accomplice testimony, the Court correctly determined Ledesma's testimony did not have a substantial and injurious effect on the jury's verdict. Brecht, 507 U.S. at 638. Accordingly, the Court RECOMMENDS the Petition be denied as to this ground for relief.

**E.     Ground Five: Cumulative Effect of Errors at Trial Deprived Petitioner of Due Process**

Petitioner's fifth ground of relief is a claim cumulative error warrants relief. (Doc. No. 1 at

1  37). Respondent contends Petitioner's cumulative error fails because his individual claims do not
2  establish constitutional errors or prejudice. (Doc. No. 8 at 34).
3      "Although no single alleged error may warrant habeas corpus relief, the cumulative effect of
4  errors may deprive a petitioner of the due process right to a fair trial." Karis v. Calderon, 283 F.3d
5  1117, 1132 (9th Cir. 2002). The Ninth Circuit has explained "[c]umulative error applies where,
6  'although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the
7  cumulative effect of multiple errors may still prejudice a defendant.'" Mancuso v. Olivarez, 292
8  F.3d 939, 957 (9th Cir. 2002) (quoting United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir.
9  1996)).
10     The Court of Appeal rejected Petitioner's cumulative error claim because it found no errors
11 were committed by the trial court. (Lodgement No. 8 at 24). Because there are no errors to
12 accumulate which amount to a denial of due process, Petitioner's cumulative error claim fails. See
13 Fuller v. Roe, 182 F.3d 699, 704 (9th Cir. 1999). Accordingly, the Court RECOMMENDS the
14 Petition be denied as to this ground for relief.

15 **VI.    CONCLUSION**

16     After thorough review of the record in this matter and based on the foregoing analysis, this
17 Court recommends the Petition for Writ of Habeas Corpus be DENIED. This Proposed Findings of
18 Fact and Recommendation for Disposition of the undersigned Magistrate Judge is submitted to the
19 United States District Court assigned to this case, the Honorable Napoleon A. Jones, Jr. , pursuant to
20 the provisions of 28 U.S.C. § 636(b)(1) (2007) and Local Rule 72.1(d).
21     IT IS HEREBY ORDERED that **no later than December 5, 2008,** any party may file and
22 serve written objections with the Court and serve a copy on all parties. The document should be
23 captioned "Objections to Report and Recommendation."
24 //
25 //
26 //
27 //
28 //

IT IS FURTHER ORDERED that any reply to the objections shall be filed and served no later than ten days after being served with the objections. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED: November 7, 2008

_____
LOUISA S PORTER
United States Magistrate Judge

cc:  The Honorable Napoleon A. Jones, Jr.
     all parties