1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| RICHARD EARL GEORGE | ) | Civil No. 07cv2215 J (POR) |
| | ) | |
| Petitioner, | ) | **ORDER:** |
| v. | ) | **(1) ADOPTING THE REPORT AND RECOMMENDATION;** |
| | ) | |
| V.M. ALMAGER, Warden, et al., | ) | **(2) DENYING THE PETITION FOR WRIT OF HABEAS CORPUS; and** |
| | ) | |
| Respondent. | | **(3) DENYING PETITIONER'S REQUEST FOR APPOINTMENT OF COUNSEL** |

Before the Court is Magistrate Judge Louisa S. Porter's Report and Recommendation ("R&R") recommending that the Court deny the Writ of Habeas Corpus, filed pursuant to 28 U.S.C. § 2254, of Petitioner Richard Earl George.  [Doc. No. 15.]  This Court has considered the Petition, Respondent's Answer, Petitioner's Traverse, Petitioner's Objections to the R&R, and all the supporting documents the parties have submitted.  Having considered the documents, this Court **ADOPTS** the R&R, **DENIES** the Petition, and **DENIES** Petitioner's request for the appointment of counsel for the reasons stated below.

### *Factual Background*

Because the facts as found by the state appellate court are set out in detail in the R&R, the Court will only provide a brief summary here.  (*See* R&R at 2-5.)

Petitioner was Bertha Ledesma's boyfriend and pimp.  Ledesma was afraid of Petitioner, and at one point wrote a letter stating that if she were found dead, to investigate Petitioner because he had tried to kill her by strangulation.  Petitioner sold drugs and was also a driver for Amvets in El Cajon.  On Saturday night, January 3, 2004, Petitioner drove Ledesma to one of her usual prostitution locations by the Adult Emporium on Main Street in Chula Vista.

At about 2:15 a.m., Petitioner agreed to give Fred Killpack oral sex.  While Ledesma and Killpack were parked in his vehicle, Killpack saw Petitioner walking towards his car from the corner.  Killpack started the car's engine and Ledesma began punching, scratching, and biting his face.  Petitioner told Ledesma to throw the car keys out of the car, which she did.  Petitioner reached into the car and choked Killpack into unconsciousness.  Petitioner took Killpack's wallet, which Killpack had taken out during the struggle and offered to him.  Petitioner and Ledesma left Killpack unconscious in his car.

When Petitioner and Ledesma were arrested on January 14, 2004, Petitioner had receipts in his car for gas station purchases made with Killpack's credit card, one of which was from a gas station near the Amvets where Petitioner worked.  Records for the credit card indicated it had been used on the morning of January 4 at a gas station near the motel where Ledesma and Petitioner were staying.

On the same morning of the Killpack incident, Ledesma and Petitioner returned to an area on 32nd Street in San Diego, arriving about 5:00 am.  There Ledesma saw Tom Duray.  The two drove around the corner and Duray paid her $30.  He reclined his seat, and while she was putting a condom on him, she stole his cell phone and put it in her pocket.  Shortly after Ledesma began performing oral sex on Duray, Petitioner reached into the car, tried to grab Duray's throat, and told Ledesma to throw the car keys out the window, which she did.  At one point, Ledesma heard a female voice coming from Duray's cell phone, yelling for her father and asking what was wrong.  Eventually Petitioner got into the back seat of Duray's car and strangled him until he stopped fighting.

Petitioner took Duray's wallet and instructed Ledesma to remove the valuable contents.  He asked her about the condition of the wallet, and she told him it looked brand new.  Petitioner

2

then transferred the contents of his wallet to Duray's and threw away his old wallet.  Duray's son testified that his father had recently purchased a new wallet that looked similar to a wallet recovered from Petitioner during his arrest.

Duray died due to manual strangulation.  From Duray's car, police recovered a used condom and collected smudges on the right rear window for DNA analysis.   A statistical analysis of the DNA evidence recovered was later presented at trial.

Killpack was initially shown a photo lineup by police, where Ledesma's photograph was not included; Killpack did not identify any of the women in that lineup.  Subsequently, Killpack was shown a lineup with Ledesma's photograph, where he identified Ledesma after two or three seconds.  In another photo lineup provided by police, Killpack "instantaneously" identified Petitioner as his assailant.  He was 100 percent positive in his identification.  Killpack also identified Petitioner at trial.

### Procedural History

On November 22, 2005, a jury found Petitioner guilty of first degree murder committed during the course of a robbery, two counts of robbery, and one count of assault by means of force likely to produce great bodily injury.  On January 4, 2006, the trial court sentenced Petitioner to serve life without parole plus seven years.

Petitioner filed an appeal to the California Court of Appeal, Fourth Appellate District, Division One ("Appeal"), raising claims similar to those in his Petition.  (Lodgment No. 8; Petition at 2.)  On May 25, 2007, the California Court of Appeal affirmed the judgment.  (Appeal at 2, 24.)  On July 2, 2007, Petitioner filed a petition for review in the California Supreme Court on same issues raised in his Appeal.  (Lodgment No. 9.)  The California Supreme Court denied the petition on August 22, 2007.  (Lodgment No. 10.)

On November 19, 2007, Petitioner filed a federal petition for writ of habeas corpus.  [Doc. No. 1.]  On March 26, 2008, Respondent filed an Answer.  [Doc. No. 8.]  Petitioner filed his Traverse on May 14, 2008.  [Doc. No. 14].  On November 7, 2008, Judge Porter issued her R&R recommending the Petition be denied.  [Doc. No. 15.]  Petitioner filed timely Objections to

1   the R&R on January 8, 2009.  [Doc. No. 21.]  Petitioner filed a Motion to Appoint Counsel on

2   February 4, 2009, filed *nunc pro tunc* to January 30, 2009.  [Doc. No. 23.]

3                                              ***Legal Standard***

4   **I. State Habeas Prisoner Standard**

5            A federal court must grant habeas relief to a petitioner in state prison if the petitioner is in

6   custody "in violation of the Constitution or other laws or treaties of the United States."  28

7   U.S.C. § 2254(a).  A federal court's duty in examining a state prisoner's habeas petition is

8   governed by 28 U.S.C. § 2254 as amended by the 1996 Antiterrorism and Effective Death

9   Penalty Act ("AEDPA").  Pursuant to § 2254, a federal court may grant habeas corpus relief

10  from a state-court judgment only if the adjudication was (1) "contrary to, or involved an

11  unreasonable application of, clearly established Federal law as determined by the Supreme Court

12  of the United States," or (2) "was based on an unreasonable determination of the facts in light of

13  the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

14           The phrase "clearly established Federal law, as determined by the Supreme Court of the

15  United States" refers to the holdings, as opposed to dicta, of the Supreme Court's decisions at

16  the time of the relevant state-court decision.  *See Williams v. Taylor*, 529 U.S. 362, 405 (2000).

17  Holdings by the Courts of Appeals and dicta in Supreme Court opinions are not governing law

18  for purposes of habeas review.  *See Carey v. Musladin*, 549 U.S. 70, 76-77 (2006); *Lockyer v.*

19  *Andrade*, 538 U.S. 63, 71-72 (2003).  However, Ninth Circuit case law may be persuasive

20  authority for purposes of determining whether a particular state-court decision is an "unreason-

21  able application" of Supreme Court law.  *Duchaime v. Ducharme*, 200 F.3d 597, 600 (2000).

22  Such precedent may also help determine what law is "clearly established."  *Id.*

23           A state-court decision is "contrary to clearly established federal law" if it (1) applies a

24  rule that contradicts the governing law set forth in Supreme Court cases, or (2) confronts a set of

25  facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless

26  arrives at the opposite result.  *See Williams*, 529 U.S. at 405.  The inquiry into whether a state

27  court's interpretation of federal law is "contrary to" clearly established federal law is itself a

28  question of federal law as to which federal courts owe no deference to the state courts.  *See*

1   *Cordova v. Baca*, 346 F.3d 924 (9th Cir. 2003).  Mixed questions of fact and law are reviewed

2   under the "contrary to" and "unreasonable application" clauses in 28 U.S.C. § 2254(d)(1).

3   *Lambert v. Blodgett*, 393 F.3d 943, 976 (9th Cir. 2004).  A state court's factual findings

4   underlying its conclusions on mixed issues are accorded a presumption of correctness.  *Id.*

5       A state court decision is an "unreasonable application of" Supreme Court precedent if the

6   court correctly identifies the governing legal rule but applies it unreasonably to the facts of the

7   case.  *Williams*, 529 U.S. at 407-408; *Luna v. Cambra*, 306 F.3d 954, 960 *as amended* 311 F.3d

8   928 (9th Cir. 2002).  This is a "highly deferential standard for evaluating state-court rulings,"

9   *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997), and "demands that state court decision be given

10  the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).  Under

11  section 2254(d)(1)'s "unreasonable application" clause, a writ of habeas corpus may not issue

12  simply because the reviewing district court concludes in its independent judgment that the

13  relevant state court decision applied clearly established federal law "erroneously" or "incor-

14  rectly."  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  Rather, that application also must be

15  *objectively* unreasonable.  *Id.* at 76.  Though this standard is not self-explanatory, it is a higher

16  standard than clear error, the old standard applied by the Ninth Circuit.  *Clark v. Murphy*, 331

17  F.3d 1062, 1068 (9th Cir. 2003).

18      A state court renders a "decision that was based on an unreasonable determination of the

19  facts in light of the evidence presented in the State court proceeding" if the decision "is so

20  clearly incorrect that it would not be debatable among reasonable jurists."  *Jeffries v. Wood*, 114

21  F.3d 1484, 1500 (9th Cir. 1997) (*overruled on other grounds by Lindh v. Murphy*, 521 U.S. 320

22  (1997)).

23      Under section 2254(e)(1), federal courts must "give great deference to the state court's

24  factual findings."  *Id.* at 1499-1500.  Petitioner may only rebut the presumption of correctness

25  given to a state court's determination of a factual issue under § 2254(e)(1) by clear and convinc-

26  ing evidence.  *See* 28 U.S.C. § 2254(e)(1); *Gonzalez v. Pliler*, 341 F.3d 897, 903 (9th Cir. 2003).

27   However, "[f]or claims for which no adjudication on the merits in state court was possible . . .

28  AEDPA's standard of review [and deference to factual findings] does not apply."  *Killian v.*

*Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002); *see Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004) (holding that 2254(e)(1) only applies to challenges based on "evidence presented for the first time in federal court," whereas 2254(d)(2) applies to "intrinsic review of a state court's findings based entirely on the state record."); *see also McKinney v. Rees*, 993 F.2d 1378, 1382 n.4 (9th Cir. 1993) ([L]egal conclusions regarding the admissibility of evidence . . . are not findings of fact, and are not binding on this court.").

When the highest state court issues a decision in a case but does not articulate the rationale for its determination, such as issuing a silent denial, the silence is deemed to be consent to the lower court's decision, and the reviewing court should "look through" to the "last reasoned opinion" to determine the legal basis for the denial. *Y1st v. Nunnemaker*, 501 U.S. 797, 804 (1991).

## II. Reviewing Magistrate Judge's R&R

The duties of a district court in connection with a magistrate judge's R&R are set forth in Rule 72(b) of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1).  A district court must "make a *de novo* determination of those portions of the report . . . to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(3) (2007); *see also United States v. Raddatz*, 447 U.S. 667, 676 (1980) ("[I]n providing for a '*de novo*' determination . . . Congress intended to permit whatever reliance a district judge, in exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations.").

## III. Pro Se Litigant

A pro se litigant's pleadings should be liberally construed, and the litigant should be given leave to amend with instructions as to curing the deficiency unless the defects cannot be cured by amendment.  *See McGuckin v. Smith*, 974 F.2d 1050, 1055 (9th Cir. 1992).

### *Petitioner's Objections*

Because Petitioner has filed objections to the R&R, this Court must conduct a *de novo* review of the portions of the R&R to which objections were made.  28 U.S.C. § 636(b)(1); FED.

1  R. CIV. P. 72(b)(3) (2007); *see also Raddatz*, 447 U.S.at 676.  Petitioner objects to the R&R,

2  raising the same general arguments offered in his Petition.  (Objections at 6-20.)

3  *Analysis*

4  The Petition raises the following five grounds for relief: (1) the trial court

5  improperly admitted evidence of a prior choking incident; (2) the trial court improperly admitted

6  evidence of an unduly suggestive photo line-up; (3) the trial court improperly admitted unreli-

7  able DNA evidence; (4) insufficient evidence corroborated Petitioner's accomplice's testimony;

8  and (5) the cumulative effect of the errors at Petitioner's trial deprived him of due process.

9  (Petition at 6-37.)  Petitioner asks that his convictions be reversed.  (*Id*. at 10, 26.)

10  **I.  Ground One - Admission of Evidence of Prior Choking Incident**

11  Petitioner claims that the trial court improperly admitted evidence of a prior choking

12  incident, thereby violating his right to due process.  (Petition at 6-7.)  The trial court admitted a

13  letter in which Ledesma wrote Petitioner tried killing her in the past by choking her, concluding

14  that the choking evidence was not so prejudicial as to overcome the probative value.  (1 Re-

15  porter's Transcript at 117.)  The court noted *inter alia* that the choking evidence was "very

16  probative" as to why Ledesma initially lied to the police.  *Id*. Petitioner contends this similar

17  prior act evidence is highly prejudicial, of limited probative value, and was admitted as

18  propensity evidence in violation of California Evidence Code § 352 and § 1101(a).  (Objections

19  at 6-9; Petition at 6-7.)

20  **A.  Legal Standard and Court of Appeal Decision**

21  **Federal Standard.**  A state's interpretation of its laws or rules provides no basis for

22  federal habeas corpus relief when no federal constitutional question arises.  *Estelle v. McGuire*,

23  502 U.S. 62, 67-68 (1991); *see Jammal v. Van DeKamp*, 926 F.2d 918, 919 (9th Cir. 1991) ("We

24  are not a state supreme court of errors; we do not review questions of state evidence law.").

25  However, a violation of *federal* due process rights may give rise to a claim for federal habeas

26  corpus relief, notwithstanding that the alleged violation coincides with a determination of state

27  law.  *See Estelle*, 502 U.S. at 67*; McKinney v. Rees*, 993 F.2d 1355, 1378 (9th Cir. 1993).  The

28  issue in such cases is "whether the state proceedings satisfied [federal] due process; the presence

1   or absence of a state law violation is largely beside the point." *Jammal*, 926 F.2d at 919-20

2   (citations omitted).

3   To demonstrate that a state court's admission of evidence violated his federal due process

4   rights, a petitioner must show that the trial court committed an error in admitting the evidence

5   that rendered the trial fundamentally unfair. *Estelle*, 502 U.S. at 67; *see Jammal*, 926 F.2d 918

6   ("[T]he admission of evidence must have so fatally infected the proceedings as to render them

7   fundamentally unfair.").

8   The Ninth Circuit has held that admission of prior bad acts only violates due process "if

9   there are *no* permissible inferences the jury may draw from the evidence . . . .  Even then, the

10  evidence must be of such quality as necessarily prevents a fair trial." *Jammal*, 926 F.2d at 920

11  (emphasis in original) (internal quotations and citations omitted).  Further, the Ninth Circuit has

12  stated that propensity evidence "will only sometimes violate the constitutional right to a fair

13  trial, if it is of no relevance, or if its potential for prejudice far outweighs what little relevance it

14  might have." *United States v. Lemay*, 260 F.3d 1018, 1027 (9th Cir. 2001).  Additionally, the

15  Ninth Circuit has stated that federal due process violations can arise from arbitrary rulings of

16  state law.  *See Fetterly v. Paskett*, 997 F.2d 1295, 1300 (9th Cir. 1993); *see also Walters v.

17  Maas*, 45 F.3d 1355, 1357 (9th Cir. 1995) (a state court's decision to admit prior acts evidence

18  violates due process when it is "arbitrary or so prejudicial that it rendered the trial fundamentally

19  unfair") (citations omitted).

20  In all federal habeas proceedings, a state court must apply the "substantial and injurious

21  effect" analysis set forth in *Brecht* regardless of whether the state appellate court applied the

22  harmless error standard set forth in *Chapman v. California*, 386 U.S. 18, 87 (1967).  *See Fry v.

23  Pliler*, 127 S. Ct. 2321, 2328 (2007) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993));

24  *see also McKinney*, 993 F.2d at 1385.

25  **California Evidence Code.**  California Evidence Code § 352 grants courts discretion to

26  exclude evidence if its probative value is substantially outweighed by the probability that its

27  admission will:  (1) necessitate undue consumption of time, or (2) create substantial danger of

28  undue prejudice, of confusing the issues, or of misleading the jury.

8

California Evidence Code § 1101(a) generally prohibits introducing evidence a defendant committed acts, other than those charged, to prove he or she is a person of bad character or has a criminal disposition.  Evidence Code § 1101(b), however, allows introduction of such evidence to prove issues such as identity, intent, motive, and lack of mistake or accident.  *People v. Kipp*, 18 Cal. 4th 349, 369 (1998).  Nevertheless, "evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent."  *Id*.  Also, uncharged misconduct is subject to exclusion if its probative value is substantially outweighed by a danger of undue prejudice, confusion of the issues, or of misleading the jury.  *Id*. at 371.

**California Court of Appeal Decision**.  In the last reasoned state court decision, the California Court of Appeal ("CCA") held that the trial court did not abuse its discretion in admitting evidence of a prior choking incident, basing its decision on interpretation of state law.  (Lodgment No. 8 at 9-12 (approaching its analysis through the interpretation of CAL. EVID. CODE §§ 352, 1101, and California case law).)  Noting that Ledesma's testimony was "sharply disputed" by the defense, the CCA found the choking evidence relevant under CAL. EVID. CODE § 1101 to show Ledesma may have initially lied to the police out of fear of Petitioner.  (*Id*.)

Further, the court found the choking evidence to be especially probative because Ledesma's letter was written before the crimes occurred and was recovered during a search of her belongings before she was arrested.  (*Id*. at 11.)  The CCA additionally determined the choking evidence was not unduly prejudicial as it would not likely inflame the jury against Petitioner in light of the violent nature of the facts relating to the crimes charged.  (*Id*. at 11-12 (noting Killpack testified that he had internal bleeding, difficulty breathing, pain when he talked, and his injuries took four to six weeks to heal completely).

**B.  Legal Analysis**

**Erroneous Interpretation of State Law**.  Petitioner points specifically to the state courts' alleged erroneous application of CAL. EVID. CODE §§ 352 and 1101 as grounds for federal habeas relief.  (Petition at 6.)  Because the Supreme Court has held that an erroneous

1   interpretation of state law provides no basis for federal habeas relief, this Court is barred from

2   granting federal habeas corpus relief on such grounds. *Estelle*, 502 U.S. at 67-68; *see also*

3   *Jammal*, 926 F.2d at 919. However, Petitioner also argues the admission of this "irrelevant

4   'other acts' evidence" violated his due process rights to a fair trial, and thereafter cites *inter alia*

5   *McKinney*, 993 F.2d at 1378 (holding that the state's admission of prior acts evidence violated

6   the petitioner's *federal* constitutional rights). (Objections at 7; Traverse at 10; Petition at 7.)

7   Therefore, this Court must look to whether the admission of the choking evidence and the

8   CCA's decision satisfied Petitioner's *federal* due process rights. *Jammal*, 926 F.2d at 919-20.

9          **Relevance and Permissible Inference**. Petitioner fails to show the choking evidence

10  was irrelevant, i.e. that no permissible inferences could be drawn from it. *See Estelle*, 502 U.S.

11  at 68-69; *McKinney*, 993 F.2d at 1381; *Jammal*, 926 F.2d at 920.[1]

12         As the CCA correctly noted, Ledesma's credibility was at issue, and the inconsistencies

13  in her statements to police raised doubt about the credibility of her testimony. (*See, e.g.,* 1 RT

14  113 (prior to Ledesma taking the stand and the admission of the choking evidence, defense

15  counsel informed the court that she intended to impeach Ledesma based on her initial statements

16  to the police); *see also* 5 RT 760-98 (during cross-examination, defense counsel repeatedly

17  questioned Ledesma about the inconsistencies between her original statements to the police and

18  her in-court testimony).)    Ledesma testified she was scared of what Petitioner might do to her

19  if she told police the truth about his involvement in the crimes. (4 RT 748.) Her letter

20  corroborated this testimony. (*See id*. at 747) This evidence could reasonably have the purpose

---

[1] Petitioner argues that, under *McKinney*, the choking evidence was irrelevant because the prosecution did not offer it to prove "some material element of the charged crimes." (Objections at 9.) As reasoned below, the choking evidence supported the credibility of Ledesma's eyewitness testimony, which was itself direct evidence of Petitioner's identity in the crimes charged. *See McKinney*, 993 at 1384 ("Because the evidence . . . makes a fact of consequence, his identity as the murderer, more probable, its admission was not in violation of the historically grounded rule against the use of 'other acts' evidence to prove character.") While it is recognized that the choking evidence was offered as credibility evidence and thus not "direct" evidence of an element of the crime, Petitioner cites no authority to show that such evidence is *per se* irrelevant, and *McKinney* certainly offers no such proposition. *See generally*, *McKinney*, 993 F.2d at 1183 (finding that it was the absence of any logical inference unrelated to the defendant's character that made the credibility evidence irrelevant, not the sole fact that said evidence was offered solely to support the witness's credibility).

and effect of bolstering the credibility of Ledesma's in-court testimony, as jurors could infer from the evidence that Ledesma initially lied to the police because she was afraid of Petitioner; moreover, jurors could reasonably infer that, because Petitioner was no longer a threat to her, Ledesma would be more inclined to tell the truth in court.  (*See* 4 RT 753.)   Thus, the record supports the CCA's conclusion that the choking evidence was relevant to show Ledesma's motive to initially lie to the police.  *Lemay*, 260 F.3d at 1029.  As noted by the CCA, this was a purpose distinct from showing Petitioner had a propensity to choke people or commit the charged crimes.  (Lodgment No. 8 at 11.)   Thus, the choking evidence supported at least one permissible inference unrelated to Petitioner's bad character or propensity to commit the charged crimes.  *Jammal*, 926 F.2d at 920.

Petitioner offers no authority supporting the proposition that, in order to be relevant, evidence offered to prove a material element of the crime must be *direct evidence*.

**Prejudice and Probative Value**.  Petitioner fails to show that potential prejudice from the choking evidence so outweighed its probative value as to constitute a violation of his federal due process rights.  *Lemay*, 260 F.3d at 1027; *see also McKinney*, 993 F.2d at 1385.  As the CCA correctly noted, the choking evidence was probative of Ledesma's motive to lie.  Further, it was reasonable to conclude the choking evidence would not have a highly inflammatory effect in light of the violent nature of the charged crimes.  (*See, e.g.*, 3 RT 437 (Killpack testified that, following the incident, every time he coughed he would spit up blood).)[2]  Thus Petitioner fails to show that his federal due process rights were violated by the admission of evidence with an overly prejudicial effect.  *Lemay*, 260 F.3d at 1027.

**Arbitrary Determination**.  Both the trial court and the CCA found that the choking evidence did not violate CAL. EVID. CODE § 352 as being overly prejudicial.  As noted by the Magistrate Judge, this conclusion is supported by the record.  (*See* R&R at 10; Lodgment No. 8

---

[2] Additionally, during pretrial proceedings, the trial court afforded defense counsel the opportunity to reduce any danger of undue prejudice by offering to give a limiting instruction to the jury as to how the choking evidence could be used. (1 RT 117-18.)  Petitioner does not show such an instruction would have been insufficient to limit the danger of undue prejudice.  *See Maas*, 45 F.3d at 1357-58.

1    at 9-12.)  Thus, neither the trial court nor the CCA's decision can be considered so arbitrary as to

2    have violated Petitioner's right to due process.  *Walters*, 45 F.3d at 1357.

3          **Harmless Error**.  Even if the choking evidence had some unduly prejudicial effect,

4    "[t]he admission of even highly prejudicial evidence" does not "necessarily trespass on a

5    defendant's constitutional rights."  *Lemay*, 260 F.3d at 1027.  Assuming *arguendo* the choking

6    evidence was admitted erroneously, Petitioner fails to show that said evidence had or reasonably

7    may be taken to have had a substantial and injurious effect on the jury's verdict.  *McKinney*, 993

8    F.2d at 1386.  The record reflects that Petitioner's choking of Ledesma was mentioned relatively

9    briefly during the prosecution's direct examination of said witness; the relevant dialogue

10   spanned approximately one-half a transcript page.  (*See* 4 RT 746; *see also Brecht*, 507 U.S. at

11   639; *Correll v. Stewart*, 137 F.3d 1404, 1417 (9th Cir. 1998) (distinguishing that case from

12   *McKinney*, where the prosecution engaged in extensive questioning, occupying over sixty

13   transcript pages, regarding the defendant's uncharged prior acts).)  Later, during cross-examina-

14   tion, defense counsel asked whether Petitioner had choked her, to which the witness replied

15   "yes." (Lodgment No. 2, Vol. 5 at 797.)  The prosecutor once more briefly brought up the prior

16   choking incident on redirect.  (5 RT 805.)

17         Petitioner does not cite to anywhere in the record where the choking evidence was used in

18   such a way where it reasonably may be taken to have had a substantial and injurious effect on

19   the jury's verdict.  *McKinney*, 993 F.2d at 1386.  Here, like in *Brecht* and *Correll*, the prosecu-

20   tor's references to the alleged improper evidence were relatively infrequent.  *See Brecht*, 507

21   U.S. at 639; *Correll*, 137 F.3d at 1417.   Moreover, the testimony elicited was relatively

22   "sterile."  *See Correll*, 137 F.3d at 1417.  Furthermore, the evidence unrelated to Ledesma's

23   choking incident was substantial.[3]  Thus, it is "highly improbable that the error, if any, had a

24   substantial and injurious effect or influence in determining the jury's verdict."  *Id*. (internal

25   citations and quotations omitted).

26

27

28

_____

[3] *See, e.g.*, discussion of Ground Four *infra*.

Petitioner fails to show that the CCA's decision that the trial court did not abuse its discretion in admitting evidence of a prior choking incident was contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts. Additionally, Petitioner has not established that his trial was rendered fundamentally unfair. *See Estelle*, 502 U.S. at 67*; McKinney*, 993 F.2d at 1378. Based on the record and for the reasons discussed above, this Court **ADOPTS** the R&R and **DENIES** the Petition with respect to this claim.

## II. Ground Two - Photo Lineup

Petitioner claims that the trial court improperly admitted evidence of an unduly sugges-tive photo lineup, thereby violating his right to due process. (Petition at 11-17.) Petitioner argues his photograph had a green background while the other photographs had a blue back-ground, and therefore the photo line-up was unduly suggestive. (*Id* at 11.) Respondent argues the photo line-up was not unduly suggestive and the CCA's rejection of this claim was neither an unreasonable application of United States Supreme Court precedent nor an unreasonable determination of the facts. (Answer at 23.)

### A. Legal Standard and Court of Appeal Decision

**Eyewitness Identification.** "[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons*, 390 U.S. at 384. The likelihood of misidentification implicates a defendant's due process rights. *Neil v. Biggers*, 409 U.S. 188, 198 (1972). An identification procedure is suggestive when it "emphasize[s] the focus upon a single individual" thereby increasing the likelihood of misidentification. *United States v. Bagley*, 772 F.2d 482, 493 (9th Cir. 1985).

Even when a pretrial identification procedure is found to be unduly suggestive, an in-court identification is not automatically excluded. *Manson v. Brathwaite*, 432 U.S. 98, 113-14 (1977). An in-court identification after an unduly suggestive pretrial identification is proper where it is reliable under the totality of the circumstances. *Id*. at 113. To determine reliability, a

court considers:  (1) the witness's opportunity to view the perpetrator at the scene; (2) the witness's degree of attention; (3) the witness's certainty at the time of pretrial identification; (4) the accuracy of the witness's prior description of the perpetrator; and (5) the amount of time between the crime and the pretrial identification.  *Id.* at 114; *Bagley*, 772 F.2d at 492.  A witness's identification is sufficiently reliable when there is no "substantial likelihood of misidentification."  *Neil*, 409 U.S. at 201.

The CCA found that the trial court did not err by admitting an eyewitness identification that was tainted by an unduly suggestive photo lineup.  (Lodgment No. 8 at 12 (citing *People v. Johnson* 3 Cal. 4th 1183, 1217 (1992); *People v. Holt*, 28 Cal. App. 3d 343, 349-350 (1972).)[4]

**California Court of Appeal Decision**.  In finding that the photographic line-up was not unduly suggestive, the appellate court noted the following: (1) Killpack's identification of Petitioner in the photo lineup was instantaneous; (2) Petitioner's eyewitness expert testified identifications with extremely short scan durations, like that of Killpack's, tend to be the most accurate identification; (3) the expert testified that identifications tend to be more reliable when the witness has been earlier shown a photo array not containing the defendant and had selected no one as the suspect; and (4) Killpack had been shown a photographic array containing a prostitute who the police suspected might have been involved in the robbery, and he did not identify any of the photographs as showing a person involved in the offense.  (Lodgment No. 8 at 12-13.)

**B.  Legal Analysis**

**Suggestive Effect**.  Petitioner fails to show that the CCA's decision that the photograph photographic lineup was not unduly suggestive was contrary to, or an unreasonable application of, clearly established federal law.   First, Petitioner does not show that the hue differences in the photo lineup had any undue or substantial suggestive effect.  *See United States v. Burdeau*, 168

---

[4]  *Johnson* cites *Braithwaite*, 432 U.S. at 104-07, for the proposition that constitutional reliability depends on whether the identification procedure is unduly suggestive and unnecessary.  *Johnson*, 3 Cal. 4th 1183 at 1216.  *Holt* applies the standard announced in *Simmons*, 390 U.S. at 384, that a line-up will only be unduly suggestive where it gives rise to a substantial likelihood of misidentification.  *Holt*, 28 Cal. App. 3d at 349.

F.3d 352, 357 (9th Cir. 1999) ("We do not agree that the dark hue, facial expression, or placement of the photograph suggested that the witnesses should choose Burdeau's photo-graph.").   While the variant background hues arguably amount to an identifiable difference in appearance, these "[i]nsubstantial differences . . . do not in themselves create an impermissible suggestion that the defendant is the offender." *Burdeau*, 168 F.3d at 357.  Furthermore, on direct examination, defense expert Dr. Scott Fraser was asked whether differences in background color in a photo lineup, similar to those present here, would create a "suggestive" line-up. (Lodgment No. 2, Vol. 6 at1125.)  Fraser declined to state that such conditions amounted to a "suggestive" photo lineup and only testified that such conditions "*could* influence the person looking at them." (*Id*. (emphasis added).)[5]  Here, Petitioner fails to show that the differences between Petitioner's photograph and the other five in the array implied that the witness should identify him as the perpetrator. *Burdeau*, 168 F.3d at 357.

**Likelihood of Misidentification**.  Additionally, assuming *arguendo* the photo lineup was suggestive, Petitioner fails to show that the there was a substantial likelihood of misidentifica-tion. *Neil*, 409 U.S. at 201; *Bagley*, 772 F.2d at 492.  Killpack witnessed Petitioner walk through an area well-lit by overhead lighting on the street corner and security lighting from the building across the street.  (5 RT 429.)  Further, Killpack testified that, while Petitioner strangled him, he saw Petitioner at arms length, placed himself in the mindset to remember Petitioner's face, and would "remember it forever."  (5 RT 439.)

**Conclusion**.  Thus, the CCA's decision that the photographic lineup was not unduly suggestive was not contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts.  Accordingly, the Court **ADOPTS** the R&R and **DENIES** the Petition as to this ground for relief.

**III.  Ground Three - Unreliable DNA Evidence**

---

[5] Fraser testified, "I don't know about the word 'suggestive.'  The research shows that it could influence the person looking at them to make a choice, to focus on it initially, and focus on it more."

1    Petitioner contends the trial court erred in admitting unreliable DNA evidence because the

2    statistical calculations used by the criminalist did not take into account a genetic combination

3    excluding him.  (Petition at 18-26.)

4    **A.  Legal Standard**

5    A state's interpretation of its laws or rules provides no basis for federal habeas corpus

6    relief when no federal constitutional question arises.  *Estelle*, 502 U.S. at 67-68; *see Jammal*,

7    926 F.2d at 919.  However, a violation of *federal* due process rights may give rise to claim for

8    federal habeas corpus relief, notwithstanding that the alleged violation coincides with a

9    determination of state law.  *See Estelle*, 502 U.S. at 67*; McKinney v. Rees*, 993 F.2d 1355, 1378

10   (9th Cir. 1993).  The issue in such cases is "whether the state proceedings satisfied [federal] due

11   process; the presence or absence of a state law violation is largely beside the point."  *Jammal*,

12   926 F.2d at 919-20 (citations omitted).

13   To demonstrate that a state court's admission of evidence violated his federal due process

14   rights, a petitioner must show that the trial court committed an error in admitting the evidence

15   that rendered the trial fundamentally unfair.  *Estelle*, 502 U.S. at 67; *see Maas*, 45 F.3d at 1357

16   ("A state court's procedural or evidentiary ruling is not subject to federal habeas review unless

17   the ruling violates federal law, either by infringing upon a specific federal constitutional or

18   statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by

19   due process."); *Jammal*, 926 F.2d 918.  The Ninth Circuit has stated that federal due process

20   violations can arise from arbitrary rulings of state law.  *See Fetterly*, 997 F.2d at 1300 ("[T]he

21   failure of a state to abide by its own statutory commands may implicate a liberty interest

22   protected by the Fourteenth Amendment against arbitrary deprivation by a state, [and] Ninth

23   Circuit precedent generally supports this proposition.") (citing *Ballard v. Estelle*, 937 F.2d 453

24   (9th Cir. 1991)).

25   In all federal habeas proceedings, a state court must apply the "substantial and injurious

26   effect" analysis set forth in *Brecht* regardless of whether the state appellate court applied the

27   harmless error standard set forth in *Chapman v. California*, 386 U.S. 18, 87 (1967).  *See Pliler*,

28   127 S. Ct. at 2328 ("We hold that in § 2254 proceedings a court must assess the prejudicial

16

1   impact of constitutional error in a state-court criminal trial under the 'substantial and injurious

2   effect' standard set for in *Brecht* . . . .") (citing *Brecht v. Abrahamson*, 507 U.S. 619, 638

3   (1993)); *see also McKinney*, 993 F.2d at 1385.

4   **B. Legal Analysis**

5        **Erroneous Interpretation of State Law**.  Petitioner fails to state a claim for federal

6   habeas corpus relief.  First, Petitioner contends that he is entitled to federal habeas relief on the

7   grounds that the trial court admitted a statistical probability portion of the DNA evidence that

8   did not meet the requirements of *People v. Kelly*, 17 Cal. 3d 24, 30 (1976).[6]  As the trial court

9   and CCA's interpretation of its evidence laws provides no basis for federal habeas corpus relief,

10  *Estelle*, 502 U.S. at 67-68; *see Jammal*, 926 F.2d at 919, the Court is barred from granting

11  federal habeas corpus relief on such grounds.

12       **Prejudicial Effect**.  Petitioner fails to show that the admission of the statistical DNA

13  evidence was "so prejudicial that it rendered the trial fundamentally unfair."  *Maas*, 45 F.3d at

14  1357.  In holding the trial court did not err when ruling the jury could hear the DNA evidence,

15  the CCA correctly noted *inter alia* the following:  (1) the police department used a conservative

16  approach and sets a higher threshold than some other laboratories (lodgment no. 8 at 14); (2) had

17  the police used a lower threshold, it might have been more damaging to the defense than the

18  expert opinion offered (*id*. at 20); (3) the statistical analysis was relevant to show the percentage

19  of the population that could be excluded for not possessing a 14 allele (*id*. at 18-19); and (4) the

20  prejudicial effect was minimized because (a) "it was clearly presented to the jury that this was a

21  limited DNA analysis, complicated by the low levels of DNA and the multiple contributors;"

22  and (b) "the jury was fully apprised that it was not possible to determine whether the 14 allele

23  had been contributed by a homozygote and that it was possible the DNA had been contributed by

24  heterozygotes with 13, 14 and 14, 15 alleles, a situation that would exclude George as a donor

25

26       [6] Within his discussion of the state's alleged failure to properly apply state evidentiary laws with
     regard to the probability portion of the DNA evidence, Petitioner alleges his conviction was obtained as
27   the result of evidence that is insufficient to persuade a properly instructed, reasonable jury of his guilt.
     (Petition at 19 (citing *Jackson v.  Virginia*, 443 U.S. 307).)  For the purpose of discussion herein, this
28   allegation is considered part of Petitioner's Fourth ground for relief and is therefore addressed in
     Ground Four discussion *infra*.

1  (*id.* at 19)."  Based thereon, and absent Petitioner offering any additional support establishing

2  otherwise, Petitioner fails to show that the admission of the DNA statistical evidence was "so

3  prejudicial that it rendered the trial fundamentally unfair."  *Maas*, 45 F.3d at 1357.

4        **Arbitrary Application of State Law**.  Petitioner also fails to show that either the trial

5  court's decision to admit the statistical evidence or the CCA's decision finding no abuse of

6  discretion was an arbitrary application of state law. (Lodgment No. 8 at 20.)[7]   As noted by the

7  Magistrate Judge, the record shows that the Court of Appeal applied state law carefully and

8  thoroughly when finding no abuse of discretion in the trial court's determination that the jury

9  could hear the DNA evidence and determine what weight to give it.  (R&R at 15.)  Relying *inter*

10  *alia* on *People v. Kelly*, 17 Cal.3d 24, 20 (1976), the CCA noted the DNA and statistical analysis

11  in question was generally accepted in the scientific community.  (Lodgment No. 8 at 17-18.)

12  Further, the CCA noted that Petitioner's argument, that under a given scenario he could have

13  been excluded as a contributor, went to the weight of the evidence, not its admissibility.

14  (Lodgment No. 8 at 19.)  Additionally, the CCA found no abuse of discretion by the trial court

15  under a Cal. Evid. Code § 352 analysis.  (Lodgment No. 8 at 17-20.)  This conclusion was

16  supported by the record.  Thus, neither the trial court's decision to admit the statistical evidence

17  nor the CCA's decision thereon could be considered arbitrary.

18        **Conclusion**.  Petitioner fails to show that the CCA's decision that the trial court did not

19  abuse its discretion in admitting the statistical DNA evidence was contrary to or an unreasonable

20  application of clearly established federal law or an unreasonable determination of the facts.  28

21  U.S.C. 2254(d).  Further, Petitioner does not show either that the admission of the statistical

22  DNA evidence rendered his trial fundamentally unfair or that the state-court decisions on the

23  admissibility of said evidence was arbitrary.  *Maas*, 45 F.3d at 1357; *Fetterly*, 997 F.2d at 1300.

24        Accordingly, for the reasons stated above, the Court **ADOPTS** the R&R and **DENIES**

25  the Petition as to this ground for relief.

26  **IV. Ground Four - Insufficient Evidence Corroborated Accomplice's Testimony**

27

28       [7] A more complete recitation of the CCA's analysis and application of state law is set out in the R&R.  (R&R at 13-14.)

Petitioner claims that the testimony of his accomplice, Ledesma, was insufficiently corroborated and therefore could not be used to support the verdicts.  (Petition at 27-37.)  He further contends that Ledesma's testimony was unreliable.  (Objections at 14.)  Additionally, Petitioner argues that without Ledesma's testimony, there was insufficient evidence to support a guilty verdict beyond a reasonable doubt.   (Petition at 27-37.)  Respondent argues that Petitioner fails to state a federal question and moreover that, even assuming error, Petitioner has not demonstrated the testimony had a substantial and injurious effect on the jury's verdict.  (Answer at 20.)

## A.  Legal Standard and Court of Appeal Decision

**Proof Beyond Reasonable Doubt**.  The federal constitutional right to due process "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  When a habeas petitioner claims there was insufficient evidence produced at trial to support a conviction, a federal court determines whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*"  Jackson v. Virginia*, 443 U.S. 301, 319 (1979).  Deference is provided to the trier of facts' weighing of the evidence by reviewing "*all of the evidence* . . . in the light most favorable to the prosecution." *Id.* (emphasis in the original). With the additional layer of deference established by the AEDPA, Petitioner must demonstrate the California Court of Appeal contradicted clearly established Supreme Court precedent by rejecting Petitioner's claim because no rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *Cf. Juan H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005).

**Accomplice Testimony**.  In considering the requirements of procedural due process, use of accomplice testimony is not catalogued with constitutional restrictions.  *United States v. Augenblick*, 393 U.S. 348, 352 (1969).  Accordingly, any failure to satisfy California's require-ment of corroboration for accomplice testimony does not present a federal question unless the accomplice testimony is facially incredible or insubstantial, *United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993), or unless the alleged violation rendered the petitioner's trial

1    fundamentally unfair.  *Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000) (citing *Estelle v.*
2    *McGuire*, 502 U.S. at 72-73).

3          A state violates a criminal defendant's due process right to fundamental fairness if it
4    arbitrarily deprives the defendant of a state law entitlement.[8]  *Hicks v. Oklahoma*, 447 U.S. 343,
5    346 (1980).

6          In all federal habeas proceedings, a state court must apply the "substantial and injurious
7    effect" analysis set forth in *Brecht* regardless of whether the state appellate court applied the
8    harmless error standard set forth in *Chapman v. California*, 386 U.S. 18, 87 (1967).  *See Fry v.*
9    *Pliler*, 127 S. Ct. 2321, 2328 (2007) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993));
10   *see also McKinney v. Rees*, 993 F.2d 1378, 1385 (9th Cir. 1993).

11         **California Court of Appeal Decision**.  The CCA began its analysis of this claim by
12   reiterating that the photographic lineup was not unduly suggestive and Killpack's identification
13   was reliable.  (Lodgment No. 8 at 21.)  The court thereafter found sufficient evidence to
14   corroborate Ledesma's testimony with regard to both the Killpack robbery and assault as well as
15   the Duray robbery and murder.  Moreover, the CCA determined that, even absent Ledesma's
16   testimony or the DNA evidence, there was sufficient evidence to establish Petitioner's identity as
17   the robber and assailant.  (*Id*. at 23-34.)  The court noted Killpack's identification of Petitioner
18   as his attacker, Ledesma's presence at both incidents, Ledesma's relationship to Petitioner, the
19   timing and location of the incidents, and the strong similarities of how the robberies and assaults
20   occurred.  (*Id*.)  Petitioner fails to show he is entitled to federal habeas corpus relief on this
21   claim.

22   **A.  Legal Analysis**

23

24         [8] CAL. PENAL CODE § 1111 states:

25
26         A conviction can not be had upon the testimony of an accomplice unless it be corroborated by
     such other evidence as shall tend to connect the defendant with the commission of the offense; and the
     corroboration is not sufficient if it merely shows the commission of the offense or the circumstances
27   thereof.

28         An accomplice is hereby defined as one who is liable to prosecution for the identical offense
     charged against the defendant on trial in the cause in which the testimony of the accomplice is given.

**Witness Credibility**.  Petitioner's contention that the CCA erred when finding Ledesma's testimony not unreliable is not persuasive.  As noted by the CCA, evidence corroborated Ledesma's testimony pertaining to both the Killpack and Duray incidents.  With regard to the Killpack robbery, the credibility of Ledesma's testimony is supported *inter alia* by the following:  (1) Ledesma testified that Petitioner robbed and assaulted Killpack, and Killpack identified Petitioner in court as the person who robbed and strangled him (3 RT 438, 4 RT 449, 451-52, 601, 603-04); (2) Ledesma testified that she threw the car keys out of the window, and the police located Killpack's keys in the dirt near where his car was parked during the robbery (4 RT 585-86); (3) Ledesma testified that she took everything of value out of Killpack's wallet including the Shell gas card, and Shell gas receipts were located in Petitioner's car (4 RT 610-12); and (4) the transactions from after the robbery and before the card was canceled occurred at gas stations near the Bay Cities Motel, the Motel 6, and Petitioner's work (4 RT 646-51, 655-56, 673).

Further, with regard to the Duray robbery and murder, Ledesma's testimony was supported *inter alia* by the following: (1) Ledesma testified that she threw Duray's keys out the window, and Duray's car keys were located near where his car was parked (4 RT 722); Ledesma testified she heard someone on Duray's cell phone during the attack (4 RT 731-732), and this was corroborated both by phone records and the testimony of Duray's daughter (4 RT 729-30); Ledesma testified that Petitioner kept Duray's wallet after the incident, which was supported in that Petitioner had a new wallet on him when arrested (3 RT 537-38) and Duray's son testified that Duray had recently purchased a new wallet (3 RT 556-57).

Thus, Petitioner fails to show that the state court erred by admitting testimony that was facially incredible or insubstantial.  *Necoechea*, 986 F.2d at 1282.

**Arbitrary Determination**.  Additionally, Petitioner fails to show the trial court or the CCA decision to allow Ledesma's testimony amounted to an arbitrary deprivation of a state law entitlement.  *See Hicks*, 447 U.S. at 346; *see also* CAL. PENAL CODE § 1111.  As noted by the CCA, Ledesma's testimony pertaining to the Killpack robbery was corroborated by Killpack's eyewitness testimony and by the receipts found in Petitioner's car.  (Lodgment No. 8 at 22.) Further, with regard to Duray's murder, the CCA noted Ledesma's testimony was corroborated

1  by the similarities between the Killpack and Duray robberies.  (Lodgment No. 8 at 23.)  Thus,

2  neither the trial court nor the CCA determination regarding the admissibility of Ledesma's

3  testimony could be said to be so arbitrary as to violate due process.

4        **Harmless Error**.  Even if the trial court erred in admitting Ledesma's testimony, any

5  error was likely harmless.  As noted by the CCA, Petitioner could reasonably be connected to the

6  Duray robbery and murder absent Ledesma's testimony based on the similarities to the Killpack

7  robbery and assault.  Killpack solicited a prostitute before the robbery and had reclined his seat

8  while Ledesma was in his car (3 RT 419-22, 426); Duray's body was found in the reclined

9  driver's seat of his vehicle (3 RT 504); both victims were strangled to the point of unconscious-

10  ness with enough force to cause internal bleeding (3 RT 433-34, 437, 6 RT 986-87); both

11  victims' wallets were stolen (3 RT 441, 512-13); DNA evidence connected Ledesma to the

12  condom found on Duray's body (3 RT 511, 5 RT 864-66); and Petitioner was Ledesma's pimp

13  or boyfriend (4 RT 686-88).  Based thereon, Petitioner fails to show that Ledesma's testimony

14  had or reasonably may be taken to have had a substantial and injurious effect on the jury's

15  verdict.  *McKinney*, 993 F.2d at 1386.

16        **Evidence Beyond a Reasonable Doubt**.  Petitioner fails to show that there was insuffi-

17  cient evidence to support a guilty verdict beyond a reasonable doubt.  As reiterated by the CCA,

18  the photographic lineup was not unduly suggestive and Killpack's identification was reliable.

19  (Lodgment No. 8 at 21.)[9]  Additionally, as discussed above, Ledesma's testimony was amply

20  corroborated by other evidence.  Based on the record, Petitioner cannot establish that, "after

21  viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

22

---

23      [9] Petitioner asks the court to "really look at the ten fingerprints" taken from Killpack's

24  vehicle that do not match his own.  (Objections at 16.)  The fingerprints taken from Killpack's
   car by police did not match Petitioner's (*id*. at 552), and the only prints taken from the Duray

25  vehicle were Duray's (*id*. at 553).  However, fingerprints recovered from Killpack's vehicle did
   not come back to *any* particular person, including Killpack himself.  (*Id*. at 554.)  Further, the

26  jury heard testimony from homicide detective John Young that this type of absence of traceable
   fingerprints was not unusual, and that because there are so many variables to obtaining a

27  fingerprint, one is "lucky" to find one.  (*Id*.)  Thus, the jury could reasonably infer from the
   evidence that, even if Petitioner did touch the area Killpack pointed out to police, said touching

28  was unlikely to yield any traceable fingerprints.  As such, the fingerprint evidence to which
   Petitioner points would  have little effect on Killpack's credibility or overall exculpatory value,
   especially in light of the considerable amount of evidence weighing against Petitioner.

07cv2215 J (POR)

1   could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443

2   U.S. at 319.

3     **Conclusion**.  Petitioner fails to show that Ledesma's testimony was facially incredible or

4   insubstantial, or that its admission rendered his trial fundamentally unfair.  *Laboa*, 224 F.3d at

5   979; *Necoechea*, 986 F.2d at 1282.  Further, Petitioner does not show the CCA decision was

6   contrary to, or involved an unreasonable application of clearly established federal law, or was

7   based on an unreasonable determination of the facts.  Furthermore,  assuming *arguendo* the

8   admission of the accomplice testimony was erroneous, Petitioner does not show that Ledesma's

9   testimony had a substantial and injurious effect on the jury's verdict.  *Brecht*, 507 U.S. at 638.

10   Accordingly, the Court **ADOPTS** the R&R and **DENIES** the Petition with respect to these

11   grounds for relief.

12   **V.  Ground Five - Cumulative Error**

13     Petitioner asserts the cumulative effect of the evidentiary errors warrants reversal.

14   (Objections at 19.)  In cases where there are a number of trial errors, the court may look at "the

15   overall effect of all the errors in the context of the evidence introduced at trial against the

16   defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting *United*

17   *States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988)). "In other words, 'errors that might not

18   be so prejudicial as to amount to a deprivation of due process when considered alone, may

19   cumulatively produce a trial setting that is fundamentally unfair.'" *Alcala v. Woodford*, 334 F.3d

20   862, 883 (9th Cir. 2003) (quoting *Thomas v. Hubbard*, 273 F.3d 1164, 1180 (9th Cir. 2001)).

21     The Ninth Circuit has explained "[c]umulative error applies where, 'although no single

22   trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative

23   effect of multiple errors may still prejudice a defendant.'" *Mancuso v. Olivarez*, 292 F.3d 939,

24   957 (9th Cir. 2002) (quoting *Frederick*, 78 F.3d at 1381).  Therefore, in conducting a cumulative

25   error analysis, a court must look at the combined effect of each error that occurred during a

26   petitioner's trial.  Because there are no errors to accumulate which amount to a denial of due

27   process, Petitioner's cumulative error claim fails.  *See Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir.

28   1999).  Accordingly, this Court **FINDS** that the overall effect of all the errors in the context of

23

1   the evidence introduced at trial against Petitioner did not result in a fundamentally unfair trial.

2   *See Frederick*, 78 F.3d at 1381.  Therefore, this Court **DENIES** relief based on Petitioner's

3   claim that the cumulative effect of the errors amounted to a fundamentally unfair trial.

4   **VI.  Motion for Appointment of Counsel**

5         Petitioner requests appointment of counsel to represent him in this matter pursuant to 18

6   U.S.C.A. § 3006A.  [Doc. No. 23.]  Petitioner argues the Court should grant his request for

7   counsel because "it appears that [he] does not have a good grasp of the legal procedures and

8   issues in this case," and thereafter recites his five grounds of relief in the Petition.  (*Id*. at 2.)  He

9   further contends the Court should grant his request for counsel because he has requested the

10  Court conduct an evidentiary hearing in order to develop facts in support of his claims.  (*Id*.)

11  **A.  Legal Standard**

12        The Sixth Amendment right to counsel does not extend to federal habeas corpus actions

13  by state prisoners.  *McCleskey v. Zant*, 499 U.S. 467, 495 (1991);  *Chaney v. Lewis*, 801 F.2d

14  1191, 1196 (9th Cir. 1986);  *Knaubert v. Goldsmith*, 791 F.2d 722, 728 (9th Cir. 1986).  In the

15  Ninth Circuit, "[i]ndigent state prisoners applying for habeas relief are not entitled to appointed

16  counsel unless the circumstances of a particular case indicate that appointed counsel is necessary

17  to prevent due process violations."  *Chaney*, 801 F.2d at 1196;  *Knaubert*, 791 F.2d at 728-29.  A

18  due process violation may occur in the absence of counsel if the issues involved are too complex

19  for the petitioner.  In addition, the appointment of counsel may be necessary if the petitioner has

20  such limited education that he or she is incapable of presenting his or her claims.  *Hawkins v.*

21  *Bennet*, 423 F.2d 948, 950 (8th Cir. 1970).

22        Financially eligible habeas petitioners seeking relief pursuant to 28 U.S.C. § 2254 may

23  obtain representation whenever the court "determines that the interests of justice so require."  18

24  U.S.C. § 3006A(a)(2)(B); *Terrovona v. Kincheloe*, 912 F.2d 1176, 1181 (9th Cir. 1990); *Bashor*

25  *v. Risley*, 730 F.2d 1228, 1234 (9th Cir. 1984).

26        The interests of justice require appointment of counsel when the court conducts an

27  evidentiary hearing on the petition.  *Terrovona*, 912 F.2d at 1177; *Knaubert*, 791 F.2d at 728;

28  *Abdullah v. Norris*, 18 F.3d 571, 573 (8th Cir. 1994); Rule 8(c), 28 U.S.C. foll. § 2254.  The

1  appointment of counsel is discretionary when no evidentiary hearing is necessary. *Terrovona*,

2  912 F.2d at 1177; *Knaubert*, 791 F.2d at 728; *Abdullah*, 18 F.3d at 573.

3  **B.  Legal Analysis**

4          Based on a review of Petitioner's filings in this case, and absent Petitioner offering

5  additional support showing otherwise, Petitioner cannot establish that the appointment of

6  counsel is necessary to prevent a due process violation. *Chaney*, 801 F.2d at 1196; *Knaubert*,

7  791 F.2d at 728-29.  Petitioner argues that he "does not have a good grasp of the legal proce-

8  dures and issues in this case," but nowhere does he contend he lacks the requisite education or

9  capacity to present his claims. *Hawkins*, 423 F.2d at 950.  Nor does he argue that the issues

10  involved are too complex for him to comprehend; the record suggests otherwise. (*See, e.g.*,

11  Traverse at 10 (in response to Respondent's contention that his First ground for relief is based on

12  an interpretation of state law, Petitioner aptly points out his argument relies on Ninth Circuit

13  precedent of *McKinney v. Rees*, 993 F.2d 1355 (9th Cir. 1993).  Here, the mere absence of "a

14  good grasp of the legal procedures and issues in this case" alone is insufficient to show the

15  denial of counsel is necessary to prevent due process violations. *Chaney*, 801 F.2d at 1196;

16  *Knaubert*, 791 F.2d at 728-29.

17          Furthermore, despite Petitioner's contention otherwise, no record was discovered of

18  Petitioner's request for an evidentiary hearing prior to this motion.  Assuming Petitioner had

19  made such a request, for the reasons discussed above Petitioners' claims are without merit and

20  thus an evidentiary hearing is unwarranted. *See Schriro v. Landrigan*, 127 S.Ct. 1933, 1940

21  (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas

22  relief, a district court is not required to hold an evidentiary hearing.")  Therefore, Petitioner fails

23  to establish that the interests of justice require appointment of counsel.  18 U.S.C.

24  § 3006A(a)(2)(B); *Terrovona v. Kincheloe*, 912 F.2d 1176, 1181 (9th Cir. 1990); *Bashor v.*

25  *Risley*, 730 F.2d 1228, 1234 (9th Cir. 1984).

26          Accordingly, for the above-stated reasons, the Court **DENIES** Petitioner's request for an

27  appointment of counsel**.**

28                                      *Conclusion*

1         For the reasons above, the Court **ADOPTS** the R&R, **DENIES** Petitioner's Writ of

2    Habeas Corpus pursuant to 28 U.S.C. § 2254 in its entirety, and **DENIES** Petitioner's request for

3    appointment of counsel.

4         **IT IS SO ORDERED.**

5

6    DATED:   September 24, 2009

7                                                                                                  

8                                          HON. NAPOLEON A. JONES, JR.
                                           United States District Judge

9    cc:  Magistrate Judge Porter
           All Counsel of Record

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07cv2215 J (POR)